**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

THE THOMAS L. PEARSON AND THE
PEARSON FAMILY MEMBERS
FOUNDATION,

      Plaintiff and Counterclaim
      Defendant,

v.

THE UNIVERSITY OF CHICAGO,

      Defendant, Counterclaimant,
      and Third-Party Plaintiff,

v.

THOMAS L. PEARSON,

      Third-Party Defendant.

Case No. 18-CV-99-GKF-FHM

## OPINION AND ORDER

Before the court is The University of Chicago's Rule 12(b)(6) Motion to Dismiss the Plaintiff's Complaint [Doc. No. 27]. For the reasons set forth below, the motion is granted in part and denied in part.

### I.    Background

This case involves a Grant Agreement executed April 3, 2015, by and among the University of Chicago, the Foundation, and Thomas L. Pearson. Under the terms of the Agreement, the University was to create a new institute to be known as The Pearson Institute for the Study and Resolution of Global Conflicts (the "Pearson Institute") and The Pearson Global Forum (the "Pearson Forum"), a program for the purpose of conducting conferences, awards, and events advocating the application of the Pearson Institute's research findings and bringing together leading scholars and policy makers from around the world to exchange ideas and to

maximize the potential to prevent and resolve violent conflicts. The Foundation alleges the following in its Complaint:

Under the terms of the Grant Agreement, the University was obligated to perform certain tasks that were fundamental to the purpose of the Foundation's grant and to the establishment and operation of the Pearson Institute and the Pearson Forum, but the University failed to perform those obligations in a number of respects. [Doc. No. 2, p. 5, ¶ 16].

First, the University was obligated to appoint an Institute Director for the Institute by September 1, 2016, with a one-year cure period ending September 1, 2017. [*Id.*, pp. 5–6, ¶ 17]. The Institute Director was to be the Institute's senior leadership and management executive, directing the day-to-day operations of the Institute. [*Id.*, p. 6, ¶ 18]. The University has failed to appoint an Institute Director. [*Id.*, p. 6, ¶ 19]. In June 2016, the University appointed Professor James Robinson as "Faculty Director," stating in a corresponding press release that the position was "newly created." [*Id.*, p. 6, ¶ 20]. Professor Robinson is not tasked with the "day-to-day operations" and management role required of an Institute Director, and Robinson's status as a Professor exempts him from administrative/management duties. [*Id.*, p. 6, ¶ 21]. The University specifically advised the Pearsons that Professor Robinson did not have the skill set or interest to fulfill the administrative, management and fund-raising responsibilities, among others, required for the Institute Director position. [*Id.*, p. 6, ¶ 22]. On August 29–30, 2017, just prior to the expiration of the cure period on September 1, 2017, the University secretly altered the Institute's website, without notice to the Pearsons or the Foundation, to change Professor Robinson's title from Faculty Director to Institute Director. [*Id.*, p. 6, ¶ 23]. Although the University was required to keep the Foundation informed regarding the appointment of an Institute Director, the University deliberately concealed Professor Robinson's retitling. [*Id.*, p. 7, ¶¶ 24–25].

Second, the Grant Agreement required the University to fill four chaired faculty positions. [*Id.*, p. 7, ¶ 28]. The parties understood that funding chaired professorships was essential to attract the caliber of distinguished scholars with the profile and reputation desired to establish the Institute as a quickly emerging world class entity. [*Id.*, pp. 7–8, ¶ 29]. The University has not appointed the final faculty chair, and has filled two of the other positions with junior, non-tenured professors from academic institutions that are ranked below the University in national academic standings. [*Id.*, p. 8, ¶ 30]. These non-tenured professors were given their chaired professorships at the Pearson Institute because they are protégés and former students of Professor Robinson. [*Id.*, p. 8, ¶¶ 31–32]. Although the Agreement requires the University to keep the Foundation informed regarding the recruitment of chaired professors, the University did not disclose the pre-existing relationships with Professor Robinson. [*Id.*, p. 8, ¶ 33].

Third, the University is required to hold the first annual Pearson Forum by October 31, 2018, with a two-year cure period ending October 31, 2020. [*Id.*, p. 9, ¶ 36]. The University stated in March 2017 that it would not be able to hold the Pearson Forum by October 31, 2018, and that it had not planned or done the necessary preparatory work to hold the Forum by that date. [*Id.*, p. 9, ¶ 37]. Instead, the University stated it intended to meet its obligation by involving the Institute in the 2018 Irish Catholic Bishops World Meeting of Families Congress. [*Id.*, p. 9, ¶ 37]. The Foundation alleges that participation in a conference organized by another organization, and which has its own agenda and purpose, is inconsistent with the University's obligation under the Agreement. [*Id.*, p. 9, ¶¶ 38–39].

Fourth, the Grant Agreement obligated the University to produce and deliver to the Pearsons by March 31, 2017, the Institute's first definitive operating plan and budget. [*Id.*, p. 9, ¶ 40]. The University delivered a document purporting to be the required operating plan and

budget, but the document was replete with material errors and did not meet intended standards of quality or professionalism, nor was it fit for its intended use. [*Id.*, p. 9, ¶ 41]. The University subsequently delivered a revised version, which was similarly unacceptable. [*Id.*, p. 9–10, ¶ 41]. In a footnote, the University advised the Foundation for the first time that the University believed it had the right to charge to the Institute many millions of dollars of operating expenses of the University's Harris School of Public Policy Studies, of which the Pearson Institute and the Pearson Forum are parts. [*Id.*, p. 10, ¶ 42]. These operating expenses could result in the Institute's budget having to absorb an increase in expenses of approximately 50%, which would either cause the shutdown of the Institute and Forum, or would require the Pearsons and the Foundation to make enormous additional contributions in order to preserve their investment and maintain the viability of the Institute and Forum. [*Id.*, p. 10, ¶ 43]. The Foundation would not have agreed to the Grant Agreement if the University had disclosed its intent to reserve to itself the possibility of charging these additional Harris School expenses to the Institute. [*Id.*, p. 10, ¶ 44].

