**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **The Thomas L. Pearson and**<br>**The Pearson Family Members Foundation,** | |
|       **Plaintiff and Counterclaim**<br>      **Defendant,** | |
|    **v.** | |
| **The University of Chicago,** | **Case No.:  18-CV-99-GKF-FHM** |
|       **Defendant and Counterclaimant,** | |
|    **v.** | |
| **Thomas L. Pearson,** | |
|       **Counterclaim Defendant.** | |

**THE THOMAS L. PEARSON AND THE PEARSON FAMILY MEMBERS
FOUNDATION'S MOTION TO COMPEL**

Plaintiff, The Thomas L. Pearson and The Pearson Family Members Foundation (the "Foundation"), submits the following Motion to Compel pursuant to Fed. R. Civ. P. 37. The Foundation requests that the Court enter an Order compelling Defendant, The University of Chicago (the "University"), to (1) provide full responses and responsive documents with respect to certain discovery requests; (2) include certain University affiliated witnesses as custodians for document production; (3) utilize the search terms requested by the Foundation for the search and production of University documents; and (4) collect and produce responsive ESI from all University custodians' mobile devices.

**INTRODUCTION**

In 2015, the Foundation agreed to make one of the largest donations to the University in its history, $100 million. In exchange, the University agreed, among other things, to establish The

Pearson Institute for the Study and Resolution of Global Conflicts ("The Pearson Institute"), the first research institute devoted solely to the study and resolution of global conflicts; hire a preeminent Institute Director to lead and manage The Pearson Institute day-to-day; and host The Pearson Global Forum, intended to convene the world's foremost thinkers and influencers each year to develop new strategies to prevent, resolve, and recover from conflict. These obligations are governed by the terms of a Grant Agreement executed by the Foundation and the University in April 2015.

The Foundation brought this lawsuit because the University failed to fulfill these and many other promises made in the Grant Agreement. For example, the U of C failed to appoint an Institute Director to run the day-to-day operations for The Pearson Institute; failed to fill other positions provided for in the Grant Agreement, including the Event Planner, Grants Administrator, or Communications Manager, failed to create and develop an original academic curriculum; failed to fill chaired faculty positions with preeminent individuals; failed to apply objective standards to the selection of individuals for scholarships; failed to provide an acceptable operating plan and budget; and failed to self-report any of these breaches despite its explicit obligation to do so under the Grant Agreement.

The Foundation has propounded written discovery and document requests targeted at these and other issues. The University has resisted disclosing certain information based upon its unilateral opinion about what aspects of the Foundation's claims should be permitted to proceed. The same arguments used to withhold discovery materials were put forth in the University's Motion to Dismiss and were rejected the Court. For example, the University has withheld information and documents about faculty hiring and curriculum because it thinks the Foundation

has no right to base its claims on those issues under the Grant Agreement. The Court denied those requests for dismissal. The Foundation is entitled to discovery on these topics.

In addition, the University has attempted to shield certain of its employees and decision makers from discovery by asserting that collecting documents from them would be disproportionate to the needs of the case even though they possess relevant documents. The benefit of discovery from these individuals vastly outweighs any burden of collecting from them. The University has also refused to utilize the search terms requested by the Foundation for the search and production of University documents as part of the ESI Protocol agreed to by the parties. Finally, the University has refused to commit to collecting and searching ESI from all University custodians' mobile devices in accordance with the parties' ESI Protocol. The University should be compelled to respond fully, fairly, and timely to the discovery sought by the Foundation.

## PROCEDURAL HISTORY

1.      The Foundation filed this lawsuit on February 20, 2018, alleging claims against the University for breach of contract, breach of fiduciary duty, fraudulent concealment, breach of the duty of good faith and fair dealing, and anticipatory repudiation. (Doc. 2).

2.      On April 5, 2018, the University filed an Answer (Doc. 28), a Counterclaim against the Foundation and Thomas L. Pearson (Doc. 29), and a Motion to Dismiss to all of the Foundation's claims (Doc. 27).

3.      On May 7, 2018, the Foundation and Thomas L. Pearson filed a Motion to Dismiss the University's Counterclaim. (Doc. 36).

4.      The Court entered an Order (Doc. 45) denying the Foundation's Motion to Dismiss on June 27, 2018, and an Opinion and Order (Doc. 46) granting in part and denying in part the University's Motion to Dismiss on June 29, 2018. The Court's Opinion and Order permitted to

proceed the Foundation's claims for breach of contract, breach of the duty of good faith and fair dealing, and anticipatory repudiation but dismissed its claims for breach of fiduciary duty and fraudulent concealment. (*Id.*).

