IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

THE THOMAS L. PEARSON AND
THE PEARSON FAMILY MEMBERS FOUNDATION,

        Plaintiff and Counterclaim
        Defendant,

   v.

THE UNIVERSITY OF CHICAGO,

        Defendant and Counterclaimant.

  AND

THE UNIVERSITY OF CHICAGO,

        Counterclaimant and Defendant,

   v.

THE THOMAS L. PEARSON AND
THE PEARSON FAMILY MEMBERS FOUNDATION,

        Counterclaim Defendant and
        Plaintiff,

THOMAS L. PEARSON,

        Counterclaim Defendant.

No. 18-cv-99-GKF-FHM

## THE UNIVERSITY OF CHICAGO'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL

**Table of Contents**

Introduction ........................................................................................................... 1

Background ........................................................................................................... 2

Argument ............................................................................................................. 2

I.  The Harm That Would Result From Producing Highly Sensitive and Confidential Information About Faculty Hiring Far Outweighs Any Arguable Relevance ................... 2

  A.  The Foundation Contracted Away any Role or Authority in Faculty Hiring ........ 3

  B.  Disclosure of the University's Tenure Files Would Threaten the Integrity of its Academic Hiring .................................................................................. 5

II.  The University Should Not Be Compelled to Provide Even More Detail About the Pearson Institute's Curriculum ........................................................................ 7

III.  The University Should Not Be Compelled to Produce Irrelevant and Sensitive Information from Calendars of University Officials ........................................... 8

IV.  The University Should Not Be Required to Collect Documents from the Four Additional Custodians the Foundation Seeks .................................................... 9

  A.  Chairman of the Board of Trustees Joseph Neubauer .......................................... 10

  B.  Former Executive Vice President David Greene .................................................. 10

  C.  University General Counsel Kim Taylor and Senior Associate General Counsel Russell Herron ........................................................................ 11

V.  The University Should Not Be Compelled to Use the Foundation's Additional Demanded Search Terms .................................................................................. 13

VI.  The University Should Not Be Compelled to Collect Personal Data on its Custodians' Mobile Phones .............................................................................. 14

Conclusion ............................................................................................................. 15

# Table of Authorities

**Cases**

*Blum v. Schlegel*,
150 F.R.D. 38 (W.D.N.Y. 1993) ............................................................................ 6

*Cotton v. Costco Wholesale Corp.*,
No. 12-2731-JW, 2013 WL 3819974 (D. Kan. July 24, 2013) ............................... 14

*Hayse v. City of Melvindale*,
Civ. Act. No. 17-13294, 2018 WL 3655138 (E.D. Mich. Aug. 2, 2018), *objections overruled*, Civ. Act. No. 17-13294, 2018 WL 4961528 (E.D. Mich. Oct. 15, 2018).............. 15

*Ibrahim v. Am. Univ.*,
No. 98-1032 TFH, 1999 WL 458166 (D.D.C. May 24, 1999) .................................. 6

*Keyishian v. Bd. of Regents of Univ. of New York*,
385 U.S. 589 (1967) .............................................................................................. 6

*Kumar v. Board of Trustees*,
774 F.2d 1 (1st Cir. 1985) ..................................................................................... 6

*Lindley v. Life Inv'rs Ins. Co. of Am.*,
267 F.R.D. 382 (N.D. Okla. 2010), *aff'd in part as modified*,
No. 08-CV-0379-CVE-PJC, 2010 WL 1741407 (N.D. Okla. Apr. 28, 2010) ................... 11, 12

*Lindley v. Life Inv'rs Ins. Co. of Am.*,
No. 08-CV-0379-CVE-PJC, 2010 WL 1741407 (N.D. Okla. Apr. 28, 2010) .......................... 12

*Mortgage Resolution Servicing, LLC v. JPMorgan Chase Bank, N.A.*,
15 Civ. 0293 (LTS) (JCF), 2017 WL 2305398 (S.D.N.Y. May 18, 2017) ................................ 9

*Note Funding Corp. v. Bobian Investment Co.*,
1995 WL 662402 (S.D.N.Y. Nov. 9, 1995) ............................................................ 12

*Regan-Touhy v. Walgreen Co.*,
526 F.3d 641 (10th Cir. 2008) ............................................................................... 6

*Theidon v. Harvard Univ.*,
314 F.R.D. 333 (D. Mass. 2016) ............................................................................ 6

