IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

The Thomas L. Pearson and
The Pearson Family Members Foundation,

    Plaintiff and Counterclaim Defendant,

v.

The University of Chicago,

    Defendant and Counterclaimant,

v.

Thomas L. Pearson,

    Counterclaim Defendant.

Case No.: 18-CV-99-GKF-FHM

## THE THOMAS L. PEARSON AND THE PEARSON FAMILY MEMBERS FOUNDATION'S REPLY IN SUPPORT OF ITS MOTION TO COMPEL

Plaintiff/Counter-Defendant The Thomas L. Pearson and the Pearson Family Members Foundation (the "Foundation") submits this Reply in Support of its Motion to Compel.

### INTRODUCTION

The University of Chicago (the "University") has inaccurately attempted to portray its stance in discovery as generous. The reality is far different. It is the Foundation that has agreed to all of the search terms the University has requested and nearly all of the custodians requested (apart from two lawyers in private practice).[1] And while the University inevitably has more custodians

---

[1] This includes agreeing to two custodians, David and Philip Pearson, who have had no involvement whatsoever in The Pearson Institute or the facts at issue in this case. Their only relation to this matter is that, because of their familial relationship, they were both designated as Vice Presidents of the Foundation for purposes of attending the public announcement of the Grant Agreement on September 30, 2015.

and more documents to search for and review, it does not mean that it should be able to avoid collecting and producing relevant, discoverable documents and information by pointing to numbers alone as evidence of its burden.

The University's Response (Doc. 57) is a continuation of the University's efforts to unilaterally narrow the scope of the Foundation's claims, where the Court has declined to do so. The University opposes discovery on the topics of faculty selection and curriculum, but those issues are squarely raised in the Foundation's breach of contract and breach of good faith and fair dealing claims. The University's additional concerns raised regarding confidentiality are meritless given the Protective Order in place. In addition, the additional sources of discovery sought in the Foundation's Motion—additional search terms, four custodians, and ESI from mobile devices— are reasonable given the serious issues at stake in this case and the amount in controversy. The University has not demonstrated otherwise and the Foundation's Motion to Compel should be granted in its entirety.

**ARGUMENT**

**I.    Faculty Selection Documents and Information Are Relevant, Discoverable, and Can Be Protected from Public View by the Stipulated Protective Order.**

The University had an obligation to staff The Pearson Institute with elite faculty that would give the Institute instant credibility on the world stage. The Foundation's claims are based in part on the University's failure to adequately fulfill this obligation. Nevertheless, the University is resisting this discovery, asserting that production of information and documents related to the selection of faculty for The Pearson Institute would bring about a parade of horribles. Specifically, the University claims that the requested discovery would "threaten the integrity" of its faculty hiring process and have a chilling effect on candidate feedback. (Response at 5-7). Given the Stipulated Protective Order in place and the rare occurrence of a lawsuit such as this, the

University's concerns are vastly overblown and do not warrant stifling the discovery process. Further, the University has failed to demonstrate that the Grant Agreement forecloses discovery on this topic.

The Stipulated Protective Order permits the parties to designate as confidential "sensitive information," which thereby prevents disclosure of the information to anyone other than "those persons who, by the Terms of [the] Order, may have access to Confidential Information." (Doc. 51 at 2; 5). As such, there is no risk that the faculty selection information or tenure files will become part of the public domain. The fact that such information, once produced, would be viewed by the University's adversary in this litigation is not a sufficient basis to suppress it. If the standard advanced by the University—essentially, concern that "someone other than" the original author of a document might view it (Response at 7)—were adopted as a basis to withhold the requested information, discovery in every case would grind to a halt. The Stipulated Protective Order was put in place to safeguard precisely this type of information and negates in its entirety the argument advanced by the University.

