IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

The Thomas L. Pearson and
The Pearson Family Members Foundation,

    Plaintiff and Counterclaim Defendant,

v.

The University of Chicago,

    Defendant and Counterclaimant,

v.

Thomas L. Pearson,

    Counterclaim Defendant.

Case No.:  18-CV-99-GKF-FHM

**THE THOMAS L. PEARSON AND THE PEARSON FAMILY MEMBERS FOUNDATION'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION TO COMPEL** [1]

**I.   Statement of Position**

The Foundation's complaint in this case asserts that the University failed to meet the standard agreed upon for the hiring of at least two of the four chaired professorships at The Pearson Institute.  As it prepares to prove its case at trial, the Foundation needs discovery regarding this hiring process and related conduct for at least the following four reasons:

First, the Foundation has alleged that it was agreed that the University would only hire faculty for The Pearson Institute chaired professorships who would further the objective of immediately establishing The Pearson Institute as a world-class entity.  The University has denied

---

[1]  This brief is submitted pursuant to the Court's request at the March 13, 2019 hearing on Plaintiff's Motion to Compel (Doc. 54) for supplemental briefing regarding the information and documents sought in Plaintiff's Interrogatory No. 5 and Request for Production Nos. 24 and 31.

this allegation of fact and is contesting that this was the agreed upon hiring standard. There is no way to litigate the sufficiency of the University's performance without also resolving this threshold issue of the hiring standard. The request for documents and information about the University's faculty selection process is directly relevant to this disputed issue of fact. Indeed, it is the only way that the Foundation can learn what the University believed the hiring standard actually was, in real time and from documents created by actual participants in the hiring process, not from after the fact statements crafted by lawyers. The documents from the hiring process will probe the University's true understanding of what the hiring standard was and what its obligation was to the Foundation. These are contested issues in this case.

Second, the University appears now to be taking the position that the hiring standard for The Pearson Institute chairs is stated in a document it produced as Exhibit 3 to its Opposition to Motion to Compel; the University refers to this as the "Shils Report". The University has described the Shils Report as providing the process that the University is required to use in the hiring of all faculty. Having now claimed that the Shils Report was the standard for its hiring process, the Foundation is entitled to test that process to determine whether the University at the very least met even that mark. A discussion of the Shils Report and the questions it raises follows below.

Third, it is not sufficient for the Foundation to look at the professors who were hired by the University and test the adequacy of those hires only against external opinions or metrics. There will always be some element of subjectivity to that assessment and a part of the value of faithful adherence to a hiring process is that, even on a subjective standard, adherence to the process gave the Foundation further confidence that the University was doing its best to find the best people. That is, the process itself has value. Certainly, in a dispute over the question of whether the University hired the best people, the Foundation is entitled to know whether the University made

its best efforts or merely succumbed to the pressure of scrambling to hire faculty members just three months before The Pearson Institute had to start offering classes.

<u>Fourth</u>, the Foundation's claim in this case is based, in part, on the University's breach of its duty of good faith and fair dealing. As discussed below, the case law makes clear that the reasonableness of the University's conduct in its efforts to meet the hiring standard – whatever that standard was – is directly relevant to a determination of whether the University met its obligation to act in good faith. The Foundation cannot address the reasonableness of the University's conduct if it is kept from discovering what that conduct was.

## II. Why the Hiring of Professors Dube and Blattman Specifically Presents Issues for Discovery [2]

In 2016, the University appointed Professor Dube and Professor Blattman to fill two of the four chaired professorships funded by the Foundation for The Pearson Institute. Professor Dube's position immediately prior to being hired by the University had been as an assistant professor at New York University. The evidence will show that an assistant professor in the academic hierarchy is a level below associate professor, and several distinct levels below professor. Professor Blattman's position immediately prior to being hired by the University was as an associate professor at Columbia University. Neither Professor Dube nor Professor Blattman were tenured in their prior positions or had named chairs. In addition, both NYU and Columbia were ranked below the University of Chicago in the relevant rankings of academic disciplines.

To advance Professors Dube and Blattman from non-tenured positions to chaired, tenured faculty posts at the University of Chicago was not only extraordinary – leapfrogging these

---

[2] The Foundation's explanation of why Professor Roger Myerson's appointment also warrants this discovery is set forth in its Motion to Compel and Reply thereto.

candidates over several important rungs on the academic ladder – it was flatly inconsistent with the objective agreed upon by the University and the Foundation.

