IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| The Thomas L. Pearson and<br>The Pearson Family Members Foundation,<br><br>    **Plaintiff and Counterclaim Defendant,**<br><br>v.<br><br>The University of Chicago,<br><br>    **Defendant and Counterclaimant,**<br><br>v.<br><br>Thomas L. Pearson,<br><br>    **Counterclaim Defendant.** | Case No.: 18-CV-99-GKF-FHM |

**THE THOMAS L. PEARSON AND THE PEARSON FAMILY MEMBERS FOUNDATION'S RESPONSE TO DEFENDANT'S SUPPLEMENT BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL**

**The Foundation Needs the Discovery it Seeks for its Case in Chief**

For all the reasons stated in its Supplemental Brief of April 12, 2019 (Doc. 73) and Motion to Compel briefing (Docs. 54 and 58), the Foundation needs the documents and other discovery it seeks regarding the hiring of the chaired professors for The Pearson Institute in order to prove its affirmative case at trial. Nothing that the University has said in its Supplemental Brief (Doc. 74) even addresses this point. The Foundation is the plaintiff, and it is entitled to discovery in order to meet its burden of proof. The discovery is relevant to (1) the agreed upon hiring standard – which is now a contested issue of fact; (2) whether the University met that hiring standard; (3) whether the University met even its own hiring process requirements; and (4) whether, in the context of the Foundation's claim that the University breached its duty of good faith and fair dealing, the

University's conduct in the hiring process was consistent with the reasonable expectations of the Foundation.

**The University Intends to Offer Partial Proof on Various Matters Without Allowing the Foundation to Take Discovery on Those Same Subject Areas**

The University's Supplemental Brief takes the position that at trial it plans to use evidence of the faculty hiring process—to the extent advantageous for the University—but will not provide any discovery to the Foundation that (i) would allow the Foundation to use document review (and other information gathering in discovery) to conduct meaningful cross examination of the University's witnesses or (ii) would be useful and necessary to the Foundation's affirmative case.

This Court anticipated exactly this outcome and required that the University show its hand. In its Minute Sheet entry of March 13, 2019, the University was directed to disclose in its Supplemental Brief: "…[W]hether defendant will rely in any litigation on its internal evaluation process, including the fact that the process occurred, or information from the internal evaluation process." (Doc. 70). In fact, the University has now had to admit that it plans to offer proof in these categories: "…[T]he University intends to rely on the information it produces concerning faculty qualifications, its guidelines for faculty appointments, and the fact that a faculty evaluation process occurred." (Doc. 74 at 2).

In other words, the University proposes to limit discovery in order to hobble the Foundation's efforts to learn whether the University acted in good faith or met any standard in its hiring of the chaired professors for The Pearson Institute. If the University has its way, it will both unfairly stymie the Foundation from developing its affirmative case, and, with regard to each of the three subject areas that it has identified in response to the Court's instruction, prevent the Foundation from developing meaningful cross examination of the University. In short, the

University proposes cherry-picking the most favorable evidence for itself to use at trial while limiting the Foundation's discovery on the topics it has selected.

Regarding the subject area category of "faculty qualifications" identified in the Court's March 13 Minute Sheet, the University has now stated that it intends to produce only the CVs of those faculty, but not any of the analysis, commentary, or interpretation by the University of how those CVs were translated or evaluated by the University. Nor will the University, if it has its way, produce any other information, including information about alternative candidates it evaluated, as required by the Shils Report, that it considered alongside those CVs as germane to a determination by the University of "faculty qualifications." A party cannot be permitted to limit its discovery responses to only that which it chooses to use to advance its own case. The University's proposal would turn the discovery process on its head.

The CVs the University proposes providing raise important questions: What, in fact, are the qualifications of these candidates, as fully understood by the University, beyond what is contained in their CVs? What is the meaning of the information on those CVs, as understood by the University? How did the University draw its conclusions and what did it base those conclusions on? Were these candidates qualified for chaired professorships, or not? How did the alternative candidates, if any, compare to the candidates that were offered the tenured, named chaired positions? What the University did and said to arrive at answers to these questions is at the core of a significant part of this litigation and will be the subject of documentary proof from both sides and close cross-examination. The University did not base its purportedly good faith hiring decisions on CVs alone. The Foundation needs this discovery to understand the facts surrounding the University's actions.

The University also intends to offer proof of its guidelines for faculty appointments, but it is refusing to produce evidence regarding the question of whether those guidelines were applied

and met in this case. Is the jury supposed to assume that because there were guidelines for hiring that those guidelines were followed? It seems to be the University's strategy to bank on assumptions made by the jury based on deliberately incomplete proof. Without proof that the guidelines were followed, or not, how is the mere existence of guidelines probative of anything? The Foundation must be able to develop that proof through discovery.

The University says that, in addition, it intends to prove that a faculty evaluation process occurred, but that it will not allow the Foundation to develop any information with regard to that process. Presumably, the University, again, hopes that the jury will simply assume that if the faculty evaluation process occurred, it must have met the University's standards, or the standards agreed upon by the parties. The University seems to be saying that, for its purposes, the fact of a process will be valuable for a jury to know, without more. Certainly, the Foundation has a right to develop these facts, not to simply stand by while the University is allowed to manipulate incomplete information so that the jury will make assumptions that the University clearly seems to believe will work in its favor. This sort of gamesmanship is exactly what modern discovery is supposed to prevent.

### The University's Argument to Bar Discovery Presumes the Outcome Regarding Contested Issues Of Fact

The University persists in opposing the Foundation's discovery because the University contends that the Foundation was excluded from "any role or authority" concerning faculty appointments. This argument fails to tip the scale for several reasons.

First, the Foundation's complaint asserts that there was an agreement between the parties that the appointments would be world class. Indeed, the documents attached to the Foundation's Supplemental Brief reveal that the University understood and agreed with this very point. The University has, notwithstanding the documents produced by its own senior officer, denied this fact

4

and contends that there was no agreement on this point. Further, it seems to be the University's position that it was understood between the parties to the Grant Agreement that it is none of the Foundation's business what the hiring standard was or the University applied it. There is clearly a factual disagreement on this point. That is when discovery is most needed. A defendant's denial of an allegation in a complaint, and its assertion of a conflicting set of facts, does not serve to bar discovery on that disputed issue. *Avent v. Solfaro*, 210 F.R.D. 91, 94 (S.D.N.Y. 2002) ("Factual disputes are best resolved once the parties have conducted discovery and once the Court can better determine the case on its merits…"); *see also Dixie Yarns, Inc. v. Forman*, No. 91 CIV. 6449 (CSH), 1993 WL 227661, at *4 (S.D.N.Y. June 21, 1993) (courts are reluctant to determine disputed or substantial issues of law prior to discovery and a hearing on the merits).

Second, the University has now admitted, as it must, that at least some standard for the hiring process applies, presumably as set forth in the Shils Report, or the University's Guidelines on Academic Appointments (a document that the University has now identified in its brief and will be producing), or some combination of those two documents. What the University really seems to be saying, however, is: Yes, there were standards for hiring The Pearson Institute chaired professors, but the Foundation has no standing to complain if those standards were not met. In fact, the University is saying that the Foundation cannot even ask whether the University met its own standards. In essence, the University's position appears to be that it was understood and agreed during the negotiation of the Grant Agreement that the Foundation not only could not participate in the faculty selection process, but that the Foundation would be precluded from knowing whether the University had met its own standards for hiring, and that only the University, not the Foundation, would determine what those standards would be. Taken to its logical conclusion, the University appears to be saying that the Foundation cannot even raise a question about the process and has no right to be provided with honest, direct answers to its inquiries. At the very least,

discovery is needed to determine whether that preposterous result is, as a matter of fact, what the Grant Agreement was intended to mean.

Third, the case law cited in the Foundation's Supplemental Brief speaks to this very point. As a matter of law, where discretion has been vested entirely in one party to a contract, as the University claims here, that does not mean that the party with that discretion can do whatever it likes. (*See* Doc. 73 at 6). At the very least, the University was obliged to perform at a level that met the reasonable expectations of the Foundation. The Foundation is entitled to take discovery on these facts.

## Conclusion

The University has not put forth a legitimate basis for denying the Foundation discovery regarding the faculty hiring and selection process. The claims and disputed issues of fact in this case mandate the discovery sought. The Foundation's Motion to Compel on this topic should be granted.

Respectfully submitted,

*/s/ P. Scott Hathaway*
P. Scott Hathaway, OBA # 13695
Isaac R. Ellis, OBA # 30072
4000 One Williams Center
Tulsa, OK  74172-0148
Telephone:  918-586-8510 P. Scott Hathaway
Facsimile:  918-586-8610 P. Scott Hathaway
Telephone:  918-586-8996 Isaac Ellis
Facsimile:  918-586-8322 Isaac Ellis
Email:           shathaway@cwlaw.com
                     iellis@cwlaw.com

**THE THOMAS L. PEARSON AND THE PEARSON FAMILY MEMBERS FOUNDATION**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of April, 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following registrants:

Andrew C. Baak
Rebecca W. Bacon
Jessica Lynn Dickerson
Jeffrey A. Hall
William S. Leach
Taylor A. R. Meehan
Faye E. Paul

                                                */s/ P. Scott Hathaway*
                                                P. Scott Hathaway