UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| THE THOMAS L. PEARSON AND THE PEARSON FAMILY MEMBERS FOUNDATION AND THOMAS L. PEARSON, INDIVIDUALLY, <br><br> Plaintiffs and Counterclaim Defendants, <br><br> v. <br><br> THE UNIVERSITY OF CHICAGO, <br><br> Defendant and Counterclaimant. | Case No. 18-CV-99-JFH-JFJ |

**The University of Chicago's *Daubert* Motion to
Exclude Testimony of Paul Wazzan and Thomas Campbell**

**TABLE OF CONTENTS**

Background ........................................................................................................................... 1

I.      Paul Wazzan ............................................................................................................. 1

II.     Thomas Campbell .................................................................................................... 3

Argument .............................................................................................................................. 5

I.      Dr. Wazzan's Testimony Concerning (1) Certain Budget Issues and (2) Future Financial "Scenarios" Should be Excluded ............................................... 5

      A.     Dr. Wazzan's 2015 Budget Opinions Lack Any Factual Foundation .................... 5

      B.     Dr. Wazzan's Financial Scenarios Are Premised on Plaintiffs' Erroneous Interpretation of the 2017 Budget Footnote, Hypothetical Future University Actions, and Speculative Economic Forecasts Over the Next 18 Years ....................................................................................... 9

II.     Dr. Campbell's Testimony Should Be Excluded ................................................... 11

      A.     Dr. Campbell's Opinions Are Also Premised on Plaintiffs' Erroneous Interpretation of the 2017 Budget Footnote as well as Dr. Wazzan's Speculative Future Scenarios ................................................................... 11

      B.     Dr. Campbell's Opinions Address Future, Hypothetical University Actions that Would Disregard the Grant Agreement Obligations ...................... 12

Evidentiary Hearing and Oral Argument Requested ......................................................... 13

Conclusion ......................................................................................................................... 14

## TABLE OF AUTHORITIES

**Cases**

*Buckley v. Deloitte & Touche USA LLP*,
　888 F. Supp. 2d 404 (S.D.N.Y. 2012),
　*aff'd,* 541 F. App'x 62 (2d Cir. 2013) ................................................................................. 10

*Goebel v. Denver & Rio Grande W. R.R. Co.*,
　215 F.3d 1083 (10th Cir. 2000) ....................................................................................... 5, 11

*Greig v. Botros*,
　525 F. App'x 781 (10th Cir. 2013) ....................................................................................... 11

*Hollander v. Sandoz Pharms. Corp.*,
　289 F.3d 1193 (10th Cir. 2002) ............................................................................................. 5

*Pioneer Centres Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*,
　858 F.3d 1324 (10th Cir. 2017) ........................................................................................... 11

*Ralston v. Smith & Nephew Richards, Inc.*,
　275 F.3d 965 (10th Cir. 2001) ............................................................................................... 5

**Rules**

Fed. R. Evid. 702 ........................................................................................................................... 5

Plaintiffs' experts Paul Wazzan and Thomas Campbell offer opinions about the future. Dr. Wazzan provides future financial "scenarios"—extending to 2039—purporting to show that, if the University stopped paying certain costs in the future and "clawed back" its previous payments of those costs by charging those amounts to the grant endowment, it would substantially and even completely deplete the grant. The extent of depletion under his scenarios varies depending on his assumptions about when the University would take the hypothetical future cost actions, future investment yields, future cost inflation, and other matters.

In reliance on Dr. Wazzan's future financial scenarios, Dr. Campbell offers opinions about the University's future administration of the Pearson Institute. He says that the University would take various operational actions in the future, including shutting down the Pearson Institute for a year or even permanently, leaving two of the four chaired faculty positions unfilled, and taking other future steps that would "devastate" the Institute.

Because these opinions (1) amount to conjecture about assumed future University actions, (2) depend on speculative assumptions about investment yields, cost inflation, and other matters extending 18 years into the future, and (3) are premised on Plaintiffs' misinterpretation of a two-sentence 2017 budget footnote, they are the product of unreliable methods and lack reasonable factual foundation. The Court should exclude them under Rule 702 and *Daubert*. In addition, certain of Dr. Wazzan's 2015 budget opinions should be excluded for lack of factual support.

**Background**

I.   **Paul Wazzan**

Dr. Wazzan is a financial and damages expert. (Ex. 1, Wazzan Rpt. at 1.) His assignment was to offers opinions on three subjects:

1. Whether Exhibit D to the Grant Agreement, the 2015 preliminary budget, provided "complete and accurate budget information";

2. What would happen to the "original $100 million grant" if in the future the University (a) "clawed back" amounts it had previously paid in support of the Pearson Institute, and (b) transferred certain costs to the Pearson Fund; and

3. Projections of the Pearson Institute operating budgets through 2039, under various assumptions to show erosion to the grant endowment under assumed scenarios "where the UC-funded costs are transferred to The Pearson Fund." (Ex. 1, Wazzan Rpt. at 4.)

At the request of Plaintiffs' counsel, Dr. Wazzan (1) accepted the allegations of Plaintiffs' first amended complaint as true, and (2) assumed that, based on a footnote in the 2017 budget, the University would at some point in the future decide to discontinue its financial support of the Pearson Institute, and "claw back" prior payments, for a portion of faculty compensation, student support, and research support costs.[1] (Ex. 1, Wazzan Rpt. at 10-11; Ex. 3, Wazzan Dep. 120:8-18, 129:4-130:1.)

***2015 preliminary budget opinions.*** On assignment 1, Dr. Wazzan opines that the 2015 preliminary budget attached to the Grant Agreement was "incomplete and misleading" based on what he calls "striking differences" between the 2015 budget and the April 2017 budget. (Ex. 1, Wazzan Rpt. at 5-8.) These differences include University financial contributions for a portion of faculty compensation, student support, and research support costs, which were included in the 2017 budget but not in the 2015 budget. (*Id.* at 6-7.) Dr. Wazzan also points to three other areas of differences between the 2015 and 2017 budgets as support for his opinion that the 2015

---

[1] The 2017 budget footnote states: "Amounts contributed by Harris School are subject to re-evaluation on an annual basis based on the Harris School's budget. Inclusion of these contributions in the current year's Pearson Institute and Pearson Forum budget does not preclude charging these costs against the Pearson Fund in future annual budgets where otherwise appropriate under the terms of the Amended and Restated Grant Agreement." (Ex. 2, Nabasny Dep. Ex. 42B.)

2

budget was "incomplete and misleading": (1) increased 2017 budgeted amounts for marketing and branding, (2) new 2017 budgeted amounts for other event costs, travel, academic visitors, and supplies, and (3) decreased 2017 budgeted amounts for consultants, forum event, advisory council meetings, and other expenses. (*Id.* at 7.)

*Future financial "scenarios."* For assignments 2 and 3, Dr. Wazzan performed financial modeling of future scenarios that project Institute operations and impacts on the $100 million grant if the University (1) stopped paying a portion of faculty compensation, research support, and student support costs, and (2) clawed back such costs it had previously paid. (*Id.* at 10-12.) For assignment 2, Dr. Wazzan modeled scenarios through fiscal year 2024 based on assumed future University actions and on numerous other future assumptions, including projected endowment yields and cost inflation rates. Based on these scenarios, he opines that the principal of the original $100 million grant could erode to $80.1-$95.5 million by 2024. (*Id.* at 12.)

For assignment 3, Dr. Wazzan extended these projected financial scenarios for an additional 15 years, to fiscal year 2039, based on various assumptions, including University cost transfers and claw backs, endowment yields, and inflation rates. (*Id.* at 13-14.) He says that his scenarios show potential erosion of the principal of the original grant to $36.8 million by fiscal year 2039. (*Id.* at 13.) Dr. Wazzan also ran additional alternative scenarios based on further varied assumptions about the future, including as to the timing of University cost transfers and claw backs, endowment yields, and Institute cost levels. (*Id.* at 14-15.) He says these alternative scenarios show complete depletion of the grant and a negative principal balance by 2037. (*Id.*)

## II.     Thomas Campbell

Dr. Campbell, a lawyer, is a law and economics professor at Chapman University and former dean of that law school and of the Haas School of Business, University of California. (Ex. 4, Campbell Rpt. at 1; Ex. 5, Campbell Dep. 6:1-4.) Based on Dr. Wazzan's future scenarios

projecting impacts to the grant endowment if the University stopped paying, or clawed back, faculty, research support, and student support costs, Dr. Campbell opines on potential future impacts on the operations of the Pearson Institute. (Ex. 4, Campbell Rpt. at 2-7.) At Plaintiffs' counsel's request, Dr. Campbell, like Dr. Wazzan, assumed that based on the 2017 budget footnote "whenever the University might unilaterally wish to do so" in the future, it would discontinue or claw back such payments. (Ex. 5, Campbell Dep. 55:6-56:4, 63:8-17, 66:6-11.)

Based on this incorrect assumed meaning of the footnote and Dr. Wazzan's hypothetical scenarios, Dr. Campbell concludes that amounts supposedly subject to University "recapture[]" in the future are "sufficiently large as a percentage of the Pearson Institute's annual budgets to . . . seriously and adversely impact[] the annual programmatic planning and execution of the annual operating plan and budget for both The Pearson Institute and The Pearson Global Forum." (Ex. 4, Campbell Rpt. at 3.) He says that the effect on Institute operations shown by Dr. Wazzan's scenarios would be "devastating" and require the University to substantially cut Institute operations, including by:

- filling only two of the four chaired professorships required by the Grant Agreement;
- shifting faculty from tenured positions to year-to-year term employment;
- closing the Institute for a year or permanently.

(*Id.* at 5-7; Ex. 5, Campbell Dep. 67:13-25.)

Dr. Campbell concludes that the operational changes that he says would be necessitated by Dr. Wazzan's scenarios "would seriously inhibit and adversely impact The Pearson Institute, impeding it from fulfilling the mission described in the Grant Agreement." (Ex. 4, Campbell Rpt. at 7.)

4

**Argument**

The proponent of expert testimony bears the burden of showing that the expert's testimony is admissible. *Ralston v. Smith & Nephew Richards, Inc.,* 275 F.3d 965, 970-71 n.4 (10th Cir. 2001). Rule 702 "imposes upon the trial judge an important 'gate-keeping' function with regard to the admissibility of expert opinions." *Ralston,* 275 F.3d at 969. In this role, the Court should apply a two-step analysis, determining first whether an expert is qualified to render an opinion by "'knowledge, skill, experience, training, or education,'" and second, whether the expert's opinions are "'reliable'" under *Daubert*. *Id.* (quoting Fed. R. Evid. 702). "Reliability is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid." *Hollander v. Sandoz Pharms. Corp.*, 289 F.3d 1193, 1204 (10th Cir. 2002) (quotation omitted). "It is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate." *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000).

**I.    Dr. Wazzan's Testimony Concerning (1) Certain Budget Issues and (2) Future Financial "Scenarios" Should be Excluded**

    **A.    Dr. Wazzan's 2015 Budget Opinions Lack Any Factual Foundation**

The Grant Agreement provides that Exhibit D to the Agreement is a "preliminary projected budget" and "good faith estimate" that is "subject to adjustment by the University." (Ex. 6, Grant Agr. § 3.1(d).) Dr. Wazzan's opinion that this 2015 preliminary budget was "incomplete and misleading" is based on differences between it and the April 2017 budget. (Ex. 1, Wazzan Rpt. at 5-8.) These include the following three areas of differences: (1) increased 2017 budgeted amounts for marketing and branding, (2) new 2017 budgeted amounts for other

event costs, travel, academic visitors, and supplies, and (3) decreased 2017 budgeted amounts for consultants, forum event, advisory council meetings, and other expenses.[2] (*Id.* at 7.)

Dr. Wazzan's opinions concerning these three categories of budget expenses are premised entirely on the fact that the expenses were budgeted at different amounts in the two budgets. As set forth below, he made *no examination or analysis of facts that explain these budget differences*. Nor did he take any steps to determine if Plaintiffs were misled by any of these budget differences (which are not identified in Plaintiffs' original or amended complaints). There are countless explanations for changes in budgeted amounts in a preliminary budget— prepared before an institute has even been created or begun operations—and an operating budget prepared two years later, after the institute is up and running, that in no way suggest the preliminary budget is faulty. That is why the Grant Agreement expressly provides that the 2015 budget is "preliminary," a "good faith estimate," and "subject to adjustment by the University." (Ex. 6, Grant Agr. § 3.1(d).) Because Dr. Wazzan failed to examine any evidence that explains the budget differences, he has no basis for his opinions that the differences somehow render the 2015 preliminary budget "incomplete and misleading."

***Marketing and branding costs.*** The 2015 preliminary budget estimated marketing and branding costs at $350,000 for 2016 and zero in other years, while the 2017 budget revised the amounts to be $222,298 for 2016, $738,000 for 2017, and $50,000 for remaining years. (Ex. 1, Wazzan Rpt. at 7.) Dr. Wazzan admitted that the sole basis for his opinion that the 2015 budget "misrepresent[ed]" these costs is that the budgeted amounts were increased in the 2017 budget:

> Q. And you say, "the 2015 budget misrepresents marketing and branding costs." Right?

---

[2] The University does not seek to exclude on *Daubert* grounds Dr. Wazzan's 2015 budget opinions related to University payments of a portion of faculty compensation, student support, and research support costs.

> A. Yes.
>
> Q. And—and is that because the budget estimates them at 350,000 for 2016 and does not include additional amounts to the remainder of the period, yet the April 2017 budget includes a different amount for 2016 and a higher amount for 2017?
>
> A. Yes.
>
> * * *
>
> Q. And do you have any knowledge of the facts underlying that $738,000 figure in the 2017 budget for marketing and branding?
>
> A. No.
>
> * * *
>
> *Q. When [your report] misrepresents, in Paragraph 23, do you just mean that the amounts were substantially different from 2015 to—to 2017 budgets?*
>
> *A. Yes.*
>
> *Q. [Did] you ever ask anyone or look into the question of what was the reason for that substantial change in the marketing and branding budget amounts in 2015 and 2017?*
>
> *A. No.*

(Ex. 3, Wazzan Dep. 86:24-87:9, 89:2-5, 93:1-9 (emphasis added).)

***Event, travel, visitor, and supplies costs.*** Dr. Wazzan similarly conceded that his criticism of the 2015 preliminary budget regarding event, travel costs, academic visitors, and supplies is based exclusively on differences between the two budgets:

> Q. Let's move to Paragraph 24. It refers to a number of costs which appear in the April 2017 budget that were not included as part of the 2015 budget. Do you see that?
>
> A. Yes.
>
> Q. Okay. And you refer to event costs and—and travel and certain other amounts, right?

7

> A. Yes.
>
> Q. *Did you ever look at any evidence or ask anyone what were the causes of those changes in budget amounts from 2015—the preliminary budget in 2015 to the April 2017 budget?*
>
> A. No.

(*Id.* 93:10-22 (emphasis added).)

***Consultants, forum events, etc.*** Dr. Wazzan also admitted that his opinion on these costs is based entirely on the fact that different amounts are included in the two budgets and that he took no steps to examine why:

> Q. Paragraph 25, you refer to significant budget decreases totaling 1.1 million, including a reduction in the amount for staff consultants and forum event costs. Do you see that?
>
> A. Yes.
>
> Q. *Did you ever ask anyone or look into the evidence as to what was the reason for those budget changes between the preliminary budget in 2015 and the April 2017 budget?*
>
> A. No.

(*Id.* 93:23-94:8 (emphasis added).)

Dr. Wazzan's opinions that the 2015 preliminary budget is "incomplete and misleading" because these three categories of expenses differ in the 2017 budget—when he has made no examination of the reasons for the differences—is illogical. That subsequent operating budgets would include differences from the 2015 preliminary budget is not unusual, and was anticipated by the Grant Agreement. Because Dr. Wazzan failed to examine and evaluate the reasons for these differences, and to offer any reasonable rationale for why they are somehow improper, he has no basis for his conclusions. His opinions on these budget items fail Rule 702 because he lacks sufficient facts or data to support them.

### B. Dr. Wazzan's Financial Scenarios Are Premised on Plaintiffs' Erroneous Interpretation of the 2017 Budget Footnote, Hypothetical Future University Actions, and Speculative Economic Forecasts Over the Next 18 Years

Dr. Wazzan's testimony and opinions about the second and third assignments, which involve his financial scenarios extending to fiscal year 2039, should be excluded because they are based on a false premise—Plaintiffs' misreading of the 2017 budget footnote—and numerous speculative assumptions about the next 18 years, including about (1) hypothetical University conduct, (2) investment yields, and (3) Pearson Institute costs.

First, Dr. Wazzan accepted Plaintiffs' counsel's misinterpretation of the 2017 budget footnote as "repudiating" the Grant Agreement and permitting the University to transfer costs to, and to claw back prior payments from, the Pearson Fund without regard to the University's obligations under the Grant Agreement. For the reasons set forth in the University's Opposition to Plaintiffs' Motion for Summary Judgment (Dkt. No. 206), Plaintiffs' reading of the footnote is refuted by the express language in the footnote, which provides that cost allocations must be "appropriate under the terms of the . . . Grant Agreement." *Id.* at 27-29. The Grant Agreement (1) protects at least $93.25 million of the $100 million grant as a "permanent restricted endowment fund," and (2) provides that the University is to use the expendable portion of the $100 million grant (no more than $6.75 million) plus an annual yield from the endowment solely to pay Institute expenses. *Id.* at 29-30. Dr. Wazzan, who has no experience involving charitable grants and "skimmed" the Grant Agreement, fails to take into account any of the contractual protections of the grant endowment. (Ex. 3, Wazzan Dep. 17:19-18:1, 112:10-20.) All of his scenarios are based on the false premise that the University is free to invade—and even to completely deplete—the endowment portion of the Grant to pay annual Institute expenses without regard to its obligations under the Grant Agreement to maintain and operate the Institute

9

in perpetuity, as well as his assumption that the University would take these actions someday in the future.

Second, Dr. Wazzan concedes that his scenarios do not model the consequences of any action the University has ever actually taken with respect to the Institute. Instead, he purports to project what supposedly would result over the next 18 years if, at numerous assumed dates, the University (1) stopped paying any faculty compensation, research support, and student support costs, and (2) clawed back such costs it had previously paid. (*Id.* 69:13-70:19 (agreeing that the scenarios address "things that the university has not done yet but you're considering what would happen if they did these things in the future").) But Dr. Wazzan's speculation about the University's hypothetical, future actions—that he makes without any understanding of the Grant Agreement obligations and limitations and without regard to the University's actual conduct—is conjecture, not reliable expert opinion. *E.g.*, *Buckley v. Deloitte & Touche USA LLP*, 888 F. Supp. 2d 404, 413 (S.D.N.Y. 2012), *aff'd,* 541 F. App'x 62 (2d Cir. 2013) (excluding expert testimony based on assumptions of future conduct that lacked "sufficient factual foundation," where expert "provide[d] no analysis of the past behavior" and "no interviews or other evidence that might constitute, or even suggest a factual predicate for his conclusion"). Rather than aid the jury, Dr. Wazzan's hypothetical scenarios would only distract or confuse it and waste time.

Third, compounding the conjecture of his scenarios, Dr. Wazzan relies on assumed investment yields, Institute cost-inflation rates, and Institute expense levels extending to fiscal year 2039. He provides no reasonable foundation to support these assumptions or their extension nearly two decades into the future. For example, he assumes that the endowment yield will grow at an annual rate of three percent from 2025 to 2039, but provides no rationale or support for the forecast. He likewise provides no reasonable basis for his assumption that Institute costs will also

10

grow at 3% through 2039. Especially in light of the limited period of actual Institute operations, these assumptions 18 years into the future are inherently speculative. *Cf. Greig v. Botros*, 525 F. App'x 781, 793 (10th Cir. 2013) ("[E]xpert [ ] testimony [regarding future earnings loss] must be accompanied by a sufficient factual foundation before it can be submitted to the jury.") (alterations in original).

Dr. Wazzan's scenarios are speculative exercises about hypothetical future University action based on the false premise of Plaintiffs' misreading of the footnote. The Court should exclude his testimony and opinions about these scenarios. *See Goebel*, 215 F.3d at 1088 ("It is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate."); *Pioneer Centres Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1342 (10th Cir. 2017) (excluding expert opinion based on future action that could not be predicted "without speculation").

**II.     Dr. Campbell's Testimony Should Be Excluded**

    **A.     Dr. Campbell's Opinions Are Also Premised on Plaintiffs' Erroneous Interpretation of the 2017 Budget Footnote as well as Dr. Wazzan's Speculative Future Scenarios**

Dr. Campbell's opinions describe future operational cuts and other adverse impacts on the Institute that he says would be required under Dr. Wazzan's scenarios. All of Dr. Campbell's opinions are premised on (1) Plaintiffs' erroneous interpretation of the 2017 budget footnote, which he understands to mean that the University could stop payment of any faculty costs, research support costs, and student support costs, and claw back prior payments of such costs, "whenever the University might unilaterally wish to do so" in the future, and (2) Dr. Wazzan's scenarios of future Institute operations and depletion of the endowment fund. (Ex. 4, Campbell Rpt. at 3; Ex. 5, Campbell Dep. 55:6-56:4, 63:8-17, 66:6-11.)

11

While Dr. Campbell accepted Plaintiffs' erroneous footnote interpretation for purposes of his assignment, he did admit in his deposition that—contrary to Plaintiffs' interpretation and consistent with the University's—the words of the footnote plainly mean "whatever steps [the University] would take would be those that would have to be deemed appropriate under the [Grant] [A]greement." (Ex. 5, Campbell Dep. 96:23-97:9.) Dr. Campbell did not examine whether the Grant Agreement would permit the University to invade and deplete the endowment fund, as Dr. Wazzan's scenarios erroneously assume. (*Id.* 82:4-8.) He concedes that his opinions are not based on any action the University has ever actually taken, but instead on steps he says "the [U]niversity might take in the future." (*Id.* 66:6-11.)

For the reasons set forth in Section I.B above concerning Dr. Wazzan's scenarios, Dr. Campbell's opinions should be excluded because they depend on and are the product of Dr. Wazzan's unreliable, speculative methodology and Plaintiffs' erroneous interpretation of the budget footnote.

### B. Dr. Campbell's Opinions Address Future, Hypothetical University Actions that Would Disregard the Grant Agreement Obligations

Apart from his reliance on Dr. Wazzan's speculations and Plaintiffs' erroneous reading of the footnote, Dr. Campbell's opinions fail on independent grounds: the opinions presume, without any factual foundation, that in the future the University would take actions that breach the Grant Agreement.

Dr. Campbell acknowledges that his opinions address the operational impacts that would result if, in the future, the University were to stop paying the costs at issue, and to claw back its prior payments of those costs. (Ex. 5, Campbell Dep. 65:7-66:11.) His opinions describe what he says prudent academic management would require if the University were to take those steps. Among other things, Dr. Campbell opines that the University would be required to:

12

- Shut down the Pearson Institute for a year and, under some of Dr. Wazzan's future scenarios, permanently (*Id.* 62:20-63:2, 67:13-25);

- Leave two of the four chaired faculty professorships unfilled (Ex. 4, Campbell Rpt. at 5; Ex. 5, Campbell Dep. 72:7-16);

- Shift faculty from tenured positions to year-to-year term employment; and

- Implement various other operational cuts that "would seriously inhibit and adversely impact The Pearson Institute, impeding it from fulfilling the mission described in the Grant Agreement." (Ex. 4, Campbell Rpt. at 7; Ex. 5, Campbell Dep. 84:24-85:10.)

Dr. Campbell opines that these steps "would have a devastating impact [on] the operation of Pearson Institute." (Ex. 5, Campbell Dep. 69:11-25.)

But the Grant Agreement expressly obligates the University (1) to operate the Pearson Institute, Grant Agr. § 3.1(a), not to shut it down, (2) to fill and maintain all four chaired faculty professorships, *id.* §§ 3.2, 3.4, not to leave two unfilled, and (3) to fulfill the mission of the Institute, §§ 2.3, 3.1(e), not to impede the mission by taking actions that would have "devastating" impacts on the Institute. Dr. Campbell's opinions simply presume that in the future the University would disregard these Grant Agreement obligations, and take actions that would breach them. There is no reasonable foundation for these opinions about hypothetical future breaches, and they bear no valid connection to the breach allegations that are the subject of this case. Because his opinions amount to conjecture about supposed future University actions, they would not aid the jury, but distract, confuse, and waste time.

**Evidentiary Hearing and Oral Argument Requested**

The University requests a hearing on this motion, which concerns expert testimony regarding complex issues. The University believes that oral argument would aid the Court in understanding the facts and issues presented in the parties' briefing. The University also requests an evidentiary hearing concerning Dr. Wazzan's and Dr. Campbell's testimony.

## Conclusion

The University of Chicago respectfully requests that the Court exclude the testimony of Plaintiffs' proffered expert witnesses Paul Wazzan and Thomas Campbell for the reasons set forth above.

Dated: May 4, 2021                                         Respectfully submitted,

/s/ *Jeffrey A. Hall*
Jeffrey A. Hall
Rebecca Weinstein Bacon
Faye E. Paul
Taylor A.R. Meehan
Joshua P. Ackerman
Luke C. Beasley
Bartlit Beck LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60654
Telephone: (312) 494-4400
Facsimile: (312) 494-4440
jeffrey.hall@bartlit-beck.com
rweinstein.bacon@bartlitbeck.com
faye.paul@bartlitbeck.com
taylor.meehan@bartlitbeck.com
joshua.ackerman@bartlitbeck.com
luke.beasley@bartlitbeck.com

Andrew C. Baak
Bartlit Beck LLP
1801 Wewatta Street, Suite 1200
Denver, Colorado 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140
andrew.baak@bartlit-beck.com

And

William S. Leach, OBA #14892
Jessica L. Dickerson, OBA #21500
McAfee & Taft, a Professional Corporation
Williams Center Tower II
Two West Second Street, Suite 1100
Tulsa, Oklahoma 74103
Telephone:    (918) 587-0000
Facsimile:    (918) 599-9317
bill.leach@mcafeetaft.com
jessica.dickerson@mcafeetaft.com

*Counsel for Defendant and Counterclaimant,
The University of Chicago*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of May 2021, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of the Electronic Filing to the following ECF registrants:

P. Scott Hathaway
Isaac R. Ellis
Hayley N. Stephens
Connors & Winters, LLP
4100 First Place Tower
15 East Fifth Street
Tulsa, Oklahoma 74103
shathaway@cwlaw.com
iellis@cwlaw.com
hstephens@cwlaw.com

Julie B. Porter
Suzanne B. Notton
Andrea L. Evans
Salvatore Prescott & Porter, PLLC
1010 Davis Street
Evanston, Illinois 60201
porter@spplaw.com
notton@spplaw.com
evans@spplaw.com

Daniel P. Shapiro
1546 Knollwood Lane
Highland Park, Illinois 60035
dshapiro57@gmail.com

*Attorneys for Plaintiffs &
Counterclaim Defendants*

                                                             /s/  Jeffrey A. Hall
                                                             Jeffrey A. Hall