Fifth, the University was obligated to administer the awarding of a specified number of Pearson Fellow and Pearson Scholar scholarships. The scholarships were intended to be awarded pursuant to a discernable standard that would recognize exceptionally accomplished graduate level students who had shown commitment to the study of conflict resolution. [*Id.*, p. 10, ¶ 45]. The University awarded these scholarships without discernable, objective standards, and unilaterally altered the number of scholarships it awards annually. [*Id.*, p. 11, ¶¶ 46–47].

Sixth, the Grant Agreement required the University to "create" and "develop" an academic curriculum for the Institute relating to the study of global conflicts resolution. [*Id.*, p. 11, ¶ 48]. The University did not meet this obligation, but instead substantially relied on course

materials already developed at other institutions or taught previously at the University, and which had little or no connection to the Institute's mission. [*Id.*, p. 11, ¶ 49].

Seventh, the Foundation alleges that the University has failed to provide promised leadership for the Pearson Institute from within the University's senior management. From late October or early November of 2014, the Foundation's primary point of contact with the University was Daniel Diermeier, the Dean of the Harris School. [*Id.*, p. 11, ¶ 53]. In March 2016, only six months after the announcement of the $100 million grant, the University announced that, effective July 1, 2016, Dean Diermeier would become Provost of the University. [*Id.*, p. 12, ¶ 54]. The University advised the Foundation the Dean's position at the Harris School would be filled on an interim basis by a faculty member of the Harris School. In response, the Pearsons expressed that it was unacceptable for an interim dean to serve as the primary contact for communications with and management of the University's responsibilities and obligations under the Grant Agreement. [*Id.*, p. 12, ¶ 55]. The parties then agreed, subject to reducing their understanding to writing in a new amended and restated Grant Agreement, that Dean Diermeier, as he transitioned into the Provost position, would retain primary responsibility for communication and sole management responsibility on behalf of the University for the operation and welfare of the Institute, and for the proper stewardship of the Foundation's grant. [*Id.*, p. 12, ¶ 56]. Since that time, the Foundation has repeatedly requested the Grant Agreement be amended and restated in its entirety to reflect the parties' agreement and understanding regarding Provost Diermeier's continuing role and responsibilities, but the University has refused to provide the Foundation with information required to modify the Agreement and has failed to amend and restate the it. [*Id.*, pp. 12–13, ¶¶ 57–58]. Provost Diermeier has refused and failed to

adequately discharge his responsibilities to properly administer and manage the Institute and steward the Foundation's grant. [*Id.*, p. 13, ¶ 59].

The Foundation also alleges the University breached a variety of additional obligations under the Grant Agreement, including obligations: to provide annual reports to the Foundation; to hire a Grants Administrator by June 30, 2016; to develop strategies for additional fundraising by June 30, 2017; to have the Institute Director and the Dean of the Harris School meet at least semi-annually with the Pearson family; to keep the Pearson family appraised of, and extend invitations to the Pearson family for, events and activities at the Institute; to report to the Foundation within 30 days of discovery any failure or breach of certain specified material obligations under the Grant Agreement; to launch an Institute website by September 1, 2016; and to create a visual identity and branding plan for the Institute and Forum by June 2016. [*Id.*, pp. 13–15, ¶¶ 62–77]. The Foundation also alleges the University has failed to act in good faith. [*Id.*, pp. 15–16, ¶¶ 78–82].

The Foundation asserts five causes of action in its Complaint: (I) breach of contract; (II) breach of fiduciary duty; (III) fraudulent concealment; (IV) breach of the duty of good faith and fair dealing; and (V) anticipatory repudiation. [*Id.*, pp. 16–20, ¶¶ 83–115].

## II.  Documents Considered

In support of its motion to dismiss, the University asks the court to consider the Grant Agreement, as well as 2015–2016 and 2016–2017 Annual Reports. When ruling on a motion to dismiss for failure to state a claim, the court must exclude matters outside the pleadings. FED. R. CIV. P. 12(d). However, the court can "consider documents attached to or referenced in the complaint if they 'are central to the plaintiff's claim and the parties do not dispute [their] authenticity.'" *Brokers' Choice of America, Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103

(10th Cir. 2017) (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)). Here, the Grant Agreement is properly before the court, because it was filed as an exhibit to, and referenced in, the Complaint, and because it is central to the Foundation's claims. [Doc. Nos. 5–6; 21–22]. However, the court will not consider the Annual Reports at this stage of the litigation, because they were not attached to the Complaint and, though they are referenced in ¶ 27, they are not central to the Foundation's claims, as the Foundation could have plead its claims without reference to them. *See Maher v. Oklahoma*, 165 F. Supp. 3d 1089, 1094 (W.D. Okla. 2016) (holding a written statement quoted in plaintiff's complaint was not central because plaintiff could have pled his case without any mention of it).

## III.   Applicable Law

The Grant Agreement provides "[t]his agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to the conflicts of laws principles thereof." [Doc. No. 6, p. 32, § 10.4]. "In cases like this one, where subject matter jurisdiction is based on diversity of citizenship, federal courts must look to the forum state's choice-of-law rules to determine the effect of a contractual choice-of-law clause." *MidAmerica Constr. Mgmt., Inc. v. MasTec North America, Inc.*, 436 F.3d 1257, 1260 (10th Cir. 2006). "Under Oklahoma law, a contract will be governed by the laws of the state where the contract was entered into *unless otherwise agreed* and unless contrary to the law or public policy of the state where enforcement of the contract is sought." *Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1236 (10th Cir. 2007) (emphasis added). Here, both parties agree the Grant Agreement's choice-of-law clause applies and that New York law governs the Foundation's claims. *See* [Doc. Nos. 2, p. 3, ¶ 11; 27, p. 11]. The court will therefore apply New York's substantive law and federal

procedural law.  *Racher v. Westlake Nursing Home Ltd. P'ship*, 871 F.3d 1152, 1162 (10th Cir. 2017).

## IV.    Federal Pleading Standard

In considering a motion to dismiss under FED. R. CIV. P. 12(b)(6), a court must determine whether the plaintiff has stated a claim upon which relief can be granted.  A complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The plausibility requirement "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence" of the conduct necessary to make out the claim.  *Id.* at 556.  "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.* at 555 (quotations omitted).  The court "must determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed."  *Lane v. Simon*, 495 F.3d 1182, 1186 (10th Cir. 2007) (quoting *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007)).

## V.    Analysis

As previously stated, the Foundation asserts five counts, all of which the University moves to dismiss.  The court will separately consider each count.

### a.    Breach of Contract

"To state a claim for breach of contract under New York law, 'the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages.'"  *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)).  The

University argues the Foundation has failed to sufficiently allege actionable breaches of the Grant Agreement, and/or damages.

i.      Actionable Breaches

Under the Grant Agreement, the University has Founding Obligations, which relate to the establishment of the Institute and Forum, and Maintenance Obligations, which relate to the ongoing operation of the Institute and Forum.   The University's Founding Obligations (and corresponding due dates and cure periods) are listed in Exhibit A to the Agreement:

**Exhibit A**

Founding Obligations

| University Founding Obligation | Due Date | Cure Period |
| --- | --- | --- |
| Appoint first chaired faculty (see Section 3.4) | September 1, 2016 | September 2, 2016 - September 1, 2018 |
| Appoint first Institute Director (see Section 3.2) | September 1, 2016 | September 2, 2016 - September 1, 2017 |
| Open temporary space at 1155 E. 60th Street (see Section 3.6(a)) | September 1, 2016 | September 2, 2016 - March 1, 2017 |
| Create first definitive operating plan and budget (see Sections 3.1(a) and 3.1(d)) | March 31, 2017 | April 1, 2017 - March 31, 2018 |
| Create Advisory Council and appoint Donor Members (see Section 3.5) | June 30, 2017 | July 1, 2017 – June 30, 2018 |
| Appoint second and third chaired faculty (see Section 3.4) | September 1, 2017 | September 2, 2017 – September 1, 2019 |
| Hold first Pearson Forum | October 31, 2018 | November 1, 2018 – October 31, 2020 |
| Open permanent space for Pearson Institute in Keller Center (see Section 3.6(b) | January 31, 2019 | February 1, 2019 – January 31, 2020 |

[Doc. No. 6, p. 39, Exhibit A].  Similarly, the University's Maintenance Obligations are listed in Exhibit B:

**Exhibit B**

Maintenance Obligations

| University Maintenance Obligation | Cure Period |
|---|---|
| • Keep the Institute Director (as defined in Section 3.2) position filled, except for good reason discussed in advance with the Donor | 2 years |
| • Keep all four faculty chair positions filled, absent good reason discussed in advance with the Donor | 2 years |
| • Hold the Pearson Forum as provided in Exhibit C | 1 year |
| • Maintain Pearson Institute and Pearson Forum offices in Keller Center space, or provide notice to the Donor of the need for space that cannot be accommodated in Keller, in accordance with Section 3.5 of the Agreement | 1 year |
| • Provide agreed-upon annual reports to the Donor in accordance with Article 5 of the Agreement | 6 months |
| • Cure Casualty Event | 3 years |

[*Id.*, p. 40, Exhibit B]. In addition to these Founding and Maintenance Obligations, the University agreed to timely establish and conduct staffing, programs, and operations for the Institute and the Forum in accordance with an "Initial Operating Plan," attached as Exhibit C to the Agreement. [*Id.*, pp. 41–46, Exhibit C].

The Grant Agreement also contains a provision protecting the University of Chicago's academic independence. Section 3.5(b) provides:

> The [Foundation] acknowledges and agrees that neither it, nor any member of the Pearson Family, nor the Advisory Council, nor any Donor Members, will have any role or authority with respect to making appointments (academic or professional) to the Pearson Institute or the Pearson Forum, setting the research agenda of the Pearson Institute, or the selection of topics or presenters for the Pearson Forum.

[Doc. No. 6, pp. 15–16].

The Foundation alleges the University breached its Founding Obligations to appoint an Institute Director, appoint faculty chairs, hold the first Pearson Forum, and create the first definitive operating plan and budget. It alleges the University breached its Maintenance Obligation to provide the agreed-upon annual reports to the Foundation. It alleges the University

breached its additional obligations, largely found in the Initial Operating Plan, including to award fellowships and scholarships, create and develop curriculum, retain University Provost Daniel Diermeier as the Foundation's primary contact, have the Institute Director and the Dean of the Harris School meet semi-annually with the Foundation, invite the Pearson family to Institute events, hire a Grants Administrator, develop strategies for additional fundraising, timely launch an Institute website, create a visual identity and branding plan for the Institute and Forum, and report known breaches of Founding and Maintenance obligations.

### 1.     Whether the Alleged Breaches are Actionable

The University argues many of the alleged breaches are not actionable, because the cure periods have not expired.  The Foundation responds that, under the terms of the Grant Agreement, the cure periods apply only if the Foundation elects to terminate the contract, which it has not done.  These arguments turn on different interpretations of the Grant Agreement's remedies provisions.

"Under New York law, the initial interpretation of a contract is a matter of law for the court to decide.  Where a contract is unambiguous, a court . . . interprets the plain language of the agreement as a matter of law." *Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 328 (2010) (quoting *Kamfar v. New World Rest. Grp., Inc.*, 347 F. Supp 2d. 38, 48–49 (S.D.N.Y. 2004)).  "On a motion to dismiss, the [c]ourt may resolve issues of contract interpretation . . ., but must resolve all ambiguities in the contract in [p]laintiff's favor." *Id.* (citing *Banks v. Corr. Servs. Corp.*, 475 F. Supp. 2d 189, 195 (E.D.N.Y. 2007).  "However, the mere fact that the [p]arties disagree on the proper interpretation of the contract does not render the contractual language ambiguous." *Id.* at 329 (citing *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990)).  "Contract language is not ambiguous if it has a 'definite and precise

meaning, unattended by a danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.* (quoting *Hunt Ltd. V. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)).

The disputed provisions are §§ 6.2, 6.4, and 6.6:

6.2 <u>Termination by the [Foundation]</u>.   The [Foundation] may terminate this Agreement if:

 (a) the University (i) has failed to meet any Founding Obligation by the "Due Date" specified for such Founding Obligations in <u>Exhibit A</u> . . .  and (ii) has failed to cure such failures in all material respects within the "Cure Period" specified for such Founding Obligations in <u>Exhibit A</u>;

 (b) at any time before March 1, 2030, the University has breached any Maintenance Obligation and has failed to cure such breach in all material respects within the "Cure Period" specified for such Maintenance Obligations in <u>Exhibit B</u> . . .; or

 (c) the University has breached in any material respect any of its other obligations contained in this Agreement, and has failed to cure in all material respects such breach within one (1) year . . . .

6.4 <u>Rights of Reversion</u>.  Upon termination of this Agreement pursuant to Section 6.2(a) or 6.2(b) . . ., and only upon termination of this Agreement pursuant to Section 6.2(a) or 6.2(b) . . ., the [Foundation] shall have the following rights of reversion:

 (a) Upon termination of this Agreement pursuant to Section 6.2(a) . . .:

  (1) the University shall refund to the [Foundation], all amounts paid to the University under this Agreement . . ., such refund and termination being the [Foundation's] sole and exclusive remedy for the University's failure . . .; and

  (2) neither party hereto shall have any further rights or obligations under this Agreement . . . .

 (b) Upon termination of this Agreement pursuant to Section 6.2(b):

  (1) the University shall refund to the [Foundation] all amounts paid to the University under this Agreement . . ., but less the amount of such funds previously expended by the University in support of the Pearson Institute or the Pearson Forum, such termination and

refund being the Donor's sole and exclusive remedy for the University's failure . . .; and

(2) neither party hereto shall have any further rights or obligations under this Agreement . . . .

6.6    Ongoing Obligations.  The University acknowledges that after the expiration of the time periods specified in Sections 6.2(a) [and] 6.2(b) . . . for the exercise by the [Foundation] of its reversion rights, the University will continue to use the Pearson Fund to support the Pearson Institute and the Pearson Forum in accordance with applicable law, and after the expiration of such time periods, the exclusive remedy provisions in Section 6.4 . . . shall cease to be effective and the [Foundation] will be entitled to any remedies available to it under applicable law arising from the University's breach of its obligations.

[Doc. No. 6, pp. 24–25, 27–28].

The University contends that § 6.4 conditions the Foundation's right to a refund of contributions "[u]pon termination . . . and only upon termination" pursuant to §§ 6.2(a) and 6.2(b), and that § 6.6 "confirms that only after the expiration of [the applicable cure period] may the Foundation pursue 'any remedies available to it under applicable law arising from the University's breach of its obligations.'"  [Doc. No. 37, p. 4] (quoting the Grant Agreement, § 6.6).

In response, the Foundation argues § 6.2 creates an optional right to terminate, and § 6.4 states the Foundation's remedies *in the event of termination*.  Absent contrary language, however, the Foundation argues termination should not be construed as its exclusive remedy.  [Doc. No. 35, pp. 19–20].  Here, the Foundation is not seeking termination, and therefore argues these termination provisions simply do not apply.

Although the parties disagree about the proper interpretation of §§ 6.2, 6.4, and 6.6, the disputed portions are not ambiguous.  Section 6.2 gives the Foundation the right to terminate the Grant Agreement in the event the University breaches its obligations and fails to cure.  Section 6.4 provides that a refund of all amounts paid to the University is the Foundation's sole and

exclusive remedy upon termination pursuant to §§ 6.2(a) or 6.2(b).  Section 6.6 states that after the expiration of the time periods specified in §§ 6.2(a) and 6.2(b) for the exercise of the Foundation's rights of reversion the exclusive remedy provisions in § 6.4 cease to be effective.

The court agrees with the Foundation that termination pursuant to § 6.2 is not its exclusive remedy for breach of the University's obligations.  "Under New York Law, contractual remedies are deemed to be nonexclusive absent some indication of contrary intent," *Inter-American Dev. Bank v. Nextg Telecom Ltd.*, 503 F. Supp. 2d 687, 698 (S.D.N.Y. 2007), and §§ 6.2, 6.4, and 6.6 do not indicate an intent to make termination the Foundation's exclusive remedy.[1]  The alleged breaches are actionable even though their cure periods have not expired, because the cure periods apply only if the Foundation elects to terminate the contract.

### 2. Whether the Allegations State a Claim for Breach

#### a. Founding Obligations

*Institute Director.*  Section 3.2(a) of the Grant Agreement provides:

[t]he University shall . . . appoint a faculty director to direct the day-to-day operations of the Pearson Institute (the "Institute Director") . . . .  The Institute Director shall be selected . . . to hold a named professorship in the Harris School to be designated as the "The Reverend Dr. Richard L. Pearson Professor of Global Conflicts Studies and Faculty Director, The Pearson Institute for the Study of Global Conflicts Studies and Faculty Director."  The Institute Director shall be a prominent faculty member with an established record of published scholarship that demonstrates his or her commitment to issues pertinent to the Mission and to the work of the Pearson Institute.

[Doc. No. 6, p. 13].  The Foundation alleges that the University has failed to appoint an Institute Director.  [Doc. No. 2, p. 6, ¶ 19].  It alleges that, in June of 2016, the University appointed

---

[1]  Nor does the University actually argue termination is the Foundation's exclusive remedy.  *See* [Doc. No. 37, p. 5] ("[W]hether section 6.2's termination provisions are properly described as [optional and permissive] is irrelevant.").  Rather, much of the University's argument appears to be directed toward whether the Foundation can seek a refund of contributions without electing to terminate the Grant Agreement.  The court need not decide that issue at this juncture, as it goes to the Foundation's available remedies, not to whether the alleged breaches are actionable.

Professor James Robinson as "Faculty Director," but that Faculty Director Robinson is not tasked with, and, by the University's alleged admission, is not suited for, the day-to-day operations and management role required by an Institute Director.  [*Id.*, p. 6, ¶¶ 20–21].  Rather, his "responsibilities and duties [are] separate and distinct from those of the Institute Director." [*Id.*, p. 6, ¶ 22].  According to the Foundation, Faculty Director Robinson's status as a University Professor specifically exempts him from administrative and management duties or obligations, and University representatives specifically advised the Pearsons that Professor Robinson did not have the skill set or interest to fulfill the administrative, management, and fundraising responsibilities, among others, required for the Institute Director position.  [*Id.*, p. 6, ¶¶ 21–22].

The University argues these allegations fail to state a claim for breach, because § 3.2(a) uses the terms "Faculty Director" and "Institute Director" interchangeably.  But the Foundation is not claiming the University simply mistitled Professor Robinson's position; rather, the Foundation alleges that, regardless of how he is titled, Professor Robinson's job responsibilities are "separate and distinct from those of the Institute Director," and do not include "direct[ing] the day-to-day operations of the Pearson Institute" as required by the Grant Agreement.  Taken as true, the Foundation states a claim for breach of § 3.2(a).

*Faculty Chairs.*  Section 3.4 requires "the University [to] establish three (3) named professorships in the Harris School (the "Faculty Chairs") . . . ."  [Doc. No. 6, p. 14].  Section 5.1 requires "the University [to] keep the [Foundation] reasonably informed of its progress in recruiting the initial and any subsequent . . . Faculty Chairs in the Pearson Institute."  [*Id.*, p. 23].  The Foundation alleges that the University has not appointed the final faculty chair or kept the Foundation reasonably informed of its efforts to do so, and has filled the other two positions with junior, non-tenured professors from lesser academic institutions.  [Doc. No. 2, p. 8, ¶ 30].  The

Foundation further alleges these non-tenured professors were hired because they are protégés and former students of Professor Robinson, and that the University did not inform the Foundation of the non-tenured professors' pre-existing relationships with Professor Robinson. [*Id.*, p. 8, ¶¶ 31–33].

As to the two positions already filled, the University contends § 3.5(b) expressly precludes the Foundation from challenging their qualifications. [Doc. No. 6, pp. 14–15]. The University also argues disclosure of their status as Robinson's former students was not required by § 5.1's mandate that it keep the Foundation "reasonably informed about its progress in recruiting." Regardless, the Foundation's allegations that the University has not appointed the final faculty chair and has not kept the Foundation reasonably informed of its efforts to do so adequately state claims for breach of §§ 3.4 and 5.1. The University's only argument to the contrary is that its failure to appoint the final faculty chair is not actionable because the cure period has not run. However, for the reasons previously stated, the cure periods apply only if the Foundation elects to terminate the contract.

*First Pearson Forum*. The Grant Agreement requires the University to hold the first Pearson Forum by October 31, 2018. [Doc. No. 6, p. 39]. The Foundation alleges the University has stated it will not be able to hold the Pearson Forum by that date. [Doc. No. 2, p. 9, ¶ 37]. This allegation adequately states a claim for breach. The University's argument to the contrary—that the cure period for holding the first Pearson Forum has not expired yet—is again foreclosed because the cure periods apply only if the Foundation elects to terminate the contract.

*Operating Plan and Budget*. The Grant Agreement obligates the University to produce and deliver the Institute's first definitive operating plan and budget by March 31, 2017. [Doc. No. 6, p. 39]. The Foundation alleges the University delivered a document, which purported to

be the required operating plan and budget, but that the document was replete with material errors, did not meet intended standards of quality or professionalism, and was not fit for its intended use. [Doc. No. 2, p. 9, ¶ 41]. The University allegedly made at least one unsuccessful attempt to revise the document. [*Id.*, p. 9–10, ¶ 41].

The University contends these allegations fail for vagueness and because the Grant Agreement does not specify the budget's required content. Upon review, the court concludes the allegations are sufficient to state a claim for breach of the University's obligation to produce and deliver the first definitive operating plan and budget.[2]

### b.    Maintenance Obligations

The Foundation alleges the University breached its Maintenance Obligation, found in § 5.1(b), to provide to the Foundation annual reports regarding the Pearson Institute's performance and financials in the previous fiscal year. [Doc. No. 6, p. 23].

The University responds that this allegation is contradicted by another paragraph in the Complaint wherein the Foundation references information in two documents titled 2015–2016 Annual Report and 2016–2017 Annual Report. *See* [Doc. No. 2, p. 7, ¶ 27]. However, the Foundation's reference to information in the annual reports does not necessarily contradict its assertion that the University failed to deliver the reports to the Foundation. Furthermore, the allegation that the University failed to provide "the required annual reports" may also be construed as alleging that the reports were materially deficient. Regardless, the allegation sufficiently states a claim for breach of § 5.1(b).

---

[2]      The University also argues the Foundation has failed to state a claim for breach of the Grant Agreement based on the University's appointment of two University employees to the Advisory Council. *See* [Doc. No. 27, pp. 18–19]. However, the Foundation's allegations regarding the Advisory Council appear to be made in regards to its claim for breach of the duty of good faith and fair dealing, not for breach of any particular provision of the Grant Agreement. *See* [Doc. No. 2, p. 15, ¶¶ 79–81].

As to the University's additional obligations, largely found in the Initial Operating Plan attached to the Grant Agreement as Exhibit C, it is not necessary at this stage of the litigation to consider each obligation and alleged breach, as the court has determined that the Foundation has adequately stated a claim for breach of the Grant Agreement based on the Founding and Maintenance obligations.  *See AKB Wireless, Inc. v. Wireless Toyz Franchise, LLC*, 2015 WL 1637593, *7 (E.D. Mich. Apr. 13, 2015) (declining to consider defendants' arguments as to other alleged breaches where the plaintiff brought a single count for breach of contract and sufficiently pled that defendants breached the contract in at least one way) (citing *In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d 363, 373 (M.D. Penn. 2008) ("Nothing in *Twombly,* however, contemplates [such a] 'dismemberment' approach to assessing the sufficiency of a complaint. Rather, a district court must consider a complaint in its entirety without isolating each allegation for individualized review.")).

ii.     <u>Damages</u>

The University argues the Foundation has not sufficiently pled damages for breach of contract.  In conjunction with the factual allegations discussed above, the Foundation alleges that,

> [a]s a direct and proximate result of the [University's] material breaches of the Grant Agreement, the Foundation has been injured.  The Foundation agreed to grant substantial sums of money to the [University] for [the Pearson Institute and the Pearson Forum] on the condition that it would be used to fulfill the Foundation's objectives under the Grant Agreement.  The [University] has not performed as promised under the Grant Agreement.

[Doc. No. 2, p. 16, ¶ 87].  The Foundation requests the court "order the . . . return of all amounts paid pursuant to the Grant Agreement; attorney's fees, expenses, and costs; and such other relief as this Court may deem just and proper and to which the Foundation may be entitled as a matter

of law." [Doc. No. 2, p. 16]. At this stage of the litigation, the Foundation's allegations provide sufficient notice to the University on the issue of damages. The cases cited in reply by the University dismissing breach of contract claims for insufficiently pled damages are distinguishable because, unlike here, the plaintiffs' allegations of damages were coupled with insufficient factual allegations regarding the alleged breaches. *See Bravo v. MERSCORP, Inc.*, 2013 WL 1652325, *5–6 (E.D.N.Y. Apr. 16, 2013) (dismissing breach of contract claim where plaintiff failed to allege adequate performance, breach, or causally connected damages); *Amer. Fidelity Assurance Co. v. Bank of N.Y. Mellon*, CIV-11-1284-D, 2013 WL 12091102, at *3 (W.D. Okla. Jan. 18, 2013) (noting that "plaintiff indirectly concede[d] the lack of sufficient factual allegations to support its breach of contract claims," and that "the factual allegations supporting the three counts are unclear and, often, conclusory").

### b. Breach of Fiduciary Duty

The University argues the Foundation has failed to plead the existence or breach of a fiduciary relationship, because the Foundation's allegations are coterminous with its breach of contract claim.

Under New York law, "[a] fiduciary relationship arises between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Sejin Precision Indus. Co., Ltd. v. Citibank, N.A.*, 235 F. Supp. 3d 542, 557 (S.D.N.Y. 2016) (quoting *Roni LLC v. Arfa*, 963 N.E.2d 123, 124 (N.Y. 2011)). "Put differently, [a] fiduciary relation exists when confidence is reposed on one side and there is resulting superiority and influence on the other." *Roni LLC*, 963 N.E.2d at 125 (internal quotation marks omitted). "If the parties . . . do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion the

stricter duty for them." *EBC I, Inv. v. Goldman, Sachs & Co.*, 832 N.E.2d 26, 31 (N.Y. 2005) (quoting *Northeast Gen. Corp. v. Wellington Adv.*, 624 N.E.2d 129, 131 (N.Y. 1993)). Dismissal of a claim for breach of fiduciary duty is appropriate where the plaintiff "has not alleged any facts suggesting that the relationship between the plaintiff and defendants was anything other than arm's-length." *Phillips v. American Inter. Grp., Inc.*, 498 F. Supp. 2d 690, 696 (S.D.N.Y. 2007) (granting motion to dismiss where plaintiff alleged defendants held themselves out as experts and plaintiff believed, trusted, and relied upon them in purchasing annuity contracts). While the Foundation is correct that a fiduciary duty may "aris[e] out of [a] relationship created by contract," the duty still must be "independent of the contract itself." *37 E. 50th St. Corp. v. Restaurant Grp. Mgt. Servs., L.L.C.*, 156 A.D.3d 569, 570 (N.Y. App. Div. 2017); *see also EBC I*, 832 N.E.2d at 31 (noting that, while the contract may not have created a fiduciary duty, "a cause of action for fiduciary duty may survive, for pleading purposes, where the complaint party sets forth allegations that, apart from the terms of the contract, the [parties] created a relationship of higher trust than would arise from the [contract] alone").

The Foundation alleges the existence of a fiduciary duty based on its "donor-donee relationship" with the University:

> By establishing [the Pearson Institute and the Pearson Forum], and undertaking the commitment to administer the funds in accordance with the terms of the Grant Agreement, including that [the Pearson Institute and the Pearson Forum] would have 'the highest level of success and recognition', the [University] undertook a position of trust and a corresponding fiduciary duty to the Foundation to achieve the objectives of the grant.

[Doc. No. 2, p. 17, ¶ 89]. The Foundation directs the court to allegations in the Complaint that it selected the University of Chicago because of its representations as one of the world's great academic institutions [*Id.*, p. 4, ¶ 14], and intended the University to use reasonable academic hiring standards in recruiting and appointing faculty chairs, to properly use grant funds for the

Pearson Institute and Pearson Forum, to award scholarships pursuant to a discernable standard recognizing accomplished graduate level students who had shown a commitment to the study of conflict resolution, and to advance the reputation of the Institute as a leading academic and research center [*Id.*, pp. 8–11, ¶¶ 31, 37–39, 42–44, 45, 50].

These allegations do not suggest the Foundation's relationship with the University was anything other than arm's-length. To the contrary, the allegations acknowledge the Foundation evaluated multiple academic institutions, and engaged in months of discussions and weeks of negotiations with the University of Chicago regarding the terms of the Grant Agreement. [Doc. No. 2, pp. 4–5, ¶ 5]; *see Abercrombie v. Andrew College*, 438 F. Supp. 2d 243, 275 (S.D.N.Y. 2006) ("Nor can it be said that the mere relationship between an *alumnae* and her *alma mater*, even if a close one, automatically imposes a fiduciary duty on the college when accepting a donation, particularly where the Complaint acknowledges the *alumnae* was represented by counsel in the transaction."). As the University argues, most of these allegations are either derived from the University's existing obligations under the Grant Agreement—and therefore insufficient to plead a "relationship of higher trust" existing "apart from the terms of the contract," *EBC I, Inc.*, 832 N.E.2d at 31—or precluded by § 3.5(b) of the Grant Agreement, which provides that the Foundation is to have no "role or authority with respect to making appointments (academic or professional) to the Pearson Institute or the Pearson Forum, setting the research agenda of the Pearson Institute, or the selection of topics or presenters for the Pearson Forum." [Doc. No. 6, pp. 15–16].

This case is similar to *New York Univ. v. International Brain Research Found.*, 2016 N.Y. Misc. Lexis 856 (N.Y. Sup. Ct. Mar. 14, 2016), which involved a 2010 grant agreement between the New York University School of Medicine and the International Brain Research

Foundation, wherein the research foundation agreed to make a series of annual contributions of $300,000 to support the brain injury research of a particular professor. *Id.* at *1. The school of medicine subsequently sued the research foundation for failing to remit payments, and the research foundation filed a counterclaim for, *inter alia*, breach of fiduciary duty. *Id.* at *3–4. The school of medicine moved to dismiss the counterclaim, arguing in pertinent part that the research foundation had failed to adequately allege the existence of a fiduciary relationship based on the donation. *Id.* at 10–11. The trial court dismissed the fiduciary duty claim, because the counterclaim did not allege facts suggesting that the parties intended to create a relationship of higher trust beyond their contractual grantor-grantee relationship. *Id.* at *11. The research foundation's conclusory allegations to the contrary were insufficient. *Id.* The trial court also held the fiduciary duty claim failed because it merely duplicated the breach of contract claim, given that the counterclaim did not plead any factors supporting breach of a duty independent of the Grant Agreement. *Id.* at *11–12.

Similarly, the Foundation has not adequately alleged that the parties intended to create a relationship of higher trust beyond their contractual grantor-grantee relationship, and the alleged breaches are either for duties arising from the Grant Agreement itself or are precluded by § 3.5(b). The Foundation has therefore failed to sufficiently allege the existence or breach of a fiduciary relationship. The University's motion to dismiss is granted as to Count II (Breach of Fiduciary Duty).

### c. *Fraudulent Concealment*

The University moves to dismiss the Foundation's fraudulent concealment claim as duplicative of the breach of contract claim, and because the Foundation failed to allege a material omission. To state a claim for fraudulent concealment, the complaint must allege: "(1) the

defendant made a misrepresentation or a material omission of fact which was false and which the defendant knew to be false; (2) the misrepresentation was made for the purpose of inducing the plaintiff to rely upon it; (3) the plaintiff justifiably relied on the misrepresentation or material omission; [] (4) injury[;] . . . [and (5)] the defendant had a duty to disclose the material information." *Bannister v. Agard*, 125 A.D.3d 797, 798 (N.Y. App. Div. 2015).

The Foundation's claim for fraudulent concealment is based on the University's alleged failure to disclose to the Foundation its retitling of Professor Robinson on the Pearson Institute website from "Faculty Director" to "Institute Director" on August 29–30, 2017. The Foundation alleges the University knew that Professor Robinson was not the Institute Director when it retitled him, and that his roles and responsibilities as faculty director have not changed since his retitling. [Doc. No. 2, pp. 18–19, ¶¶ 98–99, 105]. The Foundation further alleges that the University retitled Professor Robinson secretly, and without communicating or disclosing to the Foundation that this change was going to take place. [*Id.*, p. 18, ¶ 100]. The Foundation alleges the University had duties to keep the Foundation reasonably informed regarding its progress in recruiting the first and subsequent Institute Directors, and to promptly notify the Foundation of proposed changes to the website that are inconsistent with media or public documents previously approved by the Foundation. [*Id.*, pp. 18–19, ¶¶ 102–03]. In alleged reliance on the University's performance of those duties, the Foundation did not discover Professor Robinson's retitling for months. [*Id.*, p. 19, ¶¶ 103–04]. The Foundation further alleges that Professor Robinson's retitling as Institute Director will require correction and cause public confusion and a diminished reputation for the Pearson Institute and the Pearson Forum. [*Id.*, p. 19, ¶ 106].

The court is unconvinced that the alleged omission regarding Professor Robinson's retitling was immaterial. As discussed previously, the Foundation is not claiming the University

simply mistitled Professor Robinson's position; rather, the Foundation alleges that, regardless of what he was titled, Professor Robinson's job responsibilities are "separate and distinct from those of the Institute Director," and do not include "direct[ing] the day-to-day operations of the Pearson Institute" as required by the Grant Agreement. Failing to disclose to the Foundation that the University was holding this position of leadership out to the world as filled, while knowing that it was in fact vacant, would be material.

However, the University correctly notes that, in New York, "[i]t is axiomatic that a cause of action for fraud does not arise where . . . the fraud alleged relates to a breach of contract. Thus, absent a legal duty owed to plaintiff by defendants, independent of that encompassed by the contract, plaintiff's causes of action grounded on fraud are not cognizable." *Egan v. New York Care Plus Ins. Co.*, 277 A.D.2d 652, 653 (N.Y. App. Div. 2000). Here, the Foundation does not allege the existence of a duty to disclose the alleged retitling of Professor Robinson that arises other than from the terms of the Grant Agreement. *See* [Doc. No. 2, p. 7, ¶ 24] (alleging "[t]he Grant Agreement requires the [University] to keep the Foundation informed regarding the appointment of an Institute Director"). The University's motion to dismiss is granted with respect to Count III.

> ### d. Breach of the Duty of Good Faith and Fair Dealing

The University moves to dismiss the Foundation's claim for breach of the duty of good faith and fair dealing on the ground that it is duplicative of the Foundation's contract claims. *See Bus. Payment Sys., LLC v. Bus. Payment Sys.-Rocky Mountain, LLC*, 2013 WL 12192486, at *6 (D. Colo. Feb. 20, 2013) ("Under New York law, which the parties agree governs this claim, a claim for breach of the covenant of good faith and fair dealing should be dismissed if it is redundant of a breach of contract claim."). However, the court does not find the claims

duplicative; rather, they are "based on allegations different from those underlying the accompanying breach of contract claim." *ARS Kahirwala, LP v. El Paso Kabirwala Cayman Co.*, 2017 WL 3396422, at *4 (S.D.N.Y. Aug. 8, 2017) (quoting *JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*, 2009 WL 321222, *5 (S.D.N.Y. Feb. 9, 2009)).  Separate from its allegations regarding breach of the Grant Agreement, the Foundation also alleges the University has failed "to deal with the Foundation with honesty, forthrightness, and transparency, by engaging in deliberate misrepresentations to the Foundation over a period of more than two years, and by failing to discharge its obligations with the care an ordinarily prudent person in a like position would exercise under similar circumstances."  [Doc. No. 2, pp. 19–20, ¶ 109].  The Complaint further details alleged failures by the University to act in good faith which are not based on breaches of any particular provision of the Grant Agreement.  Such alleged failures include the appointment of two allegedly inexperienced University employees to the Advisory Council and the reservation of the right to charge millions of dollars of Harris School expenses to the Pearson Institute.  [Doc. No. 2, pp. 15–16, ¶¶ 78–82].  For that reason, the University's motion to dismiss is denied as to Count IV.  *See Bus. Payment Sys., LLC*, 2013 WL 12192486, at *5 (applying New York law and declining to dismiss plaintiff's claim for breach of the covenant of good faith and fair dealing as redundant with its breach of contract claim, where plaintiff's allegations regarding its breach of covenant claim went beyond the breach of contract claim); *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) ("[W]hen a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing on the same facts, the latter claim should be dismissed as redundant.").

To state a claim for anticipatory repudiation, a complaint must allege that "a clear manifestation of intent communicated in advance of the time for performance that when the time for performance arrives the required performance will not be rendered." *O'Shanster Res., Inc. v. Niagara Mohawk Power Corp.*, 915 F. Supp. 560, 567 (W.D.N.Y. 1996) (citing *Wester v. Casein Co. of America*, 206 N.Y. 506, 513–14 (1912)).   "The expression of intention not to perform must be positive and unequivocal." *Id.* (quoting *Record Club of America v. United Artists Records*, 643 F. Supp. 925, 936 (S.D.N.Y. 1986)).   "Whether such a repudiation took place is a 'factual determination [and] heavily dependent upon a determination of whether a breaching party's words or deeds are unequivocal.'" *Fonda v. First Pioneer Farm Credit, ACA*, 86 A.D.3d 693, 695 (N.Y. App. Div. 2011) (quoting *O'Connor v. Sleasmen*, 14 A.D.3d 986, 987–88 (N.Y. App. Div. 2011)).

The Foundation's claim of anticipatory repudiation is based on the University's alleged refusal to comply with its Founding Obligation to hold the first Pearson Forum by October 31, 2018.[3]   According to the Complaint, the University has informed the Foundation that it has not and will not do the necessary preparatory work to hold the Pearson Forum by that date.   [Doc. No. 2, p. 20, ¶ 113].   Rather, the University has stated to the Foundation its intention to involve TPI in the Bishops Congress, a conference with its own agenda and purpose, in purported

---

[3]     In its response, the Foundation seeks to expand the scope of its anticipatory repudiation claim to other alleged breaches by invoking its paragraph "restat[ing] and incorpora[ting] by reference" all preceding paragraphs.   However, as the University contends, this would place an "inordinate burden" on the University and the court, "requiring them to parse the narrative repeatedly and attempt to independently extract the particular factual averments that are relevant to [this] claim." *Greenway Nutrients, Inc. v. Blackburn*, 33 F. Supp. 3d 1224, 1260 (D. Colo. 2014) (quoting *Jacobs v. Credit Suisse First Boston*, 2011 WL 4537007, *6 (D. Colo. Sept. 30, 2011)).   More fundamentally, the Foundation has not alleged a factual basis for this claim beyond the alleged refusal to hold the Pearson Forum.

discharge of its obligation to hold the Pearson Forum. [*Id.*, p. 20, ¶ 114]. The Foundation alleges the University's failure to plan and prepare for the first Pearson Forum, combined with its stated intent to participate in the Bishops Congress in lieu of holding the first Pearson Forum, are positive and unequivocal expressions of the University's intent to not perform as required by the Grant Agreement.

The University argues that its alleged repudiation could not have been unequivocal because the cure period for holding the first Pearson Forum does not expire until 2020. This argument fails for two reasons. First, as previously discussed, the cure periods apply only if the Foundation elects to terminate the contract. Second, in New York "[t]he non-breaching party's obligation to provide notice and give an opportunity to cure . . . is excused when the breaching party has repudiated the contract." 28 N.Y. Prac., Contract Law § 13:12 (citing *In re Best Payphones, Inc.*, 432 B.R. 46, 54 (S.D.N.Y 2010) ("Once a party anticipatorily repudiates, the other party is excused from complying with any conditions precedent in the contract, including the obligation to give notice of breach and an opportunity to cure.")).

The court concludes that the Foundation has adequately stated a claim for anticipatory repudiation. Whether the communication was in fact "unequivocal" may be addressed at summary judgment. The University's motion to dismiss is denied as to Count V.

## VI. Conclusion

WHEREFORE, The University of Chicago's Rule 12(b)(6) Motion to Dismiss the Plaintiff's Complaint [Doc. No. 27] is granted as to the Foundation's claims of breach of fiduciary duty (Count II) and fraudulent concealment (Count III). The motion is otherwise denied.

IT IS SO ORDERED this 29th day of June, 2018.

GREGORY K. FRIZZELL, CHIEF JUDGE