5.      On July 3, 2018, the Court entered a Scheduling Order setting a discovery deadline of February 15, 2019, and jury trial for July 15, 2019.

6.      Since that time, the parties have been working diligently to move forward with an orderly discovery process. The parties have negotiated an Electronically Stored Information (ESI) Protocol and have discussed at length custodians from whom documents will be collected and search terms that will be used to search ESI.

7.      While much progress has been made, the parties have reached an impasse on several issues that are the subject of this motion.

8.      Pursuant to LCvR 37.1, the Foundation's counsel hereby certifies that they have fulfilled their duty to confer regarding the subject matter of this Motion through numerous telephone conferences with opposing counsel and the exchange of emails, but no accord has been reached. The Foundation's counsel are located in Tulsa, Oklahoma, and the University's lead counsel are located in Chicago, Illinois, making an in-person conference infeasible.

## ARGUMENT AND AUTHORITIES

### I.      THE UNIVERSITY SHOULD BE COMPELLED TO FULLY ANSWER THE FOUNDATION'S WRITTEN DISCOVERY AND PRODUCE RELATED DOCUMENTS.

The University has refused to answer, or has limited its answers, to several discovery requests based upon its unilateral opinion about what the scope of the Foundation's claims should be. In fact, the University's justifications for refusing to answer or provide responsive documents were put forth in its Motion to Dismiss the Foundation's contract claim. Those justifications were

rejected as a basis for dismissal of the Foundation's contract claim and the Foundation is entitled to discovery on those subjects. The remaining justifications for the University's withholding of full responses are likewise without merit. The discovery requests at issue will be addressed *seriatim*.

## DISCOVERY REQUESTS AT ISSUE

### Interrogatories

**A.     Interrogatory No. 5**

The University has refused to answer the Foundation's Interrogatory No. 5 which seeks information about criteria applied by the University in filling the chaired faculty positions it was obligated to fill under the Grant Agreement:

> **INTERROGATORY NO. 5:**
>
> **Please identify all criteria applied by you in selecting and filling the chaired faculty positions described in the Grant Agreement and the process you utilized in considering such criteria and potential candidates.**
>
> **ANSWER TO INTERROGATORY NO. 5:**
>
> The University incorporates its General Objections.  Section 3.5(b) of the Grant Agreement precludes the Foundation from having any role or authority with respect to faculty appointments.  This and other requests related to faculty hiring are therefore irrelevant and overly burdensome given the needs of the case.  The University's faculty hiring process is highly confidential.

(University's Discovery Responses, Exhibit A, p 9).  In addition, following the Foundation's request for supplementation of this refusal to answer, the University offered up a "public report" about criteria for academic appointments but still refused to answer the Interrogatory. (*See* Letter from F. Paul to S. Hathaway, dated Sep. 21, 2018, Exhibit B, pp. 1-2).

The University should be compelled to provide responsive information regarding the process used to hire the chaired faculty members. The Foundation's claims explicitly call into

question the University's appointment of the chaired faculty positions provided for in the Grant Agreement. Specifically, the Foundation's Complaint has alleged that the University' breached the Grant Agreement by hiring two junior, non-tenured professors to fill the positions and by failing to keep the Foundation informed regarding recruitment for the both chaired faculty and other positions, among other things. (Doc. 2, ¶¶ 28-34).

The University has no valid basis to oppose discovery on this topic. Instead, it has claimed that the faculty recruiting process is "highly confidential" and that the Grant Agreement precludes the Foundation's involvement in hiring faculty. Both arguments fail. There is a mutually agreed Protective Order in place (Doc. 51), which provides protections in the event confidential information is exchanged. In addition, the University expressly sought dismissal of the Foundation's claims as they relate to the faculty appointments, asserting that the Grant Agreement did not provide any right for the Foundation to have input. (*See* Motion to Dismiss, Doc. 27, pp. 1; 11-13). The University's request for dismissal of these claims was denied, and it cannot withhold discovery on the same basis.[1] The Foundation is entitled to discovery on this aspect of its claims and the University should be compelled to answer Interrogatory No. 5

### B.   Interrogatory No. 11

The University has partially refused to answer Interrogatory No. 11 by withholding information about whether any of the curriculum offered as part of The Pearson Institute was taught prior to the creation of The Pearson Institute. This Interrogatory and the University's response are as follows:

---

[1]   The University has attempted to mischaracterize the Foundation's claim regarding the hiring of faculty. The Foundation has never sought authority over the hiring process; instead, the Foundation seeks to enforce the parties' understanding that the faculty hired would be of the preeminence and stature necessary to give The Pearson Institute credibility on the world stage.

**INTERROGATORY NO. 11:**

**Please identify all curriculum that has been or will be presented as part of the Pearson Institute, including identity of the professor teaching the curriculum and whether, and to what degree, any such curriculum was taught by that respective professor, or other professors, instructors, or teaching assistants, prior to the creation of The Pearson Institute.**

**ANSWER TO INTEREROGATORY NO. 11:**

The University incorporates its General Objections.  The University objects to this request for information regarding what curriculum "will be presented" as overbroad, ambiguous, and vague.  The University further objects to this interrogatory's request for information about "whether, and to what degree, any such curriculum was taught by that respective professor, or other professors, instructors, or teaching assistants, prior to the creation of The Pearson Institute," as irrelevant, overbroad, unduly burdensome, ambiguous, and vague.  The Grant Agreement contains no criteria for the Institute's curriculum.  The University limits its answer to courses taught in academic years 2016-2017 and 2017-2018 and courses the Harris School intends to offer as part of the Pearson's academic programming in academic year 2018-2019, with the understanding that the 2018-2019 academic year has not commenced and course offerings are not finalized.

Subject to those objections, the University states as follows:  During the 2016-2017 academic year, the Harris School offered the following courses as part of the Pearson Institute's academic programming:

- *Why Nations Fail* (James Robinson) (Fall 2016)
- *Conflict in South and Southeast Asia* (Austin Wright) (Winter 2017)
- *International Policy Practicum: Immigration?* (Alicia Menendez) (Winter 2017)
- *Order and Violence* (Christopher Blattman) (Spring 2017)
- *Political Economy of Development:  Order and Violence* (Christopher Blattman) (Spring 2017)
- *Conflict:  Root Causes, Consequences, and Solutions for the Future* (Oeindrila Dube) (Spring 2017)
- *Refugees, Security, and Forced Migration* (Kara Ross Camarena) (Spring 2017)

During the 2017-2018 academic year, the Harris School offered the following courses as part of the Pearson Institute's academic programming:

- *Poverty and Economic Development* (Alicia Menendez) (Fall 2017)
- *Fiscal Policy Issues in Latin America* (Ximena Cadena) (Fall 2017)
- *Conflict:  Root Causes, Consequences, and Solutions for the Future* (Oeindrila Dube) (Winter 2018)
- *Violence in the Early Years* (Anjali Adukia) (Winter 2018)

- *The Political Economy of Natural Resources* (Luis Martinez) (Winter 2018)
- *Global Conflict Policy Lab* (Austin Wright) (Winter 2018)
- *Political Economy of Development* (James Robinson and Christopher Blattman) (Spring 2018)
- *African Development* (James Robinson) (Spring 2018)
- *Order and Violence* (Christopher Blattman) (Spring 2018)
- *Politics of Public Policy in Latin America* (Maria Angélica Bautista) (Spring 2018)

With the understanding that the 2018-2019 academic year has not commenced and course offerings are not yet finalized, the following courses are currently planned for the 2018-2019 academic year:

- *African Development* (James Robinson)
- *Order & Violence* (Christopher Blattman)
- *Conflict:  Root Causes, Consequences, and Solutions for the Future* (Oeindrila Dube)
- *Political Economy of Development* (James Robinson and Christopher Blattman)
- *Global Conflict Policy Lab* (Austin Wright)
- *The Political Economy of Natural Resources* (Luis Martinez)
- *Politics of Public Policy in Latin America* (Maria Angélica Bautista)
- *Refugees, Security, and Forced Migration* (Kara Ross Camarena)
- *Hydropolitics:  Water Policy and Conflict* (Michael Tiboris)
- *Nuclear Policy:  Dilemmas in Decisionmaking* (Kennette Benedict)

(Exhibit A, pp. 15-17). The University's response does provide some of the information requested in this interrogatory, but objects to answering whether the courses were previously taught as "irrelevant, overbroad, unduly burdensome, ambiguous, and vague."  In the process of requesting supplementation, the University's position has been that it is difficult to identify whether a particular course has been previously taught because of the manner in which professors create curriculum.

The University's justification for withholding this information is unavailing. It is not burdensome or difficult to provide responsive information. As an example, the University could readily identify which courses were previously taught under the same name. The University could also inquire of its professors whether they previously taught a substantially similar class under a

different name or whether substantial aspects of a class were previously taught. The University's professors could easily provide such information. The Foundation's Interrogatory No. 11 is not overly burdensome, broad, or vague and the University should be compelled to provide the information sought.

## Requests for Production

**C.     Request No. 24**

Similar to Interrogatory No. 5 above, the Foundation's Request No. 24 seeks documents related to the University's recruitment and hiring for the chaired faculty positions. The University's response objects and states that it will not provide responsive documents:

**REQUEST NO. 24.**

**Please produce all documents relating to the consideration, recruitment, and hiring of potential candidates (including without limitation Oeindrila Dube and Christopher Blattman) for the Rev. Dr. Richard L. Pearson Professor of Global Conflict Studies, Ramalee E. Pearson Professor of Global Conflict Studies, Philip K. Pearson Professor of Global Conflict Studies, and David L. Pearson Professor of Global Conflict Studies professorships.**

**RESPONSE TO REQUEST NO. 24:**

The University incorporates its General Objections.  Section 3.5(b) of the Grant Agreement precludes the Foundation from having any role or authority with respect to faculty appointments.  This and other requests related to faculty hiring are therefore irrelevant and overly burdensome given the needs of the case.  The University's faculty hiring process is highly confidential.  Subject to and without waiving these objections, the University has stated it will produce non-privileged documents responsive to Request for Production No. 18 (regarding Grant Agreement §5.1 (a)), as limited by the objections stated in the University's response to that request.  The University will not produce any additional documents relating to the consideration, recruitment, or hiring of candidates for the chaired faculty positions.

(Exhibit A, pp. 37-38).

Again, the University has no valid basis to oppose discovery on this topic. The faculty hiring and selection process is directly at issue in the Foundation's claims. The University does not get to decide the scope of the Foundation's claims; the Court has already done so. Accordingly, the University should be compelled to provide documents responsive to Request No. 24.

D.    **Request No. 29**

This request seeks appointment books, logs, diaries, and calendars for four key University witnesses: Daniel Diermeier, Robert Zimmer, James Robinson, and Nicki Nabasny. The University has opposed the request on the basis that the purported burden outweighs the benefit:

**REQUEST NO. 29.**

**Please produce all appointment books or logs, diaries, and/or calendars, prepared or used by Daniel Diermeier, Robert Zimmer, James Robinson, and Nicki Nabasny, including without limitation any such materials maintained for the benefit of or use by these individuals by any chief or staff, administrative assistant, executive assistant, secretary, or other administrative individual, from Jan. 1, 2014 to present.**

**RESPONSE TO REQUEST NO. 29:**

The University incorporates its General Objections.  The University further objects to the terms "appointment books or logs" or "diaries" as vague and ambiguous.  The University also objects to this request as irrelevant, overbroad, and unduly burdensome.  The request seeks more than four years of calendar entries or similar material whether or not such material relates to the issues to be resolved. The burden of this request on the University and its leaders, especially in light of the confidential nature of the information requested, far outweighs the likely benefit of such discovery.

(Exhibit A, pp. 39-40). During the course of negotiations, the Foundation agreed to narrow the scope of this Request to include only "full calendars/appointment books of the individuals listed for the stated timeframe, while limiting the other categories of documents sought (logs and diaries) to those pages that relate to any issue at stake in this litigation." (Letter to University's Counsel from S. Hathaway, dated August 21, 2018, Exhibit C). In response, the University agreed to

produce "portions" of the requested document it deemed relevant, but still refused to provide documents fully responsive to this request, as narrowed, based on its prior objections. Specifically, the University has refused to produce full calendars and appointment books for the listed individuals. The University's objection to providing these documents is without merit.

The Foundation's claims are fundamentally based upon the University's failure—through its key personnel—to fulfill its duties under the Grant Agreement. This involves, in part, an apparent failure on the part of those key personnel to devote sufficient time to the task at hand: developing a world-class institute. In addition, University personnel had obligations to attend certain meetings and perform certain functions in a timely manner. The calendars and appointment books are critical to determining whether the University met its obligations and to demonstrating that it failed to devote sufficient time to ensuring success of The Pearson Institute. The University should be compelled to produce all responsive documents.

E.      Request No. 31

This request seeks documents relating to committees or other deliberative bodies within the University with supervisory or administrative responsibilities for The Pearson Institute or Pearson Global Forum:

**REQUEST NO. 31.**

> **Please produce all documents relating to each and every committee or other deliberative or administrative body that had any supervisory or administrative role regarding the Pearson Institute or Pearson Global Forum, including without limitation the membership roster and meeting minutes for each such body, including the Board of trustees.**

**REPSONSE TO REQUEST NO. 31:**

> The University incorporates its General Objections.  The University objects to this request for documents for "each and every" committee or other deliberative or administrative body with "any supervisory or administrative role" as vague and ambiguous, overbroad, and unduly burdensome in light of the issues to be resolved

in this case.  The University further objects, if by this request, the Foundation seeks meeting minutes or other materials from faculty hiring committees or materials otherwise relating to the highly confidential faculty hiring process.

The parties continued negotiations regarding the scope of this request. The Foundation clarified the scope of this request as seeking "documents showing the composition of the relevant committees and deliberative bodies, as well as minutes and other materials which directly reference or relate to the issues at stake in this litigation." (Exhibit C, pp. 4-5). The University ultimately agreed to produce responsive documents, except those relating to the faculty hiring committee. (Exhibit B, pp. 3-4).

As noted above with respect to Interrogatory No. 5 and Request No. 24, documents related to faculty hiring are relevant and subject to discovery. The University should be compelled to produce all documents responsive to this request.

## II.     THE UNIVERSITY SHOULD BE COMPELLED TO INCLUDE JOSEPH NEUBAUER, DAVID GREENE, RUSSELL HERRON, AND KIM TAYLOR AS CUSTODIANS FOR PURPOSES OF DOCUMENT COLLECTION.

The parties have agreed to designate certain individuals as custodians for purposes of document collection and production. On the Foundation's side, this consists of the Pearson family members. On the University side, there have been many employees and leaders at the University involved in The Pearson Institute prior to and since its inception. The University has thus far agreed to name a number of custodians but has refused with respect to four individuals that have relevant, discoverable information: Joseph Neubauer, Chairman of the University' Board of Trustees, David Greene, former Executive Vice President, Russell Herron, Senior Associate General Counsel, and Kim Taylor, General Counsel. The University incorrectly asserts that collection from these custodians as requested by the Foundation is not proportionate to the needs of the case.

### General Standards Governing Discovery

"Parties may obtain discovery regarding *any* nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case..." Fed. R. Civ. P. 26(b)(1) (emphasis added).  Lower courts in the Tenth Circuit have endorsed a "broad view" of relevance since the 2015 amendment to Rule 26. *Reibert v. CSAA Fire & Casualty Ins. Co.*, 2018 WL 279348, *3, (N.D. Okla. Jan. 3, 2018) (Jayne, J.) (citing *Benavidez v. Sandia Nat'l Labs*., 319 F.R.D. 696, 717 (D.N.M. 2017)). On the issue of proportionality, courts take the following factors into consideration:

- the importance of the issues at stake in the action;

- the amount in controversy;

- the parties' relative access to relevant information;

- the parties' resources;

- the importance of the discovery in resolving the issues; and

- whether the burden or expense of the proposed discovery outweighs the likely benefit.

Fed. R. Civ. P. 26(b)(1). These factors in Rule 26 were *not* intended to "place on the party seeking discovery the burden of addressing all proportionality considerations." Fed. R. Civ. P. 26 Advisory Committee Notes. Nor was the rule intended to "permit the opposing party to refuse discovery simply by making a boilerplate objection that it is not proportional." *Id*. A party seeking discovery does not need to establish that every factor weighs in favor of the discovery. *See Reibert*, 2018 WL 279348 (N.D. Okla. Jan. 3, 2018).

These factors weigh heavily in favor of granting the Foundation the discovery it seeks. This case raises significant issues, not just financially, but about donor expectations and accountability on the part of an institution generously granted a huge sum of money based on the desire to leave

13

a lasting family legacy in furtherance of a world more at peace. This case has the potential to have a lasting effect on the attitude and expectations of donors to institutions of higher education. In addition to those fundamental considerations, the amount in controversy is very large. The Grant Agreement provides for a $100 million donation, a significant portion of which has already been paid to the University. Further, the documents and information sought is all in the hands of the University—it is not available from any other source. And, the University has virtually limitless resources at its disposal. The individuals that the Foundation is seeking as custodians (further discussed in detail below) have all played important roles in the facts underpinning this case—the request for their inclusion is not a fishing expedition. To the contrary, the benefit likely to be derived from their documents far outweighs the purported burden in collecting from them. These factors counsel in favor of granting the Foundation the discovery it seeks.

### Standards Applicable to Custodian Disputes

Scant legal authority exists on the standards a court should apply with respect to ESI custodians Generally speaking, however, courts have considered the following factors in determining whether an individual should be made a custodian:

- Whether the custodian has direct knowledge about important aspects of the case;

- Custodian's level of involvement in discussions and decisions serving as the basis for the claims at issue in the case; and

- Whether the relevant ESI is unique and would not be available from other designated custodians.

*See MariCal, Inc. v. Cooke Aquaculture, Inc*., No. 1:14-CV-00366-JDL, 2016 WL 9459260, at *1-3 (D. Me. Aug. 9, 2016).

The moving party need not prove that *all* documents possessed by the proposed custodians will be unique; it is sufficient to demonstrate that *some* of the documents are likely to be unique and relevant. *See MariCal,* 2016 WL 9459260, at *2 (compelling inclusion of defendants' CEO as ESI custodian based upon CEO's position of prominence in defendants' management and likelihood of his involvement in discussions regarding prior licenses for the subject patents); *see also Mt. Hawley Ins. Co. v. Felman Prod., Inc*., 269 F.R.D. 609, 620 (S.D. W. Va. 2010) ("While it is highly likely that the [proposed custodians] will produce documents and ESI which are duplicates of previously produced materials, it is reasonable to believe that they will have additional, highly relevant material…").

There is no question, Chairman Neubauer, Mr. Greene, Mr. Herron, and Ms. Taylor all possess documents relevant to this dispute. The University has never disputed that. Instead, the University has argued that it would be disproportionate to collect from them, notwithstanding the relevant documents they possess. Accordingly, the Foundation has already met its burden in showing that the proposed custodians possess relevant documents. As will be discussed below, those documents are likely to be unique and non-privileged with respect to each custodian sought. As such, all four should be made custodians.

### A.     Joseph Neubauer

Chairman Neubauer has personally met with the Pearsons. The University has attempted to portray that meeting as fulfilling an annual meeting requirement found in the Grant Agreement. The substance of his communications and other documents about that meeting are therefore directly at issue in this case. Chairman Neubauer is also likely to have unique documents as a result of his position as the Chairman of the Board of Trustees, which are likely to include, for example,

communications to the Board of Trustees, Executive Committee, and perhaps others about The Pearson Institute, the Grant Agreement, or other issues at stake in this litigation.

### B.     David Greene

Mr. Greene is a former Executive Vice President of the University. He was heavily involved in the initial meetings leading up to the negotiations and the signing of the Grant Agreement. Due to his high level role at that time, he is likely to have unique, relevant documents. Though he left the University several years ago, the University has not made any assertions that it no longer has records for him. By implication, the University still maintains records for him and could readily provide responsive documents with no interruption to him personally. Mr. Greene should be made a custodian.

### C.     Kim Taylor and Russell Herron

Ms. Taylor is General Counsel to the University and Mr. Herron is Associate General Counsel. Both were directly involved in the drafting and negotiation of the Grant Agreement and a proposed Amended and Restated Grant Agreement that was not executed. As in-house counsel to the University, many, if not most, of their responsive documents are *not* likely subject to attorney-client and work product privileges. Indeed, their work is presumptively business advice, rather than legal advice. *Lindley v. Life Inv'rs Ins. Co. of Am.*, 267 F.R.D. 382, 389 (N.D. Okla. 2010), *aff'd in part as modified*, No. 08-CV-0379-CVE-PJC, 2010 WL 1741407 (N.D. Okla. Apr. 28, 2010) ("if in-house counsel is involved, the *presumption* is that the attorney's input is *more likely business than legal in nature*") (emphasis added). Given their roles in drafting and negotiating the fundamental documents at issue in this case, both Mr. Herron and Ms. Taylor should both be made custodians.

III.   **THE UNIVERSITY SHOULD BE COMPELLED TO UTILIZE THE SEARCH TERMS REQUESTED BY THE FOUNDATION FOR THE SEARCH OF UNIVERSITY ESI.**

The parties have agreed to the use of search terms for ESI discovery. As part of that process, the parties have negotiated what terms will be utilized to search each other's documents. The Foundation has endeavored to create a list of search terms that will capture as many relevant documents as possible without being overly burdensome to the University. While the University has agreed to some of those proposed terms, it has refused to utilize many of the terms proposed by the Foundation and claimed that the terms are overly broad. Following numerous exchanges between the parties regarding proposed search terms, the Foundation offered to fully accept the latest proposed search terms requested by the University for the search of the Foundation's documents in exchange for the University's agreement to the Foundation's proposed terms, but the University refused this proposed compromise. (Email Exchange, attached as Exhibit E). The search terms requested by the Foundation are reasonable and proportionate to the needs of this case and the University should be compelled to run them.

ESI is subject to the same scope of discovery as other kinds of information. *See* Fed. R. Civ. P. 34(a) (allowing a party to serve a request to produce ESI "within the scope of Rule 26(b)"). Pursuant to Federal Rule of Civil Procedure 37(a), "a party may move for an order compelling disclosure or discovery" if another party fails to produce documents as requested under Rule 34. A discovery request should generally be allowed "'unless it is clear that the information sought can have no possible bearing' on the claim or defense of a party." *Estes v. ConocoPhillips Co.*, 2008 WL 1994918, at *2 (N.D. Okla. May 5, 2008) (quoting *Owens v. Sprint/United Mgmt. Co.*, 221 F.R.D. 649, 652 (D. Kan. 2004)). On a motion to compel ESI discovery, the nonmoving party has the burden to show that "the information is not reasonably accessible because of undue burden

17

or cost." Fed. R. Civ. P. 26(b)(2)(B). Even if such a showing is made, "the court may nonetheless order discovery from such sources if the requesting party shows good cause" and the requested discovery (1) is not unreasonably cumulative or duplicative, (2) cannot be obtained from a more convenient, less burdensome, or less expensive source, (3) is not readily available to the party seeking discovery, and (4) is not outside the scope permitted by Rule 26(b)(1). Fed. R. Civ. P. 26(b)(2)(B)-(C). Whether to compel ESI discovery lies within the court's discretion. *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 482 (10th Cir. 1995).

The Foundation has requested the following search terms that the University objects to:[2]

1. "current funding payment"
2. "donor advised fund"
3. "university progress notice"
4. "tolling agreement"
5. "Pearson Family Member's Fund"
6. "Spencer Stuart" OR "SpencerStuart"
7. Institute AND ("Grant Agreement" OR contract* OR agreement* OR gift* OR grant* OR donation* OR donor* OR conflict* OR global OR cure OR payment* OR breach* OR restriction* OR mission OR installment* OR obligation* OR endowment OR exhibit* OR appendi* OR terminat* OR revert OR reversion OR refund* OR waiv* OR confidential*)
8. Institute AND (Foundation OR family OR trust)
9. Institute /5 (Philip OR David OR Jacquelyn OR Richard OR Ramalee)
10. Institute AND (director /5 (institute OR forum OR assistant OR executive OR faculty OR academic OR operation OR "global partnership")) OR "grant* administrator"
11. Institute AND chair*
12. Institute AND (budget* OR "operating plan" OR (annual /3 expens*))
13. Institute AND ("annual report" OR "impact report" OR "annual plan")
14. Institute AND ("advisory council" OR (Institute /20 council))
15. Institute AND (website* OR logo OR "visual identity" OR brand*)
16. Institute AND (fundrais* OR fund)
17. Institute AND (fellow* OR scholar*)
18. Institute AND (curricul* OR course* OR class OR classes OR program* OR syllab*)
19. Institute AND (Catholic OR Bishop* OR Congress)
20. Institute AND (invit* OR event* OR lecture* OR speech OR panel* OR symposium OR sponsor* OR host* OR timeline* OR timetable* OR dignitar* OR conference* OR activit* OR award* OR announcement* OR "press release*")

---

[2]    The full list of search terms requested by the Foundation is attached as Exhibit F. The University's last proposed list is also attached for purposes of comparison as Exhibit G.

21. Institute AND (expend* /3 portion)
22. Institute AND "progress notice"
23. Institute AND ("keller center" OR signage OR ("keller center" /3 sign))
24. Institute AND (event /3 plan*)
25. Institute AND "communications manager"
26. Institute AND "satellite conference*"
27. Institute AND nominee

These terms are all tailored to collect ESI which relates to the Grant Agreement at issue between the parties and other documents relevant to the issues before the Court. All of the listed terms reference either (1) terms of art from the Grant Agreement that are unlikely to be used in non-relevant documents or communications or (2) include other terms found in the Grant Agreement and reference The Pearson Institute (i.e., the "Institute") to narrow the scope of the term. The vast majority of listed modifiers (e.g., "advisory council" or "progress notice") relate to specific terms and phrases used in the Grant Agreement and would yield documents relevant to the University's compliance (or lack thereof) with the Grant Agreement.

The University has objected to these terms on the basis that it has over 20 institutes throughout the entire University. This objection is unavailing for a variety of reasons. First, the vast majority of the terms above are specific phrases from the Grant Agreement. It is unlikely such terms would be used in contexts that are not relevant to this litigation. Second, the University is not searching the entire world of documents that the University possesses. To the contrary, the University is searching only the custodians the parties have agreed on (and any it may be ordered to include by the Court) and relevant shared drives, such as those maintained for The Pearson Institute. This is likely to significantly limit irrelevant documents returned by such a search that may relate to another University "Institute". The University should be compelled to utilize the search terms listed above, as well as the others included in Exhibit F, for the search and production of the University's ESI.

19

IV.    **THE UNIVERSITY SHOULD BE COMPELLED TO COLLECT DATA FROM ALL UNIVERSITY CUSTODIANS' MOBILE DEVICES AND RUN SEARCH TERMS AGAINST THE DATA.**

As noted above, the parties have entered into an ESI Protocol that provides for, among other things, the collection of ESI from custodians and the production of that ESI in a specific format, set forth in great detail in the parties' ESI Protocol.  (Stipulated ESI Protocol, Exhibit H, pp. 1-2 and Exhibit A thereto).  The ESI Protocol contemplated that the parties would negotiate which custodians would be collected from and what search terms would be run against those data collections. (*See id.*, p. 1, ¶ 1A). Despite agreeing to the ESI Protocol, the University is now refusing do full data collections and searches of University custodians' mobile devices for all responsive ESI. Instead, the University is now claiming that it can perform targeted collections of text messages alone, based upon the representations its custodians make about whether they have responsive text messages.[3] This is inconsistent with the process contemplated by the ESI Protocol and unfair in light of the University's refusal to agree to the Foundation's proposal to perform targeted collections from two of the Foundation's witnesses.[4] The University should be compelled to do full data collection of all of its custodians' mobile devices and run search terms against the data.

---

[3]    The University has stated that it believes some University custodians' cell phones are not within its possession, custody, or control. The University, however, has refused to identify which custodians this purportedly applies to or what criteria it is using to make that determination. In any event, the University has stated that it would provide "screenshots" of text messages for any custodian that reported having responsive information. The University's ability and willingness to produce such information directly contradicts any claim that such ESI is not within its possession, custody, or control.

[4]    The term "targeted collection" is intended here to mean the process of obtaining only the documents a witness identifies as responsive, in contrast to the process of running search terms on a full data set to generate a subset of responsive documents.

The University has an obligation to produce all responsive, non-privileged documents and ESI. This includes ESI contained on mobile devices, such as cell phones and tablets. The parties agreed to the ESI Protocol (which was initially proposed by the University) so that there would be consistency and reliability in the production of ESI. In negotiations over the ESI Protocol, the University attempted to add language removing cell phones and other mobile devices from the ESI Protocol's purview, but ultimately agreed to the version attached as Exhibit H, which omits the language that excluded such devices from collection. Hence, the parties contemplated production of ESI from mobile devices and agreed that such collections would occur.

Recently, the University has attempted to avoid utilizing search terms on mobile device data and stated that it would only produce screen shots of responsive text messages for some custodians. The University stated that this process would rely on those custodians to self-report whether they had responsive text messages. This proposal is unsatisfactory for several reasons. First, it is inconsistent with the ESI Protocol, which contemplates the use of search terms to collect responsive ESI. Second, it is inherently unreliable, as it contemplates witnesses' attempting to recall whether they sent any relevant text messages in the last four years. The parties' election to use search terms was intended to avoid this kind of unreliable collection. Third, the University's proposal disregards the fact that mobile devices are likely to contain responsive ESI beyond just text messages. And finally, the proposal is inconsistent with the University's rejection of the Foundation's proposal to do targeted collection for two potential witnesses that the University has requested as Foundation custodians, David and Philip Pearson. Both David and Philip Pearson have stated that they have in their possession a single responsive document, but the University rejected the Foundation's proposal to collect those two responsive documents and steadfastly

maintains that full data collections and the use of search terms should be applied for both witnesses. The University cannot have it both ways.

In light of the University's obligations under the Federal Rules and the parties' ESI Protocol, it should be compelled to perform full data collections for all University custodians' mobile devices and run search terms against those collections.

## CONCLUSION

Based on the foregoing, the Foundation respectfully requests that the Court enter an Order compelling the University to (1) provide full responses and responsive documents with respect to Interrogatory Nos. 5 and 11 and Request for Production Nos. 24, 29, and 31; (2) include Joseph Neubauer, David Greene, Russell Herron, and Kim Taylor as custodians for document production as set forth herein; (3) utilize the search terms attached as Exhibit F for the search and production of University documents; and (4) collect and produce responsive ESI from all University custodians' mobile devices.

Respectfully submitted,


s/  P. Scott Hathaway
P. Scott Hathaway, OBA # 13695
Isaac R. Ellis, OBA # 30072
4000 One Williams Center
Tulsa, OK  74172-0148
Telephone:  918-586-8510 P. Scott Hathaway
Facsimile:  918-586-8610 P. Scott Hathaway
Telephone:  918-586-8996 Isaac Ellis
Facsimile:  918-586-8322 Isaac Ellis
Email:     shathaway@cwlaw.com
           iellis@cwlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of December, 2018, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following registrants:

Andrew C. Baak
Rebecca W. Bacon
Jessica Lynn Dickerson
Jeffrey A. Hall
William S. Leach
Taylor A. R. Meehan
Faye E. Paul

<div style="margin-left:40%">

s/ P. Scott Hathaway
P. Scott Hathaway

</div>