*University of Pennsylvania v. E.E.O.C.*,
493 U.S. 182 (1990) .............................................................................................. 6

*Westport Ins. Corp. v. Hippo Fleming & Pertile Law Offices*,
319 F.R.D. 214 (W.D. Pa. 2017) ............................................................................ 5

**Rules**

Fed. R. Civ. P. 34 .................................................................................................. 14

## Introduction

In its motion to compel, the Pearson Foundation misrepresents the University of Chicago's ongoing compliance with the Grant Agreement. Contrary to the Foundation's assertions, the University continues to comply with its obligations, and the Pearson Institute continues to grow, to contribute, and to thrive in its field. For example, in the last six months the Pearson Institute:

- Co-hosted with Queens University Belfast in Northern Ireland a conference of renowned international scholars and policy leaders to examine new strategies for addressing global conflicts;

- Held the inaugural Pearson Global Forum, a conference of leading scholars and policymakers from around the world who discussed and debated ideas for the prevention and resolution of global conflicts;

- Appointed Nobel Laureate Roger B. Myerson as the Pearson Institute's final faculty chair; and

- Moved into the University's newly renovated Keller Center.

Despite the Pearson Institute's progress and success, including completion of two of the key obligations (the Forum and the final faculty chair) that formed the basis of the Foundation's complaint, the Foundation persists in its efforts to avoid its contractual obligations and to revoke its grant.

The Foundation's motion also fails to accurately portray the broad scope of discovery the University already has agreed to—and the narrow limits the Foundation has imposed on its own discovery. The Foundation's demands would require the University to undertake additional burdensome and intrusive efforts to provide information that is irrelevant or marginally relevant, and in some cases also highly sensitive and confidential. The motion should be denied.

**Background**

The parties have engaged in substantial negotiations to try to resolve their discovery

disputes. In these negotiations, the University agreed to compromise by expanding the scope of

its document review, including agreeing to employ search terms that will result in the

University's review of over 280,000 documents from 22 custodians. Ex. 1, Paul Decl. ¶¶ 2-3.

These custodians include the principal University personnel involved in the University's

performance under the Grant Agreement, and various other, more peripheral, individuals

demanded by the Foundation. Despite the expansive discovery the University has agreed to, the

Foundation demands more, including:

- 26 additional search terms that would result in the University's review of more than 200,000 additional documents, none of which contain the word "Pearson";

- Four more custodians, including the University's Board Chairman and its General Counsel; and

- Full imaging of all 22 custodians' cell phones, even for those who have not sent or received text messages related to the Pearson Institute.

Meanwhile, at the time it moved to compel, the Foundation had not yet committed to

either the search terms it would use to identify potentially responsive documents or the complete

list of custodians from which the Foundation would gather documents. After filing its motion,

the Foundation committed to five custodians and search terms.

**Argument**

**I.     The Harm That Would Result From Producing Highly Sensitive and Confidential Information About Faculty Hiring Far Outweighs Any Arguable Relevance**

Three of the Foundation's discovery requests at issue seek information about the criteria

the University used in evaluating faculty candidates for the Pearson Institute and all documents

related to the University's hiring of the Pearson Institute's chaired faculty. Mot. at 5-6

(Interrogatory 5), 9-12 (Document Requests 24, 31). The broad scope of these requests would include highly sensitive information from faculty tenure files, including confidential recommendation letters.

In response to these requests, the University has produced the "Shils Report," a document prepared by the University's Committee on the Criteria of Academic Appointment that details the criteria the University uses for faculty appointments. *See* Ex. 2, University's Supplemental Discovery Resps. at 5; Ex. 3, Shils Report. The University, however, objects to producing (a) its tenure file materials, and related correspondence, for Pearson Institute faculty and (b) materials related to other Pearson Institute faculty candidates that the University considered but did not ultimately hire.

As reflected in the Grant Agreement, the University insisted and the Foundation agreed that the Foundation would have no role or authority in faculty hiring. Maintaining strict confidentiality of this highly sensitive information related to faculty candidates is essential to the integrity of the University's evaluation and selection of faculty. If—despite the Grant Agreement's express exclusion of the Foundation from any role in faculty hiring—the Foundation were permitted to use discovery in this case to obtain these highly sensitive faculty files, that would damage the rigorous and candid faculty evaluation process. The harm and burden of this discovery far outweighs any arguable relevance.

## A.   The Foundation Contracted Away any Role or Authority in Faculty Hiring

As the University insisted, the Grant Agreement expressly protects its faculty hiring process from any interference, oversight, or involvement by the Foundation and the Pearsons:

> The Donor acknowledges and agrees that neither it, nor any member of the Pearson Family . . . will have any role or authority with respect to making appointments (academic or professional) to the Pearson Institute or the Pearson Forum . . . .

Ex. 4, § 3.5(b), Grant Agreement. The Foundation argues that, despite this Grant Agreement provision, it is entitled to information related to the University's recruitment and consideration of faculty for the Pearson Institute, including tenure files. The Foundation relies on its allegation "that the University breached the Grant Agreement by hiring two junior, non-tenured professors . . . ." Mot. at 6.[1]

This allegation cannot overcome the express terms of the Grant Agreement. While the Foundation in a footnote disclaims seeking "authority over the hiring process," in the next breath the Foundation says that it "seeks to enforce the parties' understanding" regarding the "preeminence and stature" of the Pearson Institute faculty. Mot. at 6 n.1. These allegations are a direct attack on the qualifications of the faculty hired by the University, and are precisely the type of interference prohibited by section 3.5(b) of the Grant Agreement. The Foundation agreed that it would have no "role or authority" over faculty hiring decisions for the Pearson Institute. That provision remains in effect and should inform the scope of permissible discovery. Even setting aside section 3.5(b), the Foundation's motion offers little explanation for why the tenure files and related documents are relevant to the parties' contractual dispute—for example, the Foundation cites no language from the Grant Agreement that sets forth qualifications for the two Pearson Institute chair positions at issue or that constrains the University's hiring discretion.

Contrary to the Foundation's suggestion, the Court did not validate the theory that the Foundation could prove a breach claim based on the qualifications of the Pearson Institute faculty. Mot. at 6, 10. In ruling on the University's motion to dismiss, the Court chose not to reach the question of the proper scope of the Foundation's faculty-hiring claim: "Regardless [of

---

[1] The Foundation also relies on its allegation that the University "fail[ed] to keep the Foundation informed regarding recruitment" of the chaired faculty. Mot. at 6. Proof of this allegation will turn on the University's communications with the Pearsons, which the University will produce.

the faculty-qualification allegation], the Foundation's allegations that the University has not appointed the final faculty chair and has not kept the Foundation reasonably informed of its efforts to do so adequately state claims for breach of §§ 3.4 and 5.1." Dkt. No. 46, Opinion and Order at 16. The Court permitted the faculty-hiring claim to proceed based on the Foundation's allegation that the final Pearson Institute chair was not filled—the University has since appointed Nobel Laureate Roger Myerson to fill that position—but the Court did not address whether the Foundation's allegations about the qualifications of the Pearson Institute faculty were properly within the scope of this claim.

While the Court did not need to reach this issue at the motion to dismiss stage, the Foundation's decision to pursue invasive discovery into the University's hiring process squarely implicates section 3.5(b) of the Grant Agreement. The Foundation should not be permitted to circumvent its contractual commitment to avoid any role in the University's academic hiring decisions by obtaining highly sensitive information about that process.

**B.**   **Disclosure of the University's Tenure Files Would Threaten the Integrity of its Academic Hiring**

Even in cases where a party did not expressly contract away any involvement in hiring decisions, courts have been cautious in ordering the production of personnel records like those sought by the Foundation. "Because there is a strong public policy against disclosure of personnel information, such requests are subject to a heightened relevancy standard." *Westport Ins. Corp. v. Hippo Fleming & Pertile Law Offices*, 319 F.R.D. 214, 218 (W.D. Pa. 2017) (denying a motion to compel personnel records of insurance company employees in a coverage dispute). As then-Judge Gorsuch stated in affirming an Oklahoma district court's refusal to allow such discovery, while personnel files are not "categorically out-of-bounds" in discovery, they "often contain sensitive personal information . . . and it is not unreasonable to be cautious about

5

ordering their entire contents disclosed willy-nilly." *Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 648-49 (10th Cir. 2008).

This caution has particular force in the context of university hiring decisions, where academic freedom is also implicated. "[C]ourts must be extremely wary of intruding into the world of university tenure decisions." *Kumar v. Board of Trustees*, 774 F.2d 1, 12 (1st Cir. 1985) (Campbell, C.J., concurring); *see also Keyishian v. Bd. of Regents of Univ. of New York*, 385 U.S. 589, 603 (1967) ("Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned.").

For that reason, before ordering production of documents related to faculty hiring, courts carefully balance the risks of disclosure against the requesting party's showing, if any, that the discovery is relevant to a party's claims. *See, e.g., Blum v. Schlegel*, 150 F.R.D. 38, 42 (W.D.N.Y. 1993) (denying motion to compel tenure files because plaintiff did not demonstrate their relevance and "allowing disclosure . . . would have serious potential for harm to [professors'] interests in candid, professional evaluation of their qualifications as law professors"). Although the Supreme Court declined to recognize an outright privilege against disclosure of tenure files in *University of Pennsylvania v. E.E.O.C.*, 493 U.S. 182, 193 (1990), cases allowing access to tenure files, including *University of Pennsylvania*, have generally arisen in the context of employment discrimination claims, where personnel records—in contrast to this case—are central. *See, e.g.*, *Theidon v. Harvard Univ.*, 314 F.R.D. 333, 336 (D. Mass. 2016) (ordering production because "[t]he information at issue is essential to Theidon's effort to acquire probative evidence" supporting her discrimination claim); *Ibrahim v. Am. Univ.*, No. 98-1032 TFH, 1999 WL 458166, at *2 (D.D.C. May 24, 1999) (ordering production because "the

information contained in the tenure files is relevant—and may be crucial—to plaintiff's [discrimination] claims").

Like other institutions of higher education, the University requires and depends on the utmost candor from those—both internal and external to the University—who provide assessments of, evaluate, and vote on faculty candidates. *See* Ex. 3, Shils Report at 7 (describing the importance of evaluations from students, faculty, and external assessors). Production under the protective order would not sufficiently mitigate the harm of disclosure because *any* disclosure of faculty tenure files risks chilling the integrity of the process not only at the University of Chicago, but potentially at other institutions of higher education as well. Recommenders who believe their letter will be viewed by someone other than the members of the faculty search committee may be less likely to give candid feedback. A voting faculty member who is concerned that the tenure vote will be revealed outside the University will be less likely to vote according to conscience.

Given the highly sensitive nature of this discovery, and the Foundation's inability to demonstrate its relevance, disclosure is not justified.

## II.   The University Should Not Be Compelled to Provide Even More Detail About the Pearson Institute's Curriculum

The Foundation's interrogatory 11 seeks information about the Pearson Institute's curriculum. In response, the University provided a list of the 27 courses the Pearson Institute has offered (or intends to offer) from the launch of the Pearson Institute through the 2018-2019 academic year. Mot. at 7-8. The University provided the name of each course, the professor who taught (or is scheduled to teach) it, and the academic year during which the course was (or is planned to be) taught. *Id.*

The Foundation insists that the University must also describe "whether, and to what degree" each course "was taught by that respective professor, or other professors, instructors, or teaching assistants, prior to the creation of The Pearson Institute." Mot. at 7. But that portion of the request seeks information that has no relevance to the University's obligations under the Grant Agreement. Even if a faculty member relied on prior course materials and ongoing research in developing a syllabus for a course taught in connection with the Pearson Institute, the Foundation offers no explanation for why this would be improper under the Grant Agreement. The Agreement does not impose any specific requirements for the content of the Pearson Institute's curriculum. To the contrary, the Agreement preserves the University's academic independence by explicitly prohibiting the Foundation from having "any role or authority with respect to . . . setting the research agenda for the Institute." Ex. 4, § 3.5(b). Because the Foundation has made no showing that the level of detail it seeks about the Pearson curriculum is relevant, the University should not be compelled to go through the exercise of compiling the information.

### III.    The University Should Not Be Compelled to Produce Irrelevant and Sensitive Information from Calendars of University Officials

The Foundation's document request 29 seeks "all appointment books or log, diaries, and/or calendars" for President Robert Zimmer, Provost Daniel Diermeier, Associate Provost Nichole Nabasny, and Pearson Institute Director James Robinson. Mot. at 10. The University has agreed to produce calendar entries that relate to the Pearson Institute, the Pearson Forum, or the Foundation's gift. But the University objects to the Foundation's unreasonable request to produce entire calendars for these University officials because the calendars include sensitive information that is wholly unrelated to this lawsuit, the Pearson Institute, or the Grant Agreement.

The calendars of President Zimmer and Provost Diermeier, in particular, may include highly confidential and sensitive information about, for example, the University's strategic plans and finances, current and prospective donors, unrelated legal issues, and personnel matters. The University has agreed to produce relevant entries and the Foundation offers no plausible basis for its intrusive request for irrelevant ones.

## IV.   The University Should Not Be Required to Collect Documents from the Four Additional Custodians the Foundation Seeks

The University has agreed to collect documents from 22 custodians, including the University President, Provost, and multiple Vice Presidents; University personnel primarily responsible for the University's performance under the Grant Agreement; the Pearson Institute's key staff; and the challenged Pearson faculty. The Foundation nonetheless insists that the University include additional custodians whose involvement was inconsequential or who have documents that are substantially duplicative or privileged.

As the responding party, the University is best situated to know which custodians most likely possess responsive, non-privileged information. *Mortgage Resolution Servicing, LLC v. JPMorgan Chase Bank, N.A.*, 15 Civ. 0293 (LTS) (JCF), 2017 WL 2305398, at \*2-3 (S.D.N.Y. May 18, 2017). The Foundation had demanded the University include 28 custodians (while the Foundation offered only two of its own). Ex. 5, 8/16/18 Ellis Email. The University had proposed 16 custodians, but in an effort to compromise and avoid involving the Court, the University agreed to collect from six more. Ex. 1, Paul Decl. ¶ 3. In addition to the key individuals noted above, the University's agreed list now includes custodians who are peripheral, at best, such as two administrative assistants, two custodians whose only relationship to the Pearson Institute was to help staff prepare budgets and approve expenses, and two custodians whose role was limited to the September 2015 grant announcement. *Id.* ¶¶ 4-8. Meanwhile, the

Foundation refused to expand its original offer of two custodians until after filing this motion, when it agreed to collect documents from three additional officers of the Foundation. Ex. 6, 1/9/19 Ellis Email.

### A.    Chairman of the Board of Trustees Joseph Neubauer

As Chairman of the University's Board of Trustees, Mr. Neubauer has had no direct connection to the issues in this case. He had no role in negotiating the Grant Agreement, no responsibility for managing the operation of the Pearson Institute, and no involvement in the University's performance under the Agreement.

It is highly unlikely that Mr. Neubauer will have relevant and "unique" documents, given his very limited involvement. Mot. at 15-16. The University has agreed to produce non-privileged portions of minutes and agendas of Board meetings that reference the Pearson Institute, the Pearson Forum, or the Foundation's gift. Relevant non-privileged communications with the Board and the Executive Committee, Mot. at 16, will be included in the documents the University is collecting from President Zimmer, who is a custodian.

### B.    Former Executive Vice President David Greene

Mr. Greene left his position as Executive Vice President at the University for a role at another institution in 2014, more than nine months before the parties executed the Grant Agreement. As the Foundation notes, Mr. Greene's involvement was limited to his participation in meetings "*leading up to* the negotiations" over the Grant Agreement. Mot. at 16 (emphasis added). He had no role in the negotiations themselves. To the extent Mr. Greene authored or received any emails about the Pearsons' proposed gift in the first half of 2014, those emails would likely have included the primary University representatives at that time, David Fithian and Kenneth Manotti, both of whom are document custodians.

Beyond his tangential connection to the case, it would be a significant burden to include Mr. Greene as a custodian. The University would have to (1) collect and process any of Mr. Greene's emails that remain on the University's legacy storage systems, (2) run search terms that, by design, capture an over-inclusive set of documents, and (3) review those documents for responsiveness and privilege. Given Mr. Greene's limited role in early discussions with the Pearsons, it is not proportionate to the needs of the case for the University to include him as a custodian.

### C.   University General Counsel Kim Taylor and Senior Associate General Counsel Russell Herron

Both Ms. Taylor and Mr. Herron have acted as legal counsel and provided legal advice throughout the University's dealings with the Foundation and the Pearsons. Much like the Foundation's own counsel—who the Foundation has refused to include as custodians—a substantial portion of Ms. Taylor's and Mr. Herron's documents are protected from discovery because they are attorney-client privileged or attorney work product. The University determined early in its discussions with the Pearsons that substantial legal counsel, and an extensively drafted and negotiated agreement, would be required in connection with the Foundation's grant for two main reasons: (1) the complexity of the Grant Agreement, and (2) the Foundation had engaged its own counsel—Daniel Shapiro and Neil Kawashima—to negotiate the terms of that agreement.

The Foundation's argument that because Ms. Taylor and Mr. Herron are inside University counsel their advice "is presumptively business advice, rather than legal advice" misstates the law. Mot. at 16. The case the Foundation quotes and cites, *Lindley v. Life Inv'rs Ins. Co. of Am.*, 267 F.R.D. 382 (N.D. Okla. 2010), *aff'd in part as modified*, No. 08-CV-0379-

CVE-PJC, 2010 WL 1741407 (N.D. Okla. Apr. 28, 2010), did not adopt such a presumption.[2] Instead, *Lindley* considered the attorney's status as in-house counsel as just "one of many factors in determining whether the communication at issue was made for the purpose of seeking or providing legal advice." *Id.* at 391. As courts in Oklahoma and New York recognize, the privilege analysis for inside counsel turns on whether the communication is legal advice, which is protected, or business advice, which is not. *See, e.g., Lindley v. Life Inv'rs Ins. Co. of Am.,* No. 08-CV-0379-CVE-PJC, 2010 WL 1741407, at *5 (N.D. Okla. Apr. 28, 2010) (reversing magistrate's order compelling production where the document "contain[ed] legal advice that defendant treated as a confidential communication between itself and its in-house counsel"); *Note Funding Corp. v. Bobian Investment Co*., 1995 WL 662402, *3-4 (S.D.N.Y. Nov. 9, 1995) ("If attorney presents or answers questions or issues of commercial strategy, but presents and analyzes those issues 'on the basis of his legal expertise and with an obvious eye to the constraints imposed by applicable law,' then the communication is privileged." (citations omitted)). The roles of Ms. Taylor and Mr. Herron in connection with the Pearson Institute have been as legal counsel for the University.

Moreover, Ms. Taylor's and Mr. Herron's responsive emails to and from the 22 University custodians—which includes all University personnel with a substantial role in this dispute as well as some with only a tangential role—will be produced, or logged as privileged, in connection with the review of those 22 custodial files. The University's review already includes several thousand such emails.

---

[2] The Foundation relies on Oklahoma privilege law, even though the Grant Agreement provides for New York law. Dkt. No. 46, Opinion & Order at 7 ("Here, both parties agree the Grant Agreement's choice-of-law clause applies and that New York law governs the Foundation's claims."). The Court need not decide whether New York or Oklahoma privilege law applies because they are consistent as applied here.

Even as it demands that the University's counsel be designated as custodians, the Foundation refuses to include its own counsel, Mr. Shapiro and Mr. Kawashima, as custodians. Ex. 6, 1/9/19 Ellis Email. Both were involved with negotiating the Grant Agreement on behalf of the Foundation. In addition to his role as counsel to the Foundation, Mr. Shapiro is also an officer of the Foundation and its representative on the Pearson Institute Advisory Council. The Foundation refuses to include Mr. Shapiro and Mr. Kawashima as custodians because it says "the vast majority" of their documents are attorney-client privileged or are duplicative of documents in the other Foundation custodians' files. Ex. 5, 8/16/18 Ellis Email at 3. The same analysis applies to Ms. Taylor's and Mr. Herron's documents.

## V. The University Should Not Be Compelled to Use the Foundation's Additional Demanded Search Terms

The Foundation also asks the University to run 26 additional terms against the documents of its 22 custodians, which would add more than 200,000 documents to the more than 280,000 the University has already agreed to review.

The University has already agreed to review any document that uses the term "Pearson," "Global Forum," or any of more than a dozen other terms. Ex. 7, University's Search Terms. In August and September, the parties exchanged proposals for search terms the University would apply. Ex. 8, 8/21/18 Meehan Email; Ex. 9, 9/13/18 Ellis Email. In October, in an effort to avoid a protracted discovery fight, the University agreed to run nearly every term the Foundation requested. Ex. 10, 10/2/18 Paul Email.

But less than a week later, the Foundation changed its position and greatly expanded the list of terms it demanded. Ex. 11, 10/8/18 Ellis Email. The expanded list of terms the Foundation demands would add more than 200,000 documents to the University's document review. Ex. 1, Paul Decl. ¶ 9. Most of the Foundation's additional demanded terms are a combination of

"Institute" with another generic term, such as "contract," "agreement," or "chair." Mot. at 18-19. As the University explained during the parties' negotiations, the University has over 30 institutes and therefore generally includes the term "Pearson" when referring to the Pearson Institute. Ex. 1, Paul Decl. ¶ 10.

The Foundation incorrectly claims the terms are "tailored" and speculates that it is "unlikely such terms would be used in contexts that are not relevant to this litigation." Mot. at 19. The University's counsel reviewed a random sample of 100 of these additional documents and none were responsive to the Foundation's document requests. Ex. 1, Paul Decl. ¶ 11. That is not a surprise because the University is already running the term "Pearson" along with numerous other terms.  So, by design, the Foundation's additional terms capture only documents that do *not* mention Pearson, Pearson Institute, Pearson chair, etc. The University should not be required to undertake this unreasonable burden.

## VI.    The University Should Not Be Compelled to Collect Personal Data on its Custodians' Mobile Phones

The Foundation seeks to compel the University to image, search, and review the mobile phones of 22 custodians. Mot. at 20-22. The Foundation's intrusive position is baseless.

First, Rule 34 only permits the Foundation to request material in the University's "possession, custody, or control." Fed. R. Civ. P. 34(a)(1). Some of the 22 custodians have personal cell phones that the University neither purchased nor pays for. The University's technology policy does not give the University the right to access personal data on those employees' personal mobile phones. *See* Ex. 12, "University's Policy on Information Technology Use and Access" at 3 (available at https://its.uchicago.edu/acceptable-use-policy/). As to those custodians, the University cannot be compelled to collect, search, and review all of the data, including mostly personal data, on those mobile devices. *See Cotton v. Costco*

*Wholesale Corp.*, No. 12-2731-JW, 2013 WL 3819974, at *6 (D. Kan. July 24, 2013) (denying motion to compel production of text messages where court found Costco did not have "possession, custody, or control" over employees' personal cell phones); *Hayse v. City of Melvindale*, Civ. Act. No. 17-13294, 2018 WL 3655138, at *7 (E.D. Mich. Aug. 2, 2018), *objections overruled*, Civ. Act. No. 17-13294, 2018 WL 4961528 (E.D. Mich. Oct. 15, 2018) (denying motion to compel text messages because the requesting party "has not met his burden of demonstrating that the personal devices belonging to the nonparty employees are within the defendants' possession, custody or control").

Nonetheless, the University has agreed to ask each custodian—except for two who are former employees—whether they have any relevant communcations and, if so, to collect and produce responsive nonprivileged messages. Ex. 1, Paul Decl. ¶ 12. For custodians who are uncertain whether they may have relevant messages on their phone, the University's counsel and eDiscovery vendor have worked with the custodian to conduct relevant searches of their native messaging applications. Ex. 1, Paul Decl. ¶ 13.

The Foundation argues that this process is deficient because it is "based upon the representations [the University's custodians] make about whether they have responsive text messages." Mot. at 20. But it is not improper or unreasonable for the University to rely on a custodian's representation that he or she does not send or receive text messages about the Pearson Institute or the Pearsons. There is no basis to require the University to take steps beyond the reasonable course to which it has agreed.

### Conclusion

For the foregoing reasons, the University respectfully requests that the Court deny the Foundation's motion to compel.

Dated: January 22, 2019

WILLIAM S. LEACH, OBA#14892
JESSICA L. DICKERSON, OBA#21500
McAfee & Taft, a Professional Corporation
Williams Center Tower II
Two West Second Street, Suite 1100
Tulsa, Oklahoma 74103
Telephone: (918) 587-0000
Facsimile: (918) 599-9317
Email:  bill.leach@mcafeetaft.com
          jessica.dickerson@mcafeetaft.com

Respectfully submitted,

 /s/ Jeffrey A. Hall
Jeffrey A. Hall
Rebecca Weinstein Bacon
Faye E. Paul
Taylor A.R. Meehan
BARTLIT BECK LLP
54 West Hubbard Street
Chicago, Illinois 60654
t: (312) 494-4400
f: (312) 494-4440
jeffrey.hall@bartlit-beck.com
rweinstein.bacon@bartlit-beck.com
faye.paul@bartlit-beck.com
taylor.meehan@bartlit-beck.com

Andrew C. Baak
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, Colorado 80202
t: (303) 592-3100
f: (303) 592-3140
andrew.baak@bartlit-beck.com

*Counsel for Defendant and Counterclaimant,*
*The University of Chicago*

16

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 22nd day of January, 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following registrants:

P. Scott Hathaway
Isaac R. Ellis
4000 One Williams Center
Tulsa, Oklahoma 74172
Attorneys for Plaintiffs

*/s/* Jeffrey A. Hall
Jeffrey A. Hall