The University also opposes discovery based upon its self-serving interpretation of § 3.5(b) of the Grant Agreement. That provision, narrow in its scope, prohibits the Foundation and the Pearson Family from having any "role or authority *with respect to making appointments* (academic or professional) to [T]he Pearson Institute or the Pearson Forum…" (Doc. 57-4) (emphasis added). This provision—contrary to the University's misguided reading—does not say that there are simply no standards that the University must meet when it comes to faculty selection. The University would have the Court believe that it could select anyone off the street as a faculty member and not run afoul of its duties to the Foundation. This is not so. The University was tasked with creating a world-class institute, and indeed, it made representations that it would hire elite

faculty to achieve this goal. The University was likewise obligated to act in good faith in carrying out its agreement with the Foundation. The Foundation's claims assert that the University failed to do so when it selected junior-level, non-tenured individuals to serve as named chaired faculty and failed to keep the Foundation informed during the process.

The cases cited by the University actually buttress the Foundation's right to the discovery it seeks. The court's opinion in *Kumar v. Board of Trustees*, 774 F.2d 1 (1st Cir. 1985), makes clear the record in that case contained exactly the kind of documentary evidence the University is attempting to withhold in the instant matter. The *Kumar* court quoted extensively from correspondence and memoranda between university officials regarding Professor Kumar's qualifications. *See id*. at 2-7. In *Theidon v. Harvard Univ.*, 314 F.R.D. 333, 336 (D. Mass. 2016), another case cited by the University, the court ordered production of documents related to a university tenure decision because "the information at issue [was] essential to [the plaintiff's] effort to acquire probative evidence, an interest that outweigh[ed] Harvard's interest in confidentiality." *Id*. at 336. The court also relied on the fact that the documents would be "subject to a protective order allowing Harvard to designate them confidential and prohibiting their disclosure to the public." *Id*. In contrast, the court in *Blum v. Schlegel*, 150 F.R.D. 38, 40 (W.D.N.Y. 1993) denied discovery where the "court's review of the disputed documents reveal[ed] that the tenure review information requested by Plaintiff ha[d] *no bearing on any issue in the case*." (emphasis added). Here, the information sought relates squarely to the Foundation's claims, which assert that the University breached its agreement with the Foundation and its duty of good faith and fair dealing in the faculty selection process and by failing to keep the Foundation informed of the process.

Finally, the University references its appointment of Roger Myerson as the final faculty chair after the commencement of this litigation as further evidence that the Court should essentially dismiss part of the Foundation's claims through a discovery ruling. In fact, this very appointment reinforces the need for discovery on this topic. The selection of Professor Myerson as a faculty member of The Pearson Institute begs the question of why Professor Myerson, who has been with the University since long before the creation of The Pearson Institute, was not selected as one of the named chaired faculty earlier. Indeed, Professor Meyerson appears to be at least the third choice for the final named chaired faculty position after two others declined the position. The answer to this question—which the discovery sought by the Foundation is likely to shed light on—may be that Professor Myerson does not have expertise in the realm of global conflicts and that the University appointed him merely as part of its litigation strategy in an attempt to avoid an existing uncured default under the Grant Agreement. This appointment demands the discovery at issue in the Foundation's Motion, especially where the University is relying on it as a defense to the Foundation's claims.

**II.     The Foundation Has A Right to Discovery Regarding Curriculum.**

Once again, the University attempts to misconstrue the Grant Agreement in support of its quest to deny the Foundation discovery. Citing § 3.5(b) (quoted above), the University asserts that the Foundation is not entitled to learn whether any of the courses taught as part of The Pearson Institute were previously taught because the Foundation has no "role or authority" in "setting the research agenda of the Pearson Institute". (Response at 8; Grant Agreement, Doc. 57-4 at § 3.5(b)). The University further claims that the information sought has no relevance to the University's obligations under the Grant Agreement. Both arguments are disingenuous and without merit. First, as a matter of common sense, the curriculum of the Institute is not the same as the "research

5

agenda" referenced in § 3.5(b). Second, the parties' intent that *new* courses in the area of global conflicts be created for The Pearson Institute is explicitly referenced in the Grant Agreement:

> WHEREAS, University faculty and other academic appointees affiliated with the Pearson Institute will **develop educational programs, including academic courses**, within the Harris School of Public Policy Studies (the "Harris School") and other schools and divisions with the University relating to the study of global conflict and its resolution…

(Grant Agreement, Doc. 57-4 at 2, emphasis added).[2] In addition, the Grant Agreement sets forth requirements for the number of courses to be offered as part of The Pearson Institute. (*See id*. at Exh. C). Viewing the Grant Agreement in its totality, it is clear the University had a duty to create new course offerings for The Pearson Institute. The information sought by the Foundation is directly relevant to determining whether the University fulfilled this obligation and satisfied its obligation to act in good faith. As such, the University should be compelled to provide the responsive information.

### III. The University Should Be Compelled to Produce the Limited Calendar Information Sought by the Foundation.

The University's resistance to producing calendars for four of its custodians during a limited timeframe is unfounded. As noted above, the Stipulated Protective Order prevents public disclosure of these items if designated as confidential by the University, thereby alleviating its concerns about revealing "strategic plans" and other sensitive information. (Response at 9). Moreover, the calendars are critical to determining the time devoted to The Pearson Institute on the part of the University personnel at issue. The University should be compelled to provide the requested documents.

---

[2] "The recitals in the agreement must be considered to discover the intent of the parties." *Fiore v. Fiore*, 61 A.D.2d 1004, 1006, 402 N.Y.S.2d 1014, 1016 (1978), aff'd, 46 N.Y.2d 971, 389 N.E.2d 138 (1979).

### IV. The Four Additional Custodians Requested by the Foundation Have Unique, Relevant Documents.

The University has failed to demonstrate that the four additional custodians sought by the Foundation do not possess relevant, unique documents and it should therefore be compelled to collect and produce those custodians' ESI and paper documents.

**Chairman Joseph Neubauer.** The University does not refute that Chairman Neubauer possesses relevant documents and acknowledges his involvement in the facts at issue, albeit while mischaracterizing it as "very limited." (Response at 10). Notably, the University does not deny that it has portrayed Chairman Neubauer's meeting with the Pearsons as an act purportedly fulfilling a University meeting requirement under the Grant Agreement. The University's Response also impliedly acknowledges that the University's Board of Trustees has conducted meetings that are relevant to this dispute. (*See id*. (referencing University's agreement to produce Board minutes and agendas)). Given these factors, Chairman Neubauer, who is likely to have communicated about relevant subject matters of this litigation with others that are *not* existing custodians, should be designated as a custodian.

**David Greene.** The University's Response acknowledges Mr. Greene's involvement in the facts at issue but maintains that it would be a "significant burden" to collect his documents because they are on legacy storage systems. The University, however, fails to explain how this is burdensome or to provide any additional facts showing that the claimed burden is disproportionate to the benefit to be derived from the relevant documents at issue. There is no explanation as to the cost or time effort in obtaining the data. *In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*, No. 12-MD-2342, 2013 WL 8445354, at *4 (E.D. Pa. Oct. 31, 2013), report and recommendation adopted, No. 12-MD-2342, 2013 WL 8445280 (E.D. Pa. Nov. 19, 2013) ("A generalized reference to the burden of a discovery activity is far less convincing [than] specific affidavits or other

7

evidence that would quantify the cost or delay that the activity would impose."). As such, the University should be compelled to produce it. *Cont'l Illinois Nat. Bank & Tr. Co. of Chicago v. Caton*, 136 F.R.D. 682, 684-85 (D. Kan. 1991) ("All discovery requests are a burden on the party who must respond thereto. Unless the task of producing or answering is unusual, undue or extraordinary, the general rule requires the entity answering or producing the documents to bear that burden.").

**Kim Taylor and Russell Herron**. The University resists inclusion of Ms. Taylor and Mr. Herron as custodians based upon its conclusory statement that their roles in connection with The Pearson Institute have been solely "as legal counsel" – ignoring their roles as negotiators and/or drafters of the Grant Agreement. This is insufficient. As the party attempting to rely on a privilege to avoid discovery, the University possesses the burden to demonstrate that the privilege is applicable. *Barclaysamerican Corp. v. Kane*, 746 F.2d 653, 656 (10th Cir. 1984) ("The party seeking to assert the attorney-client privilege or the work product doctrine as a bar to discovery has the burden of establishing that either or both is applicable."); *accord Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 428 (S.D.N.Y. 2013). The University has not met its burden to show that the entirety of Ms. Taylor's and Mr. Herron's files are likely to be privileged. To the extent they have documents subject to a valid claim of privilege, those documents can be logged as such.

**V.     The Foundation's Requested Search Terms Are Likely to Generate Responsive Documents.**

Despite the Foundation having agreed to the full set of search terms requested by the University, the University refuses to reciprocate. The University represents that the additional terms requested by the Foundation would result in an added 200,000 documents for it to review for responsiveness and that a review of 100 random sample documents did not yield any relevant

documents. However, this information is insufficient to deny the Foundation's requested search terms.

The University has not provided any information regarding the number of specific hits generated by each requested search term. It could be that a single term included is resulting in the vast majority of documents, which could then be tailored to yield better results. In addition, the sample size of 100 documents out of over 200,000 is woefully insufficient to make any conclusive determinations. The Court has not been provided with any information regarding which terms yielded the 100 documents at issue and it would be improper to reject all of the requested terms on this basis. The Foundation therefore requests that the Court order the University to utilize the search terms as requested, or in the alternative, conduct an *in camera* review of a larger sample of documents composed of a number of documents generated by each search term so that an individualized and meaningful determination can be made with respect to the Foundation's requested search terms.

### VI. University Custodians' Mobile Devices are Within Its Possession, Custody, or Control and ESI from Those Devices Should Be Collected and Searched.

The University resists its obligation to produce all responsive ESI contained on its custodians' mobile devices solely on the basis that "[s]ome of the 22 custodians have personal cell phones that the University neither purchased nor pays for." (Response at 14). But the University provides no information about who those people are. It is evident, however, that **some** University custodians have mobile devices paid for (and therefore obviously controlled) by the University— the Court and the Foundation are simply left to guess which ones. Without any information about the circumstances surrounding University custodians' mobile devices (which the Foundation has repeatedly requested), it is impossible to make a determination about which custodians' mobile device ESI is or is not within the University's possession, custody, or control. In the absence of

9

any information about which individuals' mobile devices the University claims are out of its reach, the University's blanket request to avoid this discovery obligation should be dismissed out of hand.

The University's position is also belied by its own proposed method of collection—to ask if each custodian has relevant messages and then to collect and produce them. If the University is able to simply collect the messages at will, the devices at issue **are** within its possession custody or control. *See Ice Corp. v. Hamilton Sundstrand Corp.*, 245 F.R.D. 513, 516-17 (D. Kan. 2007) ("Courts have universally held that documents are deemed to be within the possession, custody or control if the party has actual possession, custody or control or has the *legal right to obtain the documents on demand*." (emphasis in original). Moreover, the University's Response is silent as to the fact that it now proposes targeted collections for all of its custodians despite having previously refused to permit the Foundation's request to perform targeted collections for two individuals that the Foundation has agreed to as custodians.[3] The University should be compelled to collect and search all custodians' mobile devices.

## CONCLUSION

The Foundation respectfully requests that the Court enter an Order granting the Foundation's Motion to Compel with respect to all of the foregoing issues.

---

[3] The University's attempt to shirk its data collection obligations stands in stark contrast to the efforts undertaken by the Foundation for its custodians. None of the Foundation's custodians have computers, phones, or email accounts maintained or provided by the Foundation. Nor are any of the custodians reimbursed by the Foundation for any costs and expenses associated with such data sources. Still, the Foundation obtained ESI from all of its custodians to perform searches of the data using the University's requested search terms to fully respond to the University's discovery requests

Respectfully submitted,

**THE THOMAS L. PEARSON AND THE PEARSON FAMILY MEMBERS FOUNDATION**


s/ P. Scott Hathaway
P. Scott Hathaway, OBA # 13695
Isaac R. Ellis, OBA # 30072
4000 One Williams Center
Tulsa, OK  74172-0148
Telephone:  918-586-8510 P. Scott Hathaway
Facsimile:  918-586-8610 P. Scott Hathaway
Telephone:  918-586-8996 Isaac Ellis
Facsimile:  918-586-8322 Isaac Ellis
Email:    shathaway@cwlaw.com
             iellis@cwlaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of February, 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following registrants:

Andrew C. Baak
Rebecca W. Bacon
Jessica Lynn Dickerson
Jeffrey A. Hall
William S. Leach
Taylor A. R. Meehan
Faye E. Paul

s/ P. Scott Hathaway
P. Scott Hathaway