Further, the Foundation does not have to rely solely on its pleading for this point. It is notable that even the limited evidence uncovered thus far strongly suggests that the University knew all along that it would be inappropriate to hire junior scholars for The Pearson Institute as chaired or tenured professors. Daniel Diermeier, then Dean of the Harris School of Public Policy and the University's senior person and primary contact with the Pearsons as The Pearson Institute was being discussed conceptually, sent an email in 2014 discussing what would be appropriate hiring for The Pearson Institute:

> It would be important to have some endowed positions at the assistant and associate level, not just full professors. This is important for this particular endeavor as many of the scholars are still quite young. Ideally, I would like 2-3 senior and the rest junior[.]

(Exhibit A, p. 2).[3] In another email prior to the execution of the Grant Agreement, David Fithian, Executive Vice President, told the Pearsons:

> One of the keys to successfully launching the Institute and to ensuring it's high quality from the start is to attract the *very best faculty talent*. That is why you will see a large portion of funds up front being directed to endowing the directorship of the Institute and *three senior faculty positions in the first two years*. This is extremely important and Daniel will be happy to discuss this further with you should you have questions about it.

(Exhibit B, emphasis added).

This and other evidence at trial will show that it was understood that the chaired professorships would be filled by senior level academics, not "young scholars". In fact, the Pearsons agreed to fund more expensive chaired professorships because, in the academic world,

---

[3] This Exhibit contains redactions to avoid disagreement over whether the document needs to be filed under seal. The Foundation reserves the right to challenge its designation as "confidential".

chaired professorships are generally the highest prestige and best compensated teaching positions. The intent of the parties was to use these chaired faculty positions to attract academic stars to give the new Pearson Institute immediate stature and credibility as a leader in the academic community. Professors Blattman and Dube are not being criticized here, and they may or may not have promising academic careers ahead of them, but the appointment of these relatively junior faculty to these most senior positions was glaringly inconsistent with the agreed upon plans for The Pearson Institute.

Again, even the evidence collected so far from the University demonstrates that the standard for The Pearson Institute was understood by all parties to be, in all respects, world class. Another senior University executive emailed Dean Diermeier in 2014:

"What is important for [the Pearsons] is that the Program:

1 – is world class

2 – will impact policy

3 – will change the world".

(Exhibit A at 3).

The University has denied all of these allegations, putting all of these facts at issue. (*See* University answer to complaint, Doc. 28, paragraphs 29-34.) In order to prove its case and refute these denials, the Foundation needs the discovery it seeks.

The University's position regarding discovery is, in part, that the Foundation should not have access to information regarding the process by which Professors Dube and Blattman were hired because, the University asserts, it was agreed that the Foundation would not participate in the selection process for the chaired faculty. Even if that is true, and whatever "exclusion from the selection process" might mean, it cannot mean that the University did not have to adhere to standards in the performance of its hiring obligations. To the contrary, as a matter of law, where

discretion to perform a contractual obligation is vested in one party to a contract, that party is obligated to exercise that discretion "reasonably and with proper motive, … not… in a manner inconsistent with the reasonable expectations of the parties." *Valley Stream Foreign Cars, Inc. v. Am. Honda Motor Co.,* 209 F. Supp. 3d 547, 555 (E.D.N.Y. 2016); *see also Cross & Cross Properties, Ltd. v. Everett Allied Co.,* 886 F.2d 497, 502 (2d Cir. 1989) ("The boundaries set by the duty of good faith are generally defined by the parties' intent and reasonable expectations in entering the contract."); *1-10 Indus. Assocs., LLC v. Trim Corp. of Am.,* 297 A.D.2d 630, 631-32, 747 N.Y.S.2d 29,31 (2002). [4] Further, in meeting its hiring obligation, the University's adherence to its own articulated standards is directly relevant to the question of whether the University properly performed under the contract. *Dalton v. Educ. Testing Serv.,* 87 N.Y.2d 384, 389 (1995) (testing company's failure to abide by its own test security procedures was a breach of the implied covenant of good faith and fair dealing).

Tacitly acknowledging that there certainly were criteria the University had to meet in its hiring process, the University has now produced with its briefing on this Motion to Compel a 23-page Report of the University of Chicago Committee on the Criteria of Academic Appointment (1972 The University of Chicago). The University refers to this document as the "Shils Report", and describes it as providing the general standard for faculty hiring. In testing whether the University behaved "reasonably and with proper motive" in the context of the understanding between the parties, as the case law provides, the Foundation can test to determine whether the University followed its own standards. Certainly, the University cannot produce a document in

---

[4] The Grant Agreement includes this same concept of reasonableness. At section 3.8, titled <u>Intent of the Parties</u>, the contract echoes the case law cited herein as it recognizes that, with regard to aspirational statements included in the Grant Agreement, "… the University will not be in default under this Agreement if [T]he Pearson Institute or the Pearson Forum does not achieve such goals despite the University's <u>reasonable efforts to pursue them</u>". (Doc. 57-4, emphasis added)

6

discovery purporting to set forth the University's hiring standards, and then bar discovery on whether it met those standards when that is one of the precise issues in this case.

### III. What Did the Shils Report Require?

The Shils Report establishes that the University's hiring process must have a "scrupulous insistence on the most demanding criteria in the act of appointment" of faculty members (Report at 2). That is, frankly, exactly what the Foundation has been saying. The University's denials of the Foundation's allegations have put the question of compliance with these standards at issue.

The Shils Report further requires that as a part of the hiring process, "Any appointive body must have a standard by which it assesses the merits of the alternative candidates before it." (Report at 4). Did the University, in fact, evaluate alternative candidates against an articulated standard? The Foundation is entitled to collect discovery to test whether the University complied with its own mandate.

The Shils Report also requires that all academic appointments should be made "on the basis of careful study by members of the appointive body of the publications and other written work of the candidate, and of written assessments… which assess originality, rigor and fundamental significance of the work and which estimate the likelihood that the candidate is or will become a leading figure in his field". (Report at 4-5). The Foundation is entitled to discovery to determine whether any of these requirements were met.

One of the issues asserted by the Foundation is that Professors Dube and Blattman were hired, in part, because of their prior relationships or familiarity with Professor Robinson, who was named as the chief academic officer or faculty director of The Pearson Institute substantially concurrent with the hiring of Dube and Blattman. In fact, the Shils Report cautions against exactly this sort of risk in hiring:

> "Particular care must be taken to keep 'inbreeding' at a minimum…. The arguments against 'inbreeding' are (1) the dangers of relaxation of standards; (2) the dangers of narrowing and stereotyping the intellectual focus of the department in question; and (3) the dangers of appointing candidates who are excessively dependent intellectually on their former teachers' ideas and even presence."

(Report at 5-6).

This is exactly what the Foundation has alleged in its complaint. Were Dube and Blattman hired on Professor Robinson's say so, or because of prior familiarity? Were standards relaxed? The discovery sought by the Foundation is relevant in considering whether the University acted in good faith to determine whether even this internal University standard was also violated.

The Shils Report further provides that "Appointive committees should not consider only one candidate at any one time for a given appointment…. [S]everal alternative candidates [should] be considered". (Report at 8). What happened in this case? Were Dube and Blattman each considered against alternative candidates? The Foundation is entitled to these facts.[5]

The Foundation has the burden of proving its case. It is entitled to collect evidence through discovery that will be relevant to the allegations of its complaint. Regardless of how the University intends to defend and whatever proof they intend to offer, the Foundation has alleged that the University has breached its contract with, and has acted in bad faith in failing to perform its obligations to, the Foundation. The Foundation is entitled to discovery on these points.

**IV.    The University's Confidentiality Objection**

The University's principal concern with this production request appears to be the protection of information submitted in the hiring process by third parties, where those third parties understood their submissions to be confidential. First, there is already a protective order in this case. The

---

[5]    Throughout the Shils Report there are citations to "University Statutes", presumably a codification of rules and processes at the University. To the extent that those statutes are cited but not reproduced in the Shils Report, the Foundation requests those documents as well.

University has not explained why that is not sufficient.  Many cases have discovery issues that present confidentiality risks to the litigants.  The University seems to be arguing that it is entitled to the protection of some sort of new privilege for the academic hiring process.  No such privilege exists, nor should one be created here.  The University should produce the documents that its own conduct has put at issue.

Nonetheless, and in the interest of moving past this objection, the Foundation has no objection to the University, in the first instance, redacting the names of third-party document authors in those instances where those third-parties had an expectation of privacy, while leaving in place other identifying information that may be pertinent to the litigation, such as title (e.g. "Professor…"). In the event that the content of those documents indicate that further disclosure is necessary, the Foundation reserves its right to seek that additional information, including depositions.

Plaintiff's Motion to Compel should be granted on this issue.

Respectfully submitted,

*/s/ P. Scott Hathaway*
P. Scott Hathaway, OBA # 13695
Isaac R. Ellis, OBA # 30072
4000 One Williams Center
Tulsa, OK  74172-0148
Telephone:  918-586-8510 P. Scott Hathaway
Facsimile:  918-586-8610 P. Scott Hathaway
Telephone:  918-586-8996 Isaac Ellis
Facsimile:  918-586-8322 Isaac Ellis
Email:        shathaway@cwlaw.com
                   iellis@cwlaw.com

**THE THOMAS L. PEARSON AND THE PEARSON FAMILY MEMBERS FOUNDATION**

9

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of April, 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following registrants:

Andrew C. Baak
Rebecca W. Bacon
Jessica Lynn Dickerson
Jeffrey A. Hall
William S. Leach
Taylor A. R. Meehan
Faye E. Paul

                                              */s/ P. Scott Hathaway*
                                              P. Scott Hathaway