IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| THE THOMAS L. PEARSON AND THE PEARSON FAMILY MEMBERS FOUNDATION AND THOMAS L. PEARSON, INDIVIDUALLY, | | |
| | Plaintiffs and Counterclaim Defendants, | |
| v. | | Case No. 18-CV-99-JWB |
| THE UNIVERSITY OF CHICAGO, | | |
| | Defendant and Counterclaimant. | |

## MEMORANDUM AND ORDER

This matter comes before the court on motions for partial summary judgment filed by both parties.[1] (Docs. 187, 189.)  The motions are fully briefed and ripe for decision.  (Docs. 206, 207, 226, 229.)  For the reasons stated herein, Plaintiffs' motion for partial summary judgment is DENIED, and Defendant's motion for partial summary judgment is GRANTED in part and DENIED in part.  Additionally, the court strikes Count I in the amended complaint as it pertains to the University's failure to provide an Initial Budget that complied with § 3.1(d) as exceeding the scope of the leave to amend.

## I.    BACKGROUND

The following statement of facts is taken from the parties' submissions.   Factual disputes about immaterial matters are not relevant to the determination before the court.   Therefore, immaterial facts and factual averments that are not supported by record citations are omitted.

---

[1] Also pending are various motions in limine and Daubert motions.  (Docs. 248, 250, 251, 252, 254, 255, 256, 257.) It appears that many of the parties' requests have been mooted and/or need to be revised in light of the court's rulings set forth herein.  These motions are DENIED without prejudice.

At issue in this case is a grant of $100 million to Defendant, the University of Chicago, made by Plaintiffs, Thomas Pearson and The Thomas L. Pearson and The Pearson Family Members Foundation (the "Foundation").[2]  The Foundation was established by Plaintiff Thomas Pearson and his brother, Timothy R. Pearson, who both serve as co-presidents.[3]  The Pearsons are both experienced businessmen.  Thomas Pearson is a lawyer with experience drafting and negotiating complex commercial contracts.

The Pearsons approached the University about a possible grant in late 2013.  The parties began discussing terms of such a grant in early 2014.  The Pearsons were represented by counsel throughout the extensive Grant Agreement negotiations.  On April 3, 2015, the Foundation (by co-presidents Timothy and Thomas Pearson), Thomas Pearson individually, and the University (by President Robert Zimmer) executed a Grant Agreement.  (Doc. 6.)  The Grant Agreement contains a choice of law provision which specifies that New York law governs.  (Doc. 6 § 10.4.)  It contains an integration clause, which states that "[t]his Agreement contains all of the terms agreed upon by the parties hereto with respect to the subject matter of this Agreement and supersedes all prior agreements, arrangements and communications between the parties, oral or written, concerning such subject matter."  (*Id*. § 10.9.)  And it also provides that it "may be amended only by a writing signed by [all parties]."  (*Id*. § 10.10.)

The stated purpose of the grant was to "recognize the life-long commitment of [Thomas and Timothy Pearson's] parents, The Reverend Dr. Richard L. and Ramalee E. Pearson, to inspire, educate, and encourage the on-going discussion, understanding, and resolution of global conflicts, and contribute to the advancement of a global society at peace."  (*Id.* at 2.)  To that end, Plaintiffs

---

[2] The Foundation is a Delaware nonstock corporation with its principal place of business in Tulsa, Oklahoma.

[3] Timothy Pearson is not a party to this lawsuit.

would contribute a total of $100 million to the University payable in nine annual installments beginning in June 2015, and the University would create and operate The Pearson Institute for the Study and Resolution of Global Conflicts ("TPI") and an annual conference called The Pearson Global Forum (the "Pearson Forum").

### A.       Plaintiffs' Obligations

Under Article 1 of the Grant Agreement, the Foundation was generally required to pay the full annual installments on June 30 each year.  (*Id*. § 1.1.)  Thomas Pearson agreed to pay any unpaid portion of the annual installments if the Foundation failed to pay the full amount.  (*Id*. § 1.4.)  The Payment Schedule (Appendix 1 to the Grant Agreement) provides as follows:

| Due Date | Total Payment | Endowment Portion Range | Expendable Portion Range |
|---|---|---|---|
| 6/30/2015 | $11,000,000 | $9,750,000-$10,800,000 | $200,000-$1,250,000 |
| 6/30/2016 | $11,000,000 | $9,900,000-$10,600,000 | $400,000-$1,100,000 |
| 6/30/2017 | $13,000,000 | $12,100,000-$12,200,000 | $800,000-$900,000 |
| 6/30/2018 | $13,000,000 | $11,700,000-$12,000,000 | $1,000,000-$1,300,000 |
| 6/30/2019 | $13,000,000 | $12,000,000-$12,200,000 | $800,000-$1,000,000 |
| 6/30/2020 | $12,000,000 | $11,400,000-$11,500,000 | $500,000-$600,000 |
| 6/30/2021 | $11,000,000 | $10,600,000-$10,700,000 | $300,000-$400,000 |
| 6/30/2022 | $10,000,000 | $9,900,000-$10,000,000 | $0-$100,000 |
| 6/30/2023 | $6,000,000 | $5,900,000-$6,000,000 | $0-$100,000 |
| **TOTALS** | $100,000,000 | $93,250,000-$96,000,000 | $4,000,000-$6,750,000 |

(Doc. 6 at App'x 1, p. 38.)

Section 2.1 of the Grant Agreement provides that the University was required to "hold and retain" each Grant installment, any additional contributions made under Section 2.2, and all income and earnings on any of the foregoing in a separate fund (the "Pearson Fund"). (*Id*. § 2.1.) Under § 2.3, the University was required to "use the Pearson Fund and each Portion thereof for the sole and exclusive purposes of creating and operating the Pearson Institute and the Pearson Forum . . . ." (*Id*. § 2.3.) And § 3.1(c) provides that the University "shall satisfy the costs and expenses of operating the Pearson Institute and the Pearson Forum from the Pearson Fund to the extent of available funds." (*Id*. § 3.1(c).)

The "endowment portions" of the annual installments (totaling $93.25-$96 million, plus income and earnings) are protected as permanent restricted endowment funds.[4] (*Id*. § 2.1(b) & App'x 1.) The Grant Agreement permits the University to use an annual "endowment yield" or payout (based on a projected 5.5% annual draw on the endowment) to fund TPI and Pearson Forum operations. (Doc. 6 §§ 2.1(b), 3.1(c) & Ex. D-2, D-3.) The Grant Agreement also permits the University to use the expendable portions of the annual installment payments (totaling $4-$6.75 million) to pay operating expenses of TPI and the Pearson Forum.[5] (*Id*. § 2.1(b) & App'x 1.) Accordingly, two of the sources of funds available for TPI and Pearson Forum expenditures each year are (1) the endowment yield, and (2) the expendable portion of the annual payment.

However, in the event the University is operating under a "Cure Period" with respect to one of its "Founding Obligations" or "Maintenance Obligations" at the time any installment

---

[4] This designation limits the University's use of the endowment in order to protect the endowment principal and its purchasing power in perpetuity. (*See* Doc. 206-2 at 199:7-15 (stating that the University "can't invade the principal of [the permanent restricted endowment fund]"); Doc. 206-14 at 208:20-25 ("Endowments, you never touch the principal. You're only spending the payout."))

[5] Section 2.1(b) gives the University "discretion to allocate each Grant installment between the Endowment Portion and the Expendable Portion, as provided in the range of values for the Endowment Portion and Expendable Portion in Appendix I, provided such allocations remain within the applicable range specified on Appendix I." (Id. § 2.1(b)).

payment is due, "the Donor may elect to suspend payment by providing written notice to the University of its election to suspend in advance of such payment date, and following such election, during any such Cure Period, the Donor's obligation to make such payment shall be suspended, except for the obligation to make a Current Funding Payment." (*Id*. at § 1.1.) A "Current Funding Payment" is defined as follows:

> [A] payment to the University in an amount equal to the actual annual operating expenses for the Pearson Institute and the Pearson Forum identified in the budget for the budget year in which the Donor's suspension of payment occurs, except that if such actual annual operating expenses exceed the "Expendable Portion Range" specified in Appendix 1 for the relevant Grant installment (defined below), then a "Current Funding Payment" means the maximum of the "Expendable Portion Range" specified in Appendix 1 applicable to the Grant installment (defined below) for such budget year. Within thirty (30) days of the University curing its breach within the applicable Cure Period in accordance with Section 6.2, the Donor shall make such payment(s) as shall be necessary to become current under the schedule set forth on Appendix l, as of that date, taking into account any Current Funding Payments paid to the University as provided above. In the event the Donor elects to suspend any payment as provided above, following the University's cure of such breach within the applicable Cure Period in accordance with Section 6.2, the University shall have the right to make proportionate and reasonable adjustments to the budget for the Pearson Institute and the Pearson Forum and to the Operating Plan (defined below) to take into account any reduced yield on the Endowment Portion of the Pearson Fund resulting from the delay in receipt of the Donor's payments.

(*Id*.)

### B.   The University's Obligations

Article 3 of the Grant Agreement provides that the University was required to satisfy various "Founding Obligations" and "Maintenance Obligations" relating to TPI and the Pearson Forum. (*Id*. at § 3.1.) First, the Founding Obligations set deadlines for the University to establish TPI, the Pearson Forum, and to satisfy the following obligations set forth in Exhibit A to the Grant Agreement:

| Founding Obligation | Due Date | Cure Period |
|---|---|---|
| Appoint first chaired faculty | 9/1/2016 | 9/2/2016 – 9/1/2018 |
| Appoint first Institute Director | 9/1/2016 | 9/2/2016 – 9/1/2017 |
| Open temporary space at 1155 E. 60th Street | 9/1/2016 | 9/2/2016 – 3/1/2017 |
| Create first definitive operating plan and budget | 3/31/2017 | 4/1/2017 – 3/31/2018 |
| Create Advisory Council and appoint Donor Members | 6/30/2017 | 7/1/2017 – 6/30/2018 |
| Appoint second and third chaired faculty | 9/1/2017 | 9/2/2017 – 9/1/2019 |
| Hold first Pearson Forum | 10/31/2018 | 11/1/2018 – 10/31/2020 |
| Open permanent space for TPI in Keller Center | 1/31/2019 | 2/1/2019 – 1/31/2020 |

(*Id*. at 39.)

Second, the Maintenance Obligations require the University to operate TPI and the Pearson Forum, and to satisfy the following obligations set forth in Exhibit B: (1) keep the Institute Director position filled; (2) keep all faculty chair positions filled; (3) hold the Pearson Forum; (4) maintain TPI and Pearson Forum offices in Keller Center; (5) provide agreed-upon annual reports to Plaintiffs; and (6) cure casualty event.[6]  (*Id*. at 40.)  Upon failing to meet a Founding Obligation, or breach of a Maintenance Obligation, the University was given 30 days to report the failure or breach to Plaintiffs and to provide a plan and timetable for curing.  (*Id*. § 3.1(b)).

The Grant Agreement provides that TPI would be housed at and included within the University's already existing Harris School of Public Policy.  (*Id*. § 3.1(f) (stating that TPI "shall be a component of the Harris School."))  It directs the University to cause the Harris School "to

---

[6] The cure periods for these obligations are: two years for items (1) and (2); one year for items (3) and (4); six months for item (5); and three years for item (6).

appoint a faculty director to direct the day-to-day operations of" TPI, (the "Institute Director").
(*Id*. § 3.2(a).)  The "Institute Director shall be selected by the Dean of the Harris School to hold a
named professorship in the Harris School to be designated as the 'Reverend Dr. Richard L. Pearson
Professor of Global Conflict Studies and Faculty Director, The Pearson Institute for the Study and
Resolution of Global Conflicts.'" (*Id*.)  The Institute Director and the Harris School would then
appoint a non-faculty director (the "Forum Executive Director") to administer the day-to-day
operations of the Pearson Forum.  (*Id*. § 3.3.)  The University was to fill the Institute Director
position by September 1, 2016.  (*Id*. at Ex. A-1, p. 39.)  And the Forum Executive Director was to
take office by September 1, 2017.  (*Id*. at Ex. C-2, p. 42.)

On June 1, 2016, the University appointed James Robinson as the Institute Director and
the Reverend Dr. Richard L. Pearson Professor of Global Conflict Studies and Faculty Director.
Professor Robinson is a prominent economist and political scientist who held chaired
professorships at Harvard University from 2009 to 2015 and had joined the University of Chicago
in 2015 as a University Professor, an honor reflecting internationally recognized eminence.  He
holds degrees from the London School of Economics, the University of Warwick, and Yale
University. (Doc. 189-15.)  On July 16, 2018, the University appointed Blanca Berthier as the
Forum Executive Director.  (Doc. 189-16.)

In addition, the Grant Agreement provides that the University "shall establish three (3)
named professorships in the Harris School," to be designated as "The Ramalee E. Pearson
Professor of Global Conflict Studies," "The Philip K. Pearson Professor of Global Conflict
Studies," and "The David L. Pearson Professor of Global Conflict Studies."  (*Id*. § 3.4.)  Section
3.5(b) provides:

> The [Foundation] acknowledges and agrees that neither it, nor any member of the
> Pearson Family, nor the Advisory Council, nor any Donor Members, will have any

7

role or authority with respect to *making appointments* (academic or professional) to the Pearson Institute or the Pearson Forum, *setting the research agenda* of the Pearson Institute, *or the selection of topics or presenters* for the Pearson Forum.

(*Id*. § 3.5(b) (emphasis added.))

The Grant Agreement provides that the University was to fill the first chaired professorship by September 1, 2016, and the second and third by September 1, 2017. (*Id*. at Ex. A-1, p. 39.) The Grant Agreement provides a cure period for filling the second and third chairs that extended until September 1, 2019. (*Id*.)

On July 1, 2016, the University appointed two chaired professors. The University appointed Oeindrila Dube as the Philip K. Pearson Professor, one of the three chaired professorships under the Grant Agreement. (Doc. 189-7.) Dube had been an assistant professor of politics and economics at New York University. She holds a PhD in public policy from Harvard University, an MPhil in economics from Oxford University, a BA in public policy from Stanford University, and she received a Rhodes Scholarship in 2002. (Doc. 189-8 at 11:8-23; Doc. 189-9.) Additionally, the University appointed Christopher Blattman as the Ramalee E. Pearson Professor. (Doc. 189-7.) Blattman had been an associate professor at Columbia University's School of International and Public Affairs and Department of Political Science. He holds a PhD in economics from the University of California at Berkeley, and a master's degree in public administration and international development from Harvard University's Kennedy School of Government. (Doc. 189-10 at 12:11-14; Doc. 189-11.)

On November 8, 2018, the University appointed Roger Myerson as the David L. Pearson Professor, the final named professorship under the Grant Agreement. (Doc. 189-12.) Myerson had been The Glen A. Lloyd Distinguished Service Professor of Economics at the University of Chicago. He was one of the three winners of the 2007 Nobel Memorial Prize in Economic

Sciences.  He holds a PhD in applied mathematics, an ASM in applied mathematics, and an AB in applied mathematics, all from Harvard University.  (Doc. 189-13 at 50; Doc. 189-14.)

### C.    Initial Operating Plan and Preliminary Budget

The Grant Agreement also included an Initial Operating Plan and a Preliminary Budget. In addition to its Founding and Maintenance Obligations, the University was also required to "timely establish and conduct staffing, programs and operations for [TPI] and the Pearson Forum in accordance with the initial operating plan attached as Exhibit C."  (Doc. 6 § 3.1(a)).  The Initial Operating Plan generally provides a timeline the University was expected to follow in establishing and conducting staffing, programs, and operations for TPI and the Pearson Forum.[7]

The Preliminary Budget is attached to the Grant Agreement as Exhibit D.  The Grant Agreement describes the Preliminary Budget as follows:

> [A] preliminary projected budget for the Pearson Institute and the Pearson Forum *showing estimated projected revenue and expenditures, and the sources thereof, for a nine-year period* commencing on July 1, 2015 (the "Initial Budget").  The parties recognize that the Initial Budget is the University's preliminary good faith estimate of the budget of the Pearson Institute and the Pearson Forum, and is therefore subject to adjustment by the University. Notwithstanding the foregoing, no adjustment to the Initial Budget as reflected in any subsequent budget for the Pearson Institute or the Pearson Forum shall alter or diminish the University's obligations and/or commitments under Section 3.1(a), including the exhibits referred to therein.

(*Id*. § 3.1(d) (emphasis added.))

The University created the substance of the Preliminary Budget between December 2014 and February 2015.  The Preliminary Budget contains the University's "estimated projected revenue and expenditures" for TPI and the Pearson Forum for a nine-year period from fiscal year 2016 to fiscal year 2024.  (*See* Doc. 6 at 47-49; Doc. 206-3 at 126:2-14).  The University provided

---

[7] This operating plan incorporates hard deadlines previously established elsewhere in the Grant Agreement and establishes some additional soft deadlines/benchmarks for the University to follow.  However, the initial operating plan does not contain cure dates.

its final draft of the Initial Budget to Plaintiffs shortly before the Grant Agreement was executed. The Initial Budget generally shows how Plaintiffs' $100,000,000 endowment would be used each fiscal year. (Doc. 6 at Ex. D-2.) It estimates that $691,000 would be available to fund TPI's expenses in fiscal year 2016, with that number increasing each year through fiscal year 2024, at which point the total available funds were projected to be $4,833,000. (*Id*. at Ex. D-2–D-3.) It then lists a variety of "uses" (i.e., expenses) for things such as the Institute Director, faculty, research support, rent, etc. (*Id*. at D-3.) It budgets $650,000 for "uses" in fiscal year 2016, with that number increasing each year through fiscal year 2024, at which point the total "uses" were projected to be $4,599,000. (*Id*.) There is a projected budget surplus for each fiscal year.

The parties disagree on whether the Preliminary Budget was required to include the projected total annual expenses for TPI, or just those that would be paid for by the Pearson Fund. The parties also disagree on whether the Preliminary Budget was required to include expenses paid by the Harris School, that also benefited TPI, as a "source of revenue."

Plaintiffs contend that the Preliminary Budget reflects Plaintiffs' $100 million grant as the only source of funding for TPI and the Pearson Forum, while omitting other sources, i.e., the Harris School. Plaintiffs further contend that the Preliminary Budget does not accurately reflect TPI and the Pearson Forum's *total* annual expenses, but instead only reflects the expenses that would be paid for by Plaintiffs' grant. For example, Page D-3 of the Preliminary Budget shows an estimated $250,000 salary for the Institute Director in fiscal year 2017, with that salary to increase 3% each year afterwards. (*See* Doc. 6 at 49.) However, this figure was not based on the estimated actual salary for the Institute Director, but instead was merely a portion of the Institute Director's salary that the University planned to have the Pearson Fund pay for. (*See* Doc. 187-6 at 117:19-120:1.) As another example, Page D-3 of the Initial Budget contained line items for "Research Support for

Institute Director" and "Research Support for Chaired Faculty." (*See* Doc. 6 at 49.)  The Research

Support for Institute Director expenses ranged from $60,000 in fiscal year 2016 to $74,000 in

fiscal year 2024, and the Research Support for Chaired Faculty expenses ranged from $30,000 to

$37,000.  (*Id*.)  But the Preliminary Budget stated only the amounts that were to be funded by the

Pearson Fund.  It did not show the fact that the Harris School would actually be contributing as

much or more for these positions.  (*See* Doc. 187-7 at 1; Doc. 187-8 at 141:24-142:18.)

The University agrees that the Preliminary Budget does not reflect the Harris School's

expenses, including its share of faculty compensation, research support, and student support.

However, Dr. Diermeier testified that these are expenses of the Harris School—not expenses of

TPI.  (Doc. 206-3 at 120:2-123:15.)  According to Dr. Diermeier, the faculty who hold TPI

professorships are University faculty whose appointments "reside" in the Harris School, not in

TPI, and the University is contractually committed to the faculty for their compensation.  (*Id*. at

122:22-123:15.)  Thus, the University disputes Plaintiffs' characterization of the expenditures

highlighted above.  The University contends that page D-3 of the Preliminary Budget does not

show an estimated $250,000 salary for the Institute Director.   Instead, under the heading "Uses,"

it includes a line entry for "Institute Director," among others, and an amount of $250,000, which

the University contends is the projected *TPI* expense for Institute Director compensation, which

approximates the projected yield from Plaintiffs' $5 million endowment for the Institute Director

position.  (*See id*. at 117:19-118:19; *see also* Doc. 206 at 8.)

### D.    Definitive Operating Plan and Budget

Pursuant to its Founding Obligations in the Grant Agreement, the University was required

to "[c]reate [the] first definitive operating plan and budget" by March 31, 2017.  (*Id*. at 39.)  On

December 21, 2016, the University provided the Pearsons with informal, advance information

regarding its Definitive Operating Plan and Budget.   Notably, this information included expenditures for certain items which would be paid for by both the Pearson Fund *and* the Harris School.[8]   On February 12, 2017, Plaintiffs and the University Provost, Daniel Diermeier, had a telephone conference.   Thomas Pearson stated that, until then, the Grant Agreement and its exhibits had not addressed or disclosed any contribution or support by the University and/or the Harris School.   (*See* Doc. 187-15 at 269:11-23; Doc. 187-14 at 15; Doc. 188 at 17.)   Dr. Diermeier told Mr. Pearson that the University could not avoid its obligation to pay faculty compensation in light of its contractual obligations to the faculty and to Plaintiffs under the Grant Agreement, including the University's Maintenance Obligation to keep the faculty chairs filled.   (*See* Doc. 188 at 17.) Thomas Pearson asked for assurances that this newly disclosed support would continue, and that it would not be reduced or withdrawn, as having this funding withdrawn would adversely affect TPI.   Dr. Diermeier said that it was "strongly implied" that the University would not withdraw its funding, but that he needed to follow up with the University's counsel on that issue if Pearson insisted on including a line about its commitment in the Definitive Budget.   (*Id.*)

The University timely delivered its Definitive Budget to Plaintiffs on March 31, 2017. (Doc. 187-11.)   The first page is captioned: "The Pearson Institute Summary Budget."   (*Id.* at 2.) It includes three main categories: (1) revenues; (2) fixed costs; and (3) variable costs.   The "revenues" category consists of endowment yield and expendable gifts.   The "fixed costs" category consists of compensation (academic salaries, staff salaries, and benefits) and student support.   And the "variable costs" category consists of research support, competitive research and seed grants, contract staff/consultants, events, travel, academic visitors, marketing and branding, materials and

---

[8] Plaintiffs contend that this was the first time Plaintiffs had learned that the Harris School would be sharing the funding of certain items/positions within TPI and the Pearson Forum.  However, as discussed in greater detail below, it is uncontroverted that the University disclosed the Harris School's contributions in a preliminary draft agreement in January 2015.

supplies, and other expenses.  There are three lines that are bolded and highlighted to indicate that the Harris School will be contributing: $11,866,202 for compensation costs, $3,120,244 for student support, and $395,000 for research support.

The "Total Institute costs" from fiscal year 2016 through fiscal year 2024 is $44,736,835. This consists of $15,381,446 to be contributed by the Harris School and $29,355,389 to be contributed by the Pearson Fund.  There is a footnote attached to the end of the Harris School total costs line item, which reads:

> Amounts contributed by Harris Public Policy are subject to reevaluation on an annual basis and based on Harris's budget.  Inclusion of these contributions in the current year's Pearson Institute and Pearson Forum budget does not preclude charging these costs against the Pearson Fund in future annual budgets where otherwise appropriate under the terms of the Amended and Restated Grant Agreement.

(Doc. 187-11 at 2.)

The second sentence of the footnote refers to an "Amended and Restated Grant Agreement" because at that time the parties were discussing possible amendments to the Grant Agreement. (*See* Doc. 206-12; Doc. 206-13.)  The University agrees that the footnote in the March 31, 2017, Definitive Budget applies, as a whole, to the original Grant Agreement.  (Doc. 187-8 at 200:25-201:13.)  On April 21, 2017, the University delivered another version of the Definitive Budget that substituted 2016 actual data for 2016 budgeted data (which had been inadvertently included in the March 31, 2017 budget).  (*See* Doc. 206-14 at 222:2-19; Doc. 206-9 at 2.)  The University's corrected version retained the same footnote that originally appeared in the March 31, 2017 Definitive Budget.  The parties could not reach agreement on the terms of amending the Grant Agreement, so the University modified the budget footnote to refer to the "the Grant Agreement" in the April 2018 budget.  (*See* Doc. 187-16 at 3.)

### E.    Annual Financial Reports

The Grant Agreement also required that the University provide Plaintiffs with annual written reports within 90 days of the University's fiscal year, described as a "financial report for such fiscal year indicating the actual expenses (aggregated by budget category) incurred in carrying out the programs and activities of [TPI] (including the Pearson Forum) during such fiscal year, the source of payment thereof, and a comparison of actual to budgeted expenses for such fiscal year." (Doc. 6 § 5.1(b)(2)). According to the Grant Agreement's Initial Operating Plan (Ex. C), the first annual report was due on September 1, 2017.[9]

In September 2016, the University delivered a report titled by the University as the "2015-16 Impact Report." (Doc. 187-9.) It provides that "[t]his Impact Report includes the financial report for the 2015-16 fiscal year and a summary of significant accomplishments on behalf of [TPI.]" (*Id.* at 4.) It contains a one-page summary captioned "Financials," which reflects "a summary of expenditures in fiscal year 2016 and projected budgets for fiscal year 2017." (*Id.* at 36.) This chart contains the expenses originally set forth in the Initial Budget for fiscal years 2016 (totaling $691,000) and 2017 (totaling $1,397,000). It also contains the University's actual expenditures for fiscal year 2016 (totaling $1,705,765), and new projected expenditures for fiscal year 2017 (totaling $2,083,530). (*Id.*) In reporting "original" and "projected" budgeting for TPI, this annual report used the same assumptions as had the Initial Budget, i.e., it does not reflect the Harris School's expenses, including its share of faculty compensation, research support, and student support.

F.     **Plaintiffs' Payments**

---

[9] Plaintiffs contend that § 5.1(b) of the Grant Agreement and the record (the University's internal and external communications) both reflect that the first Annual Report was due in 2016. (*See* Doc. 226 at 4.) The court disagrees for reasons explained in detail below. *See infra* Section III.A.1.c.

The Foundation made the first two annual payments of $11 million each in June 2015 and June 2016.  However, the Foundation refused to make the third payment of $13 million due in June 2017, and Thomas Pearson likewise refused to make the payment.

On June 5, 2017, Plaintiffs sent the University a "Reservation of Rights and Notice of Default." (Doc. 206-17.)  The letter provides:

> The purpose of this letter is twofold. First, as Tim and I, on behalf of The Thomas L. Pearson and The Pearson Family Members Foundation ("The Pearson Foundation") have, and are willing to continue to discuss with you the possibility of reaching an agreement that will adequately address The University of Chicago's (the "University") failure to perform certain of its material obligations under the Grant Agreement of April 3, 2015, between The Pearson Foundation and myself (for select limited purposes), on the one hand, and the University, on the other, (the "Grant Agreement"), we want to clarify that no such agreement has yet been reached, and that The Pearson Foundation and I retain and reserve all of the rights and claims each of us may have against the University.

> Second, as a result of the University's failure to (a) follow-up on the matters that were discussed in our meeting of May 4, 2017, and (b) to act on the very substantive issues detailed in The Pearson Foundation's letter of May 23, 2017, we have no choice but to advise that The Pearson Foundation and I have lost confidence that the University is seriously addressing, or intends to address, the material failures in performance that we detailed for you our various discussions and meetings occurring over the last year. Inasmuch as the cure periods contemplated in the Grant Agreement are, in some instances, lengthy, we believe that it is in the best interests of all parties to provide, pursuant to Section 6.2(a), (b) and (c) of the Grant Agreement, this notice of failure to perform with respect to material breaches by the University of a number of its obligations pursuant to Sections 1.2, 2.3, 3.1(a) and (b), 3.2(a), 3.3(a). 4.3 and 5.1(b) of the Grant Agreement. A brief summary of those material breaches, inter alia, is set forth on Exhibit "A" attached hereto. To be clear. The Pearson Foundation and I. respectively, reserve all of our remedies pursuant to Section 6.4 of the Grant Agreement.

> As we have previously expressed, we are troubled by the University's apparent lack of commitment to The Pearson Institute, the lack of transparency and veracity in certain circumstances on the part of the University in dealing openly and honestly with The Pearson Foundation and its officers and representatives, and the lack of accountability for and accomplishment by the University against mutually agreed-to objectives. Nonetheless, our principal purpose of this notification letter is to find a way to move forward with the University to implement the terms of the Grant Agreement. However, if the University does not adequately address to our reasonable satisfaction the material breaches generally described on Exhibit "A"

attached hereto and does not execute a mutually agreed to amended and restated Grant Agreement on a timely basis, then, regretfully, we believe it to be in the best interests of all parties to begin the process of dissolving our relationship.

(*Id*. at 2-3.)

In Exhibit A to the letter, Plaintiffs cite the following material breaches: (1) the University's refusal to agree to an amended and restated Grant Agreement which splits the Institute Director position into two positions; (2) material or anticipated breaches of three of the University's Founding Obligations;[10] (3) the University's proposed modification of language concerning the University's Maintenance Obligations in drafts of the amended Grant Agreement; (4) the University's failure to comply with deadlines in the Initial Operating Plan; (5) the University's rejection of Plaintiffs' proposals for an amended operating plan; (6) disagreements regarding an amended and restated Initial Budget; (7) the University's breaches of obligations concerning the announcement plan for TPI; and (8) other various breaches as to which the Plaintiffs had previously given verbal notice.  (*Id*. at 4-11.)

In January 2018, the Foundation paid the University $900,000, and in June 2018, the Foundation made a payment of $1.3 million.  But Plaintiffs refused to pay the remaining $11.7 million of the 2018 installment payment.  In June 2019, the Foundation made a payment of $1 million, but refused to pay the remaining $12 million of its 2019 installment payment.  In June 2020, the Foundation paid the University $600,000, but refused to pay the remaining $11,400,000 of the 2020 installment payment.

---

[10] The three identified breaches of the University's Founding Obligations concern the appointment of an Institute Director by September 1, 2016; the creation of the first definitive operating plan and budget by March 31, 2017; and the University's holding of the Pearson Forum in October 2018.  (Doc. 206-17 at 4-5.)  With regards to the March 31, 2017 Definitive Budget, Plaintiffs cite the University's inclusion of erroneous data which the University was forced to correct in the April 2017 "corrected" budget.  (*Id*. at 5.)  Notably, Plaintiffs did not mention the University's inclusion of Harris School expenses in the Definitive Budget, or the omission of Harris School expenses in previous budgets.  Nor do Plaintiffs mention the footnote in the March 31, 2017 budget.

### G.     Procedural History

After a failed mediation effort, the Foundation filed this lawsuit on February 20, 2018, seeking the return of all payments to the University ($25.8 million) and to avoid its obligations under the Grant Agreement.  (Doc. 1.)  The Foundation brought claims for breach of contract, breach of fiduciary duty, fraudulent concealment, breach of duty of good faith and fair dealing, and anticipatory repudiation.  (*See* Doc. 2.)  The University answered, moved to dismiss the Foundation's complaint, and filed a counterclaim against the Foundation and Thomas Pearson for breach of contract for failing to make the $13 million installment payment due in June 2017.  (*See* Docs. 27, 28, 29.)  The Foundation then filed a motion to dismiss the University's counterclaim (Doc. 36), which the then-assigned district court judge denied on June 27, 2018.  (Doc. 45.)  The court granted the University's motion to dismiss as to the Foundation's claims of breach of fiduciary duty (Count II) and fraudulent concealment (Count III) on June 29, 2018.  (Doc. 46.)  Soon after, the court entered a scheduling order setting the deadline for joinder of additional parties and amendment to the pleadings as September 21, 2018.  (Doc. 47.)

On October 21, 2019, the Foundation filed a motion for leave to amend the complaint after the pleadings deadline set forth in the scheduling order had passed.  (Doc. 93.)  The Foundation sought to add claims against the University for fraudulent inducement, equitable rescission, and unilateral mistake.  (*Id*. at 1.)  The Foundation also sought leave to "amend its Complaint to revise and provide additional factual support for existing claims and to add [Thomas Pearson] as a co-Plaintiff."  The then-assigned judge granted in part and denied in part the Foundation's motion to amend.  (Doc. 109.)  He found that the Foundation had shown good cause to add Thomas Pearson as a Plaintiff, and to add the fraud claims "because it learned new information through discovery that demonstrates an intent to defraud, whereas the previous facts known to the plaintiff did not."

17

(*Id*. at 4 (quoting Doc. 107 at 7.))  But he found that this reasoning "does not extend to the Foundation's proposed amendments regarding the quality of the October 2018 Pearson Forum." He explained that the "Forum occurred in October 2018. Yet, the Foundation offers no justification for waiting more than a year after the Forum occurred to bring this new claim." (*Id*. (quoting Doc. 102 at 13.))  Accordingly, he found that the Foundation failed to show good cause to amend its complaint to include additional allegations related to the quality of the October 2018 Pearson Forum.  (*Id*.)  Plaintiffs' amended complaint asserts five counts: (1) breach of contract, (2) breach of the duty of good faith and fair dealing, (3) fraudulent inducement, (4) unilateral mistake, and (5) equitable rescission.  (*See generally* Doc. 110.)

On January 25, 2021, both parties filed motions for partial summary judgment.[11]  (Docs. 187, 189.)  Plaintiffs seek summary judgment in their favor on their breach of contract claim (Count I), and for the return of all monies Plaintiffs have paid to the University under the Grant Agreement.  (Doc. 187 at 4.)  Specifically, Plaintiffs identify three alleged breaches of the Grant Agreement: (1) the University's failure to provide an Initial Budget that complied with § 3.1(d); (2) the University's provision of a definitive operating plan and budget on March 31, 2017 that fundamentally changed and repudiated material terms of the parties' contract; and (3) the University's provision of its 2016 annual report, which failed to comply with § 5.1(b).

The University moves for summary judgment on the following claims: (1) breach of contract claims based upon faculty hiring, Institute Director appointment, Executive Director appointment, curriculum, and budget and operating plan; (2) fraudulent inducement; (3) unilateral

---

[11] Since Plaintiffs filed their motion for partial summary judgment, the University has filed a fourth and fifth amended counterclaim.  (Docs. 345, 355.)  Each of these amended pleadings brings an additional claim for breach of contract regarding Plaintiffs' failure to make the installment payments in 2021 (Count IV in the fourth amended counterclaim) and 2022 (Count V in the fifth amended counterclaim).  The University was granted leave to bring these additional claims because the claims did not accrue until Plaintiffs defaulted on their 2021 and 2022 installment payments. (Docs. 348, 354.)

mistake; (4) rescission; and (5) Plaintiffs' demands for return of their payments to the University, and punitive damages.

The case was reassigned to the undersigned on February 16, 2023.  (Doc. 357.)

## II.   LEGAL STANDARD

Summary judgment is appropriate if "the record, including depositions, documents . . . affidavits or declarations, stipulations. . . admissions, interrogatory answers, or other materials" establishes that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The moving party bears the initial burden of establishing the absence of a genuine issue of fact.  *Celotex v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  The inquiry turns on "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Liberty Lobby*, 477 U.S. at 251-52.  In applying this standard, courts must view the evidence and all reasonable inferences from it in the light most favorable to the nonmovant.  *Matsushita*, 475 U.S. at 587.

## III.   ANALYSIS

Both parties move for partial summary judgment on multiple grounds.  At the center of this dispute is the proper interpretation of the parties' rights and obligations under the Grant Agreement.  The Grant Agreement provides "[t]his agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to the conflicts of laws principles thereof."  (Doc. 6 § 10.4.)  "In cases like this one, where subject matter jurisdiction is based on diversity of citizenship, federal courts must look to the forum state's choice-of-law rules

to determine the effect of a contractual choice-of-law clause." *MidAmerica Constr. Mgmt., Inc. v. MasTec N.A., Inc.*, 436 F.3d 1257, 1260 (10th Cir. 2006). "Under Oklahoma law, a contract will be governed by the laws of the state where the contract was entered into unless otherwise agreed and unless contrary to the law or public policy of the state where enforcement of the contract is sought." *Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1236 (10th Cir. 2007). Here, both parties agree the Grant Agreement's choice-of-law clause applies and that New York law governs the parties' claims. The court will therefore apply New York's substantive law and federal procedural law. *Racher v. Westlake Nursing Home Ltd. P'ship*, 871 F.3d 1152, 1162 (10th Cir. 2017).

Under New York law, where the parties to a breach of contract action dispute the intended meaning of the agreement, the court looks to the contract itself to determine if the terms are unambiguous, giving the words of the contract their "plain meaning." *Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1007 (N.Y. Ct. App. 2014). Where the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole. *Id.* at 1003. An agreement is unambiguous "if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.* (brackets and quotations omitted). But ambiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties' intent, or when specific language is "susceptible of two reasonable interpretations." *Id.* (quoting *State of N.Y. v. Home Indem. Co.*, 66 N.Y.2d 669, 671 (1985)).

### A.    Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs seek summary judgment in their favor on their breach of contract claim (Count I), on their claim for damages (the return of the $25.8 million Plaintiffs have paid to the

University), and on the University's counterclaims.  (*See* Doc. 187 at 4, 34.)  First, Plaintiffs identify three alleged breaches of the Grant Agreement: (1) the University's failure to provide an Initial Budget that complied with § 3.1(d); (2) the University's provision of a definitive operating plan and budget on March 31, 2017, that fundamentally changed and repudiated material terms of the parties' contract; and (3) the University's provision of its 2016 annual report, which failed to comply with § 5.1(b).  Second, Plaintiffs contend that the University's material breaches entitle Plaintiffs to reliance damages, restitution damages, and/or rescission damages.  Third, Plaintiffs contend that summary judgment is appropriate on the University's counterclaims, because Plaintiffs performed as required under the Grant Agreement.

### 1.   Plaintiffs are not entitled to summary judgment on their breach of contract claims.

Under New York law, the plaintiff must establish the following elements to prevail on a breach of contract claim: (1) the existence of a contract;[12] (2) the plaintiff's performance of the contract; (3) the defendant's breach; and (4) damages resulting from the breach.  *Calgon Carbon Corp. v. WDF, Inc.*, 700 F. Supp. 2d 408, 414 (S.D.N.Y. 2010).  The court begins with the third element, breach.  Under New York law, a defendant's breach is material when it is "so substantial that it defeats the object of the parties in making the contract; the breach must go to the root of the agreement between the parties."[13]  *Pepco Energy Servs., Inc. v. Geiringer*, 2009 WL 3644295, at *17 (E.D.N.Y. 2009) (quoting *Metro. Nat'l Bank v. Adelphi Academy*, 886 N.Y.S.2d 68 (N.Y. Sup. Ct. 2009)); *see also Spano v. V & J Nat'l Enters., LLC*, 264 F. Supp. 3d 440, 458 (W.D.N.Y. 2017)

---

[12] The first element is satisfied because the parties agree that the Grant Agreement is an enforceable contract.

[13] "[I]f a breach is relatively minor and not of the essence, the plaintiff is still bound by the contract and may not abandon performance and obtain damages for a total breach by the defendant, though the non-breaching party is entitled to damages caused even by the immaterial breach, albeit that these may be nominal in amount. Otherwise stated, a non-performing party is liable for any breach of contract, but the other party is discharged from further performance, and is entitled to substantial damages only when there is a material breach."  *Metro. Nat'l Bank v. Adelphi Academy*, 2009 WL 1477998, at *3 (N.Y. Sup. Ct. 2009) (quoting 23 Williston on Contracts § 63:3 (4th ed.)).

("A breach is material when it substantially defeats the purpose of the contract." (internal brackets and quotations omitted)).

> a.    **Plaintiffs' breach of contract claim for the University's failure to provide an Initial Budget that complied with § 3.1(d).**

Plaintiffs first move for summary judgment on the claim that the University breached its obligations under § 3.1(d) of the Grant Agreement.  (Doc. 187 at 19.)  Section 3.1(d) of the Grant Agreement required the University to provide, as Exhibit D to the Grant Agreement, a "preliminary projected budget for the Pearson Institute . . . showing estimated projected revenue and expenditures, and the sources thereof, for a nine-year period commencing on July 1, 2015."  (Doc. 6 § 3.1(d)).  Plaintiffs contend that the University breached this provision because "Exhibit D to the Grant Agreement provided by the University was substantially different than what Section 3.1(d) of the Grant Agreement required."  (Doc. 187 at 19.)  Plaintiffs contend the purpose of § 3.1(d) was to require the University to disclose the amount of funding "sufficient to fund TPI on a standalone, perpetual basis."  (*Id.* at 5.)  However, Plaintiffs contend that Exhibit D allocated *exactly* $100 million over various categories of TPI expenditures; it did not attempt to budget for total anticipated costs of TPI's programs, operations, and activities.  According to Plaintiffs, the endowment necessary to fully support TPI was at least $139 million.  (*See id.* at 15.)

The University argues that Plaintiffs should be judicially estopped from asserting this theory of breach because it circumvents the court's order granting Plaintiffs leave to amend.  The University further argues that even if Plaintiffs had pleaded a § 3.1(d) claim, Plaintiffs are not entitled to summary judgment because their argument relies on an incorrect interpretation of § 3.1(d).  The court agrees with the University on both points.

First, the court finds that Plaintiffs' theory is based on a mistaken interpretation of § 3.1(d), which provides:

> Attached as <u>Exhibit D is a</u> preliminary projected budget for the Pearson Institute and the Pearson Forum *showing estimated projected revenue and expenditures, and the sources thereof, for a nine-year period* commencing on July 1, 2015 (the "Initial Budget"). The parties recognize that the Initial Budget is the University's preliminary good faith estimate of the budget of the Pearson Institute and the Pearson Forum, and is therefore subject to adjustment by the University. Notwithstanding the foregoing, no adjustment to the Initial Budget as reflected in any subsequent budget for the Pearson Institute or the Pearson Forum shall alter or diminish the University's obligations and/or commitments under Section 3.1(a), including the exhibits referred to therein.

(*Id*. § 3.1(d) (emphasis added).))

Plaintiffs contend that § 3.1(d) "required the University to provide the Pearsons with a budget disclosing *all* costs necessary to support TPI and *all* revenue sources that would fund them." (Doc. 187 at 21 (emphasis added.))  According to Plaintiffs, the purpose of the Initial Budget and § 3.1(d) was to "enable the Pearson Family to determine *before* they executed the Grant Agreement whether the funds they were providing were anticipated to be sufficient to fund TPI on a *standalone, perpetual basis*." (*Id.* at 5 (emphasis added.))

The court disagrees.  The Grant Agreement does not define "revenue," "expenditures," or the "sources" that need to be included in the Initial Budget.  However, "silence does not equate to contractual ambiguity." *Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, 157 F. Supp. 3d 352, 364 n.2 (S.D.N.Y. 2016), *aff'd*, 850 F. App'x 38 (2d Cir. 2021).  "If the document as a whole makes clear the parties' over-all intention, courts examining isolated provisions should then choose that construction which will carry out the plain purpose and object of the agreement." *R&D Hotel, LLC v. McDonald's USA, LLC*, 2016 WL 3866408, at *2 (S.D.N.Y. 2016).

And here, the only logical reading of the Grant Agreement as a whole is that § 3.1(d) merely required the Initial Budget to reflect how Plaintiffs' endowment was being used.  Indeed, the Grant Agreement places numerous restrictions on how the University was allowed to use the endowment. (*See, e.g.,* Doc. 6 § 2.3 (stating that the Pearson Fund shall be used for the sole and exclusive

purposes of creating and operating TPI.))  In contrast, the Grant Agreement does not require the Pearson Fund be the sole and exclusive source of funding for TPI.[14]

Nor does the Grant Agreement state that TPI was to be funded in perpetuity as a standalone entity.  On the contrary, the Grant Agreement specifically provides that TPI "shall be a component part of the Harris School," and not an "independent institute within the structure of the University."[15]  (*Id*. § 3.1(f)).  As such, the Grant Agreement specifically recognized that the University would have Harris School expenses that would also benefit TPI.  For example, § 3.6(b) provides that "[t]he University shall satisfy all costs of [TPI's] relocation [from the Keller Center], and shall not charge any of those costs to, or seek or accept reimbursement from, the Pearson Fund." (*Id*. § 3.6(b)).  Similarly, § 6.4(b)(1) provides that, upon Plaintiffs' termination of the Grant Agreement, the University shall refund "all amounts paid to the University . . . but less the amount of such funds previously expended by the University in support of the Pearson Institute."  (*Id*. § 6.4(b)(1)).  Yet the Grant Agreement placed no restrictions on how the University could use its own funds and/or allocate expenses to the Harris School.  The unrestricted nature of the University's expenses suggests that Plaintiffs were not concerned with the University allocating expenses to the Harris School instead of TPI.  After all, this would only serve to benefit Plaintiffs.

Consequently, it is unreasonable to read § 3.1(d) in isolation to conclude that it was intended to ensure that the endowment would be sufficient to fund TPI on a standalone, perpetual basis.  If this was truly the parties' intent, surely they would have made TPI an independent

---

[14] In fact, the Grant Agreement specifically contemplates funding for TPI coming from sources other than the Pearson Fund. (*See* Doc. 6 at 42 (requiring the University to begin developing "strategies for additional fundraising" between September 1, 2016 and June 30, 2017); Doc. 6 at § 3.1(c) (stating that the University shall satisfy TPI's cost and expenses "to the extent of available funds."))

[15] If the University later "determines (consistent with the Mission) that [TPI] should no longer be situated within the Harris School, but should instead be an independent institute within the structure of the University, the University agrees to discuss such proposed change with the Donor prior to implementing such change . . ." (Doc. 6 § 3.1(f)).

institute upon its creation, and prohibited the University from funding TPI from anything other than the Pearson Fund.  But the parties instead agreed for TPI to be a component part of the Harris School and placed no restrictions on how the University allocated Harris School expenses.  The University was only prohibited from using the Pearson Fund to fund non-TPI expenses.

Based on this context, it is clear that the language "projected revenue and expenditures, and the sources thereof" is in reference to how Plaintiffs' endowment was being used.  Indeed, Harris School expenses that are not paid by the Pearson Fund or charged to TPI are neither a TPI expenditure nor a source of revenue for TPI.  These are exclusively Harris School expenditures. The only expenditures contemplated by the Grant Agreement are those that are paid for by the Pearson Fund or charged to TPI.  And the only sources of revenue within the purview of the Grant Agreement are the "projected endowment yield," the "expendable portion" of the annual installment payment, and any "additional contributions" made pursuant to § 2.2 or through the University's "fundraising."  (*See* Doc. 6 §§ 1.1, 2.1(b), 2.2; *see also id.* at Ex. C-2 (requiring the University to develop "strategies for additional fundraising."))

Moreover, the court notes that Plaintiffs' breach of contract theory is largely predicated on the University's representations as to the nature and extent of the University's contributions to TPI.  To the extent Plaintiffs' claim rests on representations made prior to the execution of the Grant Agreement, they are barred by the clear merger clause in § 10.9.  *See Knutson v. G2 FMV, LLC*, 2018 WL 286100, at *6 (S.D.N.Y. 2018) (holding that to the extent the plaintiff's claim rests on representations made prior to the signing of the employment agreement, they are barred by the clear merger clause in the employment agreement).  (*See also id.* § 10.9 (providing that "[t]his Agreement contains all of the terms agreed upon by the parties hereto with respect to the subject

matter of this Agreement and supersedes all prior agreements, arrangements and communications between the parties, oral or written, concerning such subject matter.")

Accordingly, Plaintiffs are not entitled to summary judgment on their breach of contract claim regarding the University's provision of the Initial Budget.

Second, the court finds that this claim should be stricken because Plaintiffs did not obtain leave to assert this new theory.  In the original complaint, the Foundation did not plead a breach of contract claim based on § 3.1(d).[16]  In October 2019, more than a year after the deadline for pleading amendments, the Foundation moved for leave to amend its complaint.[17]  (Doc. 93.)  The Foundation represented to the court it was seeking leave to: "(1) add new claims for fraudulent inducement, equitable rescission, and unilateral mistake; (2) clarify existing facts and add allegations in the Complaint; and (3) add Thomas L. Pearson . . . as a Plaintiff."  (*Id*. at 5.)  The Foundation did not represent that it was seeking to bring a new breach of contract claim or theory.

The Foundation explained that the reason for delay was because the University "did not begin producing its documents in any volume until mid-2019."  (Doc. 93 at 2.)  "Having now reviewed the University's recent document production, it has become clear to the Foundation and to Mr. Pearson that they were fraudulently induced to enter into the Grant Agreement with the University, and that the Grant Agreement should be set aside."  (*Id*. at 3.)  The Foundation elaborated:

> None of the reasons for denying leave exist here. Only after reviewing the University's document production from this past August could the Foundation conclude that there can be no explanation for the University's deceptive behavior

---

[16] In the reply, Plaintiffs concede that the factual support for this claim was added for the first time in the first amended complaint.  (*See* Doc. 226 at 7.)

[17] "After a scheduling order deadline, a party seeking leave to amend must demonstrate (1) good cause for seeking modification under Fed. R. Civ. P. 16(b)(4) and (2) satisfaction of the Rule 15(a) standard."  *Gorsuch, Ltd., B.C. v. Wells Fargo Nat. Bank Ass'n*, 771 F.3d 1230, 1240 (10th Cir. 2014).

other than fraud. These recently produced documents explain why the University concealed key facts from the Foundation.

Specifically, in its review of the University's document production, the Foundation has discovered documents evidencing misrepresentations by the University to the Foundation in the original budget for The Pearson Institute that the University provided to the Foundation prior to entering into the Grant Agreement. The documents demonstrate that the budget provided by the University was deliberately misstated. The University's most recent document production explains why the University misstated that budget. As a result of these misrepresentations, the Foundation did not know that its entire investment in The Pearson Institute and The Pearson Global Forum was subject to risks that had been deliberately hidden from the Foundation at the time the Grant Agreement was executed.

(*Id*. at 3-4.)

In response, Defendants generally contested the new claims and allegations as being based on alleged conduct that took place long before the Foundation filed suit.  (Doc. 102 at 5.) Defendants also pointed out that the Foundation's proposed amended complaint sought to add allegations regarding the quality of the inaugural Pearson Forum held in October 2018—facts which were known to the Foundation for more than a year at that time.  (*Id*. at 12-13.)

In Reply, the Foundation argued that good cause exists to amend the complaint because "[u]ntil this latest document production by the University, the Foundation had no knowledge of the University's strained financial condition and responsive austerity program, and no context to understand its behavior," which goes to the University's intent to deceive.  (Doc. 107 at 7.)  The Foundation explained:

In February 2017, the Foundation first learned that the University was contributing certain funds, not disclosed previously by the University, to support or underwrite the operations of [TPI] and [the Pearson Forum] and had been doing so since 2015—notwithstanding the fact that the Grant Agreement had required that all sources of funds necessary for the contemplated operation of TPI and [the Pearson Forum] be disclosed by the University to the Foundation prior to the time that contract was executed in April 2015. Upon learning of this University funding, the Foundation immediately requested that the University commit to continue providing this same level of funding, at a minimum, in the future to assure the continued financial viability of TPI and [the Pearson Forum]. The University not

27

only failed to respond to this request, but shortly thereafter it placed an obscure footnote in the March 31, 2017 TPI budget stating that the University would review annually the continuation of such funding and that it had a unilateral right to charge-back against the Pearson Fund amounts the University had provided previously to TPI and TPGF – the exact opposite of an assurance of continued funding. However, this information alone was not sufficient to support a fraud claim. *Without more, this appeared to be a contract claim*, and, in fact, this failure to disclose University funding and assertion of a charge back right was a part of the Foundation's contract claim in its original Complaint (Compl. ¶¶ 42-44).

The University's documents produced in mid-August 2019, however, *reveal the University's intent to deceive* the Foundation for the University's own purposes.

(*Id*. at 4-5 (emphasis added.))  "Moving to add the Foundation's fraud claim to the complaint at any earlier time would have been premature and would have subjected the claim to dismissal because a fraud claim does not exist without an intent element."  (*Id*. at 7.)

The Foundation also clarified that "this new information has caused the Foundation to seek to now amend its contract claim to plead an alternative breach theory."  (*Id*.)  The Foundation explained its alternative breach theory as follows:

What has become clear since reviewing the University's document production of mid-August 2019 is that it was the University's intention to have orally amended the Grant Agreement, notwithstanding a "no oral modification" clause, to do away with the Institute Director position altogether, and create separate and distinct Faculty Director and Executive Director positions instead.

(*Id*. at 8.)  The Foundation did not represent that it was seeking to plead any other alternative breach theories, such as breach of § 3.1(d).

The then-assigned judge granted in part and denied in part the Foundation's motion to amend.  (Doc. 109.)  He found that the Foundation had shown good cause to add the fraud claims "because it learned new information through discovery that demonstrates an intent to defraud, whereas the previous facts known to the plaintiff did not."  (*Id*. at 4 (quoting Doc. 107 at 7.))  But he found that this reasoning "does not extend to the Foundation's proposed amendments regarding

28

the quality of the October 2018 Pearson Forum."  He explained that the "Forum occurred in October 2018. Yet, the Foundation offers no justification for waiting more than a year after the Forum occurred to bring this new claim." (*Id*. (quoting Doc. 102 at 13.))  Accordingly, he found that the Foundation failed to show good cause to amend its complaint to include additional allegations related to the quality of the October 2018 Pearson Forum.  (*Id*.)

Plaintiffs now claim that the new factual allegations (found in Paragraphs 73-75 of the first amended complaint) support a claim for breach of § 3.1(d) of the Grant Agreement.  Although these facts are under the heading: "The University's Misrepresentations and Omissions Caused the Plaintiffs To Enter Into The Grant Agreement And Caused the Foundation to Pay The University $25.2 Million," Plaintiff contends that they also support its existing breach of contract claim which was pleaded in the original complaint.  Plaintiffs note that in the motion for leave to amend, the Foundation specifically sought leave to: "add factual support for existing claims."  (See Doc. 93 at 1; Doc. 226 at 8.)  According to Plaintiffs, the court granted this request, because "[o]nly specific claims in the proposed FAC regarding the University's performance of its duties pertaining to The Pearson Global Forum were excluded by the Court, and those are no part of the Section 3.1(d)-based breach of contract claim now being addressed."  (Doc. 226 at 8.)  Plaintiffs also point out that the first paragraph of Count I (breach of contract) of the first amended complaint explicitly "restate[s] and incorporate[s] by reference the allegations of Paragraphs 1–85 as though fully set forth herein."  Thus, Plaintiffs contend the court granted leave to bring this new theory.

The court finds that this position is contrary to both the letter and the spirit of the Federal Rules.  *See, e.g*., *Parrish v. Freightliner, LLC*, 471 F.Supp.2d 1262, 1268–70 (M.D. Fla. 2006) (explaining that discovery is not a game of "blind man's bluff" or "hide the ball," and excluding an expert's report and testimony after finding that the plaintiff's actions throughout the case were

"contrary to both the letter and the spirit of the Federal Rules," and the expert was asserting a "totally new theory of liability" after the plaintiff had asked for previous extensions).  It is clear that the court only granted *limited* leave to amend to include new claims and allegations concerning the University's *intent to deceive*.  According to the Foundation, the evidentiary predicate for these allegations was not provided to Plaintiffs until after the deadline for amendments had passed.  (*See* Doc. 109 at 4 (accepting the Foundation's argument that "it has shown good cause to amend because it learned new information through discovery that demonstrates an intent to defraud, whereas the previous facts known to the plaintiff did not."))  The court accepted the Foundation's representations and found that good cause had been shown to add the new fraud claims and allegations.  (*See id*.)

However, the Foundation did not represent to the court that these new allegations would also be used to support a new breach of contract theory.  In fact, the University specifically opposed the proposed amendments as untimely because the Foundation was aware of the Harris School's funding and expenses—the central premise of this new breach of contract theory—in February 2017.[18]  In reply, the Foundation emphasized that the new information went to fraud, not breach of contract, arguing that "this information alone was not sufficient to support a fraud claim," and "[w]ithout more, this *appeared to be a contract claim*, and, in fact, this failure to disclose University funding and assertion of a charge back right was a part of the Foundation's contract

---

[18] Indeed, the proposed amended complaint specifically alleged that in February 2017, "the University disclosed for the first time, and then only reluctantly, that the budget created by the University for TPI and TPGF was materially incomplete, understated costs, and did not reflect that substantial amounts of money were being provided by the University for the operation of TPI and TPGF."  (Doc. 110 at 19.)  And in Plaintiffs' motion for partial summary judgment, Plaintiffs now take the position that they first learned about the Harris School funding and expenses as early as December 2016. (*See* Doc. 187 at 13.)

claim in its original Complaint." (Doc. 107 at 4-5 (emphasis added) (citing Doc. 2 ¶¶ 42-44.))[19]
The Foundation further argued: "The University's documents produced in mid-August 2019,
however, reveal the University's intent to deceive the Foundation for the University's own
purposes." (*Id*. at 5.)

In other words, the Foundation admitted that the facts necessary to support a *breach of
contract* claim[20] regarding § 3.1(d) were known by February 2017—approximately 18 months
before the deadline for amendments to pleadings. However, the Foundation did not attempt to
plead these facts or assert this breach of contract theory at any point prior to the deadline.[21] Nor
did the Foundation represent to the court—despite multiple opportunities to do so—that it was
intending to use the new fraud allegations to bring this new breach of contract theory after the
deadline for amendments had passed. The court thus finds that the Foundation did not ask for
leave to bring a claim for breach of § 3.1(d), and the then-assigned judge did not find that good
cause existed to bring such a claim in the November 14, 2019 Order.

Accordingly, the court strikes Count I as it pertains to the University's failure to provide
an Initial Budget that complied with § 3.1(d) as exceeding the scope of the leave to amend.[22] *See
FDIC. v. Kooyomjian*, 220 F.3d 10 (1st Cir. 2000) (holding that new theories of recovery that

---

[19] Paragraph 42-44 of the original complaint allege that the University's footnote in the March 31, 2017 Definitive
Budget constituted a material breach of the Grant Agreement. The original complaint does not allege that the Initial
Budget breached the Grant Agreement.

[20] According to Plaintiffs, the same factual allegations support the breach of contract claim and the fraudulent
inducement claim. (*See* Doc. 226 at 7.) A notable difference between these claims is that intent to deceive is not a
necessary element of a breach of contract claim.

[21] The only allegations in the original complaint that mention budget issues, Paragraphs 40-44, allege a breach of the
University's obligation to provide the 2017 Definitive Budget. (Doc 2 ¶¶ 40-44.)

[22] To the extent that Plaintiffs are attempting "constructive amendment" to add this claim for the first time, the court
finds that constructive amendment is denied for the same rationale set forth by the court in the November 14, 2019
Order. *See Ahmad v. Furlong*, 435 F.3d 1196, 1202 (10th Cir. 2006) (providing that constructive amendment to add
a claim for the first time at summary judgment are governed by the same standard as a motion to amend). Specifically,
Plaintiffs "offer[] no justification for waiting more than [two years] after [Plaintiffs were aware of the facts necessary
to support a breach of contract claim regarding § 3.1(d)] to bring this new claim." (Doc. 107 at 7.)

counterclaimants added in an amended counterclaim without leave of court or consent of the opposing party, after the district court granted them leave to amend for the limited purpose of showing that original claims were not barred, were properly struck for exceeding the scope of the leave to amend); *Coppola v. Smith*, 19 F. Supp. 3d 960, 971 (E.D. Cal. 2014) (finding that the plaintiff exceeded the court's order granting leave to amend where the amended complaint included a new legal "theory" and the order only granted leave to amend the complaint "to refine and address the identified deficiencies" in a particular claim).

> **b.     The University's Provision of a Definitive Operating Plan and Budget on March 31, 2017 did not fundamentally change and repudiate material terms of the parties' contract.**

Next, both parties move for summary judgment in their favor on Plaintiffs' breach of contract claim regarding the University's obligation to deliver a Definitive Operating Plan and Budget on March 31, 2017.  (Doc. 187 at 26; Doc. 189 at 27; *see also* Doc. 110 at ¶¶ 36-37, 82-83.)  Plaintiffs allege that the University breached its material obligations when it "delivered a document to the Foundation on March 31, 2017, that purported to be the required Operating Plan and Budget.  It was replete with material errors and did not meet intended standards of quality or professionalism, nor was it fit for its intended use."  (Doc. 110 at ¶ 36.)  Plaintiffs also allege that the University included a footnote in the Definitive Budget which "asserts that the University has the right to reevaluate the Harris budget on an annual basis and decide in its sole discretion, year to year, whether to continue funding TPI and TPGF, and whether to charge the Pearson Fund at any time in order to reimburse itself for all amounts previously contributed by the University. (*Id.* at ¶ 83.)

Plaintiffs contend that summary judgment is appropriate because the Definitive Budget showed that TPI had been receiving millions of dollars in annual financial support from the Harris

School that had not been previously disclosed in the University's Initial Budget, and that Plaintiffs'
$100 million grant was insufficient (by approximately $39 million) to fully fund TPI.  Plaintiffs
also contend that in the Definitive Budget's footnote, the University "asserted unilaterally a right—
one never before discussed or agreed to—to reduce or stop [the Harris School's] contributions at
any time in the University's sole discretion, and even to reimburse itself from the Pearson Fund
for earlier financial support."  (Doc. 187 at 26-27.)  According to Plaintiffs, "these new disclosures
and assertions utterly remade and fundamentally changed the finances of TPI as disclosed to the
Pearsons, and completely redefined the financial risk to the Pearsons of their conditional grant
made to the University."  (*Id*. at 27.)

In response, the University contends that Plaintiffs' budget footnote claim fails because the
footnote did not repudiate the Grant Agreement, but rather reiterated that the University is bound
by the agreement.  (Doc. 206 at 31-32.)  The University also contends that the footnote did not
assert any extra-contractual rights as Plaintiffs claim.  (*Id*. at 32-33.)  And in its own motion, the
University moves for summary judgment on Plaintiffs' breach of contract claim to the extent it is
based on allegations concerning the quality of the Definitive Operating Plan and Budget the
University delivered on March 31, 2017.  (*See* Doc. 189 at 27; Doc. 110 at ¶ 37 (alleging that the
Definitive Operating Plan and Budget "was replete with material errors and did not meet intended
standards of quality or professionalism, nor was it fit for its intended use," and that the revised
document submitted three weeks later was also unacceptable.))

First, the court finds the University is entitled to summary judgment on Plaintiffs' breach
of contract claim regarding the quality of and errors contained in the Definitive Operating Plan
and Budget.  The University has met its initial burden by demonstrating the absence of admissible
evidence to support Plaintiffs' claim.  Indeed, it is uncontroverted that the University delivered the

Definitive Operating Plan and Budget to Plaintiffs on March 31, 2017, as required by the Grant Agreement.  (*See* Doc. 6 § 3.1, Ex. A-1; Doc. 189-18.)

But Plaintiffs fail to meet their burden to present competent evidence showing the existence of a genuine fact dispute.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); Fed. R. Civ. P. 56(c).  Plaintiffs cite no other contractual provisions or obligations of the University beyond the requirement to deliver the document by March 31, 2017.  And Plaintiffs cite no evidence to support its allegations that the document contained material errors, failed to meet standards of quality or professionalism, or otherwise was unfit for its intended use.[23] (*See* Doc. 207 at 26 (declining to respond to the University's summary judgment argument and instead incorporating by reference Plaintiffs' arguments and evidence in their motion); Doc. 187 at 26-29 (failing to cite evidence or make any arguments regarding the substance or quality of the Definitive Operating Plan and Budget.))  Because there is no genuine dispute of material fact, the University is entitled to summary judgment on Plaintiffs' claim that the University breached the Grant Agreement when it allegedly delivered an unacceptable Definitive Operating Plan and Budget.

Second, the court finds that Plaintiffs are not entitled to summary judgment on the claim that the University repudiated the Grant Agreement when it included the Definitive Budget footnote.  Under New York law, "insistence on an untenable interpretation of a key contractual provision . . . constitute[s] an anticipatory breach of the contract."  *IBM Credit Fin. Corp. v. Mazda*

---

[23] The University does point out that Thomas Pearson identified two alleged "errors" in the April 2017 budget during his deposition: (1) the lack of more detail on certain costs covered by the University for the benefit of the Institute and (2) the University's inclusion of a footnote explaining that its level of financial contribution to the Institute may fluctuate from year to year to the extent permitted by the Grant Agreement.  (*See* Doc. 189-2 at 264:19-272:3.)  But the Grant Agreement does not contain any contractual obligations related to either of these alleged errors.  Moreover, § 10.9 of the Grant Agreement bars Plaintiffs from adding terms to subjects already covered by the agreement.  (*See* Doc. 6 at § 10.9.)  Accordingly, these allegations fail to establish a genuine dispute of material fact.

*Motor Mfg. (USA) Corp*., 706 N.E.2d 1186, 1187 (N.Y. 1998).  "Under the doctrine of anticipatory breach, 'a wrongful repudiation of the contract by one party before the time of performance entitles the non-repudiating party to immediately claim damages for total breach,' and will relieve the non-repudiating party of its obligations of future performance."  *Aetna Cas. & Sur. Co. v. Aniero Concrete Co*., 404 F.3d 566, 587 (2d Cir. 2005) (quoting *Am. List Corp. v. U.S. News & World Report, Inc.*, 550 N.Y.S.2d 590, 593-94 (N.Y. Ct. App. 1989)).  "Repudiation occurs when a party manifests an intent not to perform, either by words or by deeds, or otherwise advances an untenable interpretation of the contract."  *Id*. (citing cases and authorities).  "For a party's action to constitute repudiation, it must 'make it actually or apparently impossible for [that party] to perform.'"  *Id*. at 588 (quoting Restatement (Second) of Contracts § 250 cmt. c (1981)).

Here, the Definitive Budget includes three main categories: (1) revenues; (2) fixed costs; and (3) variable costs.  (Doc. 189-18 at 3.)  The "revenues" category consists of endowment yield and expendable gifts.  The "fixed costs" category consists of compensation (academic salaries, staff salaries, and benefits) and student support.  And the "variable costs" category consists of research support, competitive research and seed grants, contract staff/consultants, events, travel, academic visitors, marketing and branding, materials and supplies, and other expenses.  There are three lines that are bolded and highlighted to indicate that the Harris School will be contributing: $11,866,202 for compensation costs, $3,120,244 for student support, and $395,000 for research support.

The "Total Institute costs" from fiscal year 2016 through fiscal year 2024 is projected to be $44,736,835.  This consists of $15,381,446 to be contributed by the Harris School and $29,355,389 to be contributed by the Pearson Fund.  The relevant footnote is attached to the end of the Harris School total costs line item.  It provides that:

35

> Amounts contributed by Harris Public Policy are subject to reevaluation on an annual basis and based on Harris's budget.  Inclusion of these contributions in the current year's Pearson Institute and Pearson Forum budget does not preclude charging these costs against the Pearson Fund in future annual budgets where otherwise appropriate under the terms of the Amended and Restated Grant Agreement.

(Doc. 187-11 at 2.)[24]

Plaintiffs contend that the University asserted two different, extra-contractual rights in this footnote: (1) the right to reduce or halt the University's contributions to TPI entirely at the University's sole discretion; and (2) the right to "claw back" or reimburse itself from the Pearson Fund for financial support the University had contributed to TPI.  (Doc. 187 at 27-28.)  According to Plaintiffs, the University's assertion of the rights to halt necessary contributions to operate TPI and to reimburse itself at will from the Pearson Fund is a breach of the University's obligation to create a Definitive Budget and amounts to a full and immediate repudiation of the Grant Agreement.  (Doc. 187 at 28-29.)

The court disagrees.  To constitute a repudiation, a party must use language "sufficiently positive to be reasonably interpreted to mean that the party *will not* or *cannot* perform." Restatement (Second) of Contracts § 250 cmt. a (emphasis added).  The University simply indicated that some expenses that could have been charged to TPI and paid for by the Pearson Fund, but were instead paid for by the Harris School, were "subject to reevaluation" on an annual basis, and that such expenses might be allocated to the Pearson Fund in future budgets.  (*See* Doc.

---

[24] The second sentence of the footnote refers to an "Amended and Restated Grant Agreement" because at that time the parties were discussing possible amendments to the Grant Agreement. (*See* Doc. 206-12; Doc. 206-13.)  Later, after the parties could not reach agreement on the terms of amending the Grant Agreement, the University modified the budget footnote to refer to the "the Grant Agreement."  The University agrees that the footnote in the March 31, 2017 Definitive Budget applies, as a whole, to the original Grant Agreement.  (Doc. 187-8 at 200:25-201:13.)  On April 21, 2017, the University delivered another version of the Definitive Budget that substituted 2016 actual data for 2016 budgeted data, which had been inadvertently included in the March 31, 2017 budget. (Doc. 206-14, Nabasny Dep. at 222:2-19, Doc. 206-9.)  The University's corrected version retained the same footnote that originally appeared in the March 31, 2017 Definitive Budget.

6 at § 3.1(c) (stating that the University shall satisfy TPI's cost and expenses "to the extent of available funds."))  This cannot be construed as the University manifesting its *intent* to breach its obligation to meet any of its Founding or Maintenance Obligations or otherwise continue to operate TPI as required by § 3.1(a) of the Grant Agreement.  (Doc. 6 § 3.1(a)).  In fact, the footnote specifically contains the caveat that any future adjustments would only be made "where otherwise appropriate under the terms of the" Grant Agreement.  (Doc. 187-11 at 2.)  This statement clearly evidences the University's intent to continue to perform its contractual obligations.  *See Aetna Cas. & Sur. Co.*, 404 F.3d at 588.

Plaintiffs contend that, by including the footnote, the University was insisting upon terms not contained in the Grant Agreement.  (*See* Doc. 187 at 29 (citing cases.))  "The cases in which such an insistence was found to constitute anticipatory breach, however, concerned instances where one party demanded that the contract be governed by terms contrary to those agreed upon." *Aetna Cas. & Sur. Co.*, 404 F.3d at 588.  "By doing so, that party repudiated a material provision of the contract, thereby revealing its intent not to perform."  *Id*. (quotations omitted).

But here, the footnote was entirely consistent with the terms agreed upon in the Grant Agreement.  Section 3.1(c) provides that the University "shall satisfy the costs and expenses of operating TPI from the Pearson Fund to the extent of available funds."  (Doc. 6 § 3.1(c)).  And while the Grant Agreement provides that the Pearson Fund can only be used to fund TPI's operations, it does not prohibit the University from contributing additional funding or allocating expenses that benefit TPI to the Harris School.  Under § 2.1(b), the "endowment portions" of the annual installment payments (totaling $93.25 million) are protected as permanent restricted endowment funds, which protects the endowment principal and its purchasing power into the future.  To pay for TPI's operations, the University is allowed to use: (1) the annual "endowment

yield" (based on an assumed 7.5% investment return and a 5.5% annual draw on the endowment); and (2) the "expendable portion" of the annual installment payments (ranging between $4 million-$6.75 million per year).  (*See* Doc. 6 § 2.1(b) & Ex. D.)  Over time, the endowment principal is expected to increase as more installment payments are made and the endowment generates income and earnings.

Under this model, it is difficult to accurately predict the specific amount of Pearson Grant funds available to the University each year, as the annual income and earnings will not be precisely 7.5% every year.  But it is reasonable to assume that the annual endowment yield is expected to increase each year, and in turn, the total Pearson Grant funds the University is allowed to use for TPI also increases.  Thus, the University included language in the footnote indicating that the "[a]mounts contributed by Harris Public Policy are subject to reevaluation on an annual basis." (Doc. 187-11 at 2.)  Because the University is permitted to reduce its discretionary contributions as more Pearson Grant funds become available in the future, this language is entirely consistent with the terms of the Grant Agreement.  It does not, as Plaintiffs contend, claim the University has the right to avoid its obligation to fully fund and operate TPI, or assert the right to use any restricted endowment funds to cover operating expenses.

Similarly, the footnote provides that "[i]nclusion of these contributions in the current year's . . . budget does not preclude charging these costs against the Pearson Fund in future annual budgets *where otherwise appropriate under the terms of the* . . . Grant Agreement."  (Doc. 187-11 at 2 (emphasis added.))  This language does not indicate the University is asserting the right to "claw back" past Harris School expenditures because that would be inconsistent with the agreed upon terms.  Rather, the reasonable interpretation is that the University was indicating that any expenses allocated to the Harris School in the Definitive Budget could be allocated to the Pearson Fund in

the future, assuming the "endowment yield" and "expendable portions" of the Pearson Fund were sufficient to cover such costs.

Accordingly, Plaintiffs are not entitled to summary judgment on their claim that the University repudiated the Grant Agreement when it included the Definitive Budget footnote.

### c.    The University's provision of its 2016 annual report.

Next, Plaintiffs move for summary judgment on their claim that the University's provision of its 2016 annual report failed to comply with § 5.1(b).  Plaintiffs contend that the Grant Agreement is clear and unambiguous, requiring the University to identify all expenses for TPI and all sources of payment for those expenses.  (Doc. 187 at 29.)  But according to Plaintiffs, the University failed to satisfy its obligation because the 2016 annual report for TPI's 2017 budget omitted the full cost of operations for TPI and funding contributed by the University, reporting a budget that was limited to only those expenses paid from the Pearson Fund.  (*Id*. at 29-30.)

Here, Plaintiffs fail to establish that they are entitled to summary judgment because their entire theory is based on a mistaken interpretation of the Grant Agreement.  Section 5.1(b)(2) provides that the annual report shall contain "[a] financial report for such fiscal year indicating the actual expenses . . . incurred in carrying out the programs and activities of [TPI] . . . during such fiscal year, [including] the source of payment thereof."  (Doc. 6 § 5.1(b)(2)).  But this language does not impose upon the University an obligation to disclose Harris School expenses that are not charged to TPI or paid for by the Pearson Fund, even if such expenses also benefit TPI.  Construing the document as a whole, this clause only contemplated expenses that were exclusive to TPI, i.e., expenses the University was allowed to pay for from the Pearson Fund.

Moreover, the Grant Agreement clearly states that the University was not obligated to provide an annual report until September 1, 2017.  (*See* Doc. 6 at Ex. C-2.)  According to the Grant

Agreement's Initial Operating Plan (Ex. C), the first annual report was due on September 1, 2017.[25]

But the subject of Plaintiffs' claim is the University's "2015-16 Impact Report."  (Doc. 187-9.)

This document was created as a courtesy, and it was not an "annual report" to which Plaintiffs had

a contractual entitlement.  There is nothing in the Grant Agreement to suggest that the University

was obligated to comply with § 5.1(b) in creating this document.  As such, the 2015-16 Impact

Report cannot form the basis of a breach of contract claim.  *Cf. Partner Reins. Co. Ltd. v. RPM*

*Mortg., Inc.*, 604 F. Supp. 3d 121, 181-82 (S.D.N.Y. 2022) (holding that "one-off projection" that

was created as a courtesy in response to a request from the defendant was not a "book" or "record"

to which the defendant had a contractual entitlement and could not form the basis of claim for

breach of duty to provide reasonable access to books and records).

Accordingly, Plaintiffs are not entitled to judgment as a matter of law on their breach of

contract claim regarding the University's provision of the 2016 report.

## 2.    Plaintiffs' Performance and Damages

Plaintiffs' motion for partial summary judgment is denied for the additional reason that

genuine disputes of material fact exist concerning whether Plaintiffs performed their own

obligations and whether Plaintiffs are entitled to any damages.  The Foundation's sole relevant

obligation under the Grant Agreement was to pay the full annual installment payments by June 30

each year in accordance with the schedule set forth in Appendix 1.  (Doc. 6 § 1.1, App'x 1.)

---

[25] Plaintiffs contend that § 5.1(b) of the Grant Agreement and the record (the University's internal and external communications) both reflect that the first Annual Report was due in 2016.  (*See* Doc. 226 at 4.)  The court disagrees. Section 5.1(b) is silent on when the first Annual Report was due.  However, § 3.1(a) requires the University to comply with the Initial Operating Plan (Doc. 6 § 3.1(a)).  And the Initial Operating Plan provides that the deadline for the University to "[i]ssue *first* annual report for the Pearson Institute" is September 1, 2017.  (*Id*. at Ex. C-2 (emphasis added).)  It is well established that a general provision cannot override specific provisions of a contract.  *See Greenwich Cap. Fin. Prods., Inc. v. Negrin*, 2009 WL 2871489, at *5 (N.Y. Sup. Ct. 2009) (citing cases).  Thus, the court finds the Grant Agreement is unambiguous, and the first Annual Report was not due until September 1, 2017.

Thomas Pearson agreed to pay any unpaid portion of the annual installments if the Foundation failed to pay the full amount.  (*Id*. § 1.4.)

Here, it is uncontroverted that the Foundation made the first two installment payments in full.  The Foundation paid $11 million to the University in June 2015, and another $11 million in June 2016.  Plaintiffs contend that these payments are sufficient to establish performance of their contractual obligations because the University materially breached the contract before the June 2017 installment came due.  But Plaintiffs have not established that the University materially breached the Grant Agreement, thus obviating any requirement that they continue to perform.  Accordingly, Plaintiffs have failed to establish as a matter of law that they performed their own obligations under the Grant Agreement.

### 3.    The University's Counterclaims

Finally, the court denies Plaintiffs' motion for summary judgment on the University's counterclaims for breach of contract regarding Plaintiffs' failure to make the full installment payments since June 2016.  Plaintiffs have not established that the University materially breached the Grant Agreement in any respects, and thus has not established that Plaintiffs' actions were justified.

Accordingly, Plaintiffs' motion for partial summary judgment is denied in its entirety.  The court additionally strikes Count I in the amended complaint regarding the University's failure to provide an Initial Budget that complied with § 3.1(d) as exceeding the scope of the leave to amend.

### B.    The University's Motion for Partial Summary Judgment.

Next, the court turns to the University's motion for partial summary judgment.  (Doc. 189.)  The University moves for summary judgment on the following claims in the first amended complaint: (1) breach of contract (Count I) regarding faculty hiring, Institute Director appointment,

Executive Director appointment, curriculum, and budget and operating plan; (2) fraudulent inducement (Count III); (3) unilateral mistake (Count IV); (4) rescission (Count V); (5) Plaintiffs' demands for return of payments to the University; and (6) punitive damages.

### 1. Plaintiffs' Faculty Appointment Claims (Count I)

Plaintiffs bring a breach of contract claim alleging that the University breached the Grant Agreement by hiring two unqualified faculty for the first two chairs and by failing to timely appoint the third faculty chair. (Doc. 110 ¶¶ 31-35, 49.) The University moves for summary judgment, arguing that the evidence establishes that the University timely made all faculty appointments. The University further argues that Plaintiffs' claim regarding the faculty's qualifications is barred by the Grant Agreement, which expressly excludes the donors from having any "role or authority" regarding faculty appointments. (Doc. 189 at 16.)

First, the Grant Agreement required the University to create three named professorships (not including the Institute Director) for TPI. (*See* Doc. 6 § 3.4 (providing that the University "shall establish three (3) named professorships in the Harris School," to be designated as "The Ramalee E. Pearson Professor of Global Conflict Studies," "The Philip K. Pearson Professor of Global Conflict Studies," and "The David L. Pearson Professor of Global Conflict Studies.")) Under § 3.1(a), appointment of these faculty chairs was one of the University's Founding Obligations, and Exhibit A to the Grant Agreement set due and cure dates for these positions to be filled. (*Id*. § 3.1(a), Ex. A.) The "due date" for the University to "[a]ppoint first chaired faculty" (the "Ramalee E. Pearson Professor") was September 1, 2016, and the "cure period" was September 2, 2016, through September 1, 2018. (*Id*. at Ex. A-1.) The "due date" to appoint the second and third chaired faculty (the "Philip K. Pearson Professor" and the "David L. Pearson

Professor") was September 1, 2017, with a cure period from September 2, 2017, through September 1, 2019. (*Id.*)

It is uncontroverted that the University appointed Professors Chris Blattman and Oeindrila Dube to fill the first two faculty chairs on July 1, 2016. This was before the September 2016 and September 2017 due dates for these positions. However, the University did not appoint Professor Roger Myerson as the third faculty chair until November 8, 2018. (*See* Doc. 189-12.) This is approximately 14 months after the due date of September 1, 2017. Under § 1.1, the University's failure to fill the third faculty chair by the due date meant that the University was operating under a "cure period" with respect to one of its Founding Obligations beginning on September 2, 2017. (Doc. 6 § 1.1.) As such, Plaintiffs had the right to "elect to suspend payment by providing written notice to the University of its election to suspend payment" of the full installment amount due on June 30, 2018.[26] (*Id.*) However, the University cured its breach on November 8, 2018 when it appointed Professor Myerson. This was approximately 10 months before the applicable cure period expired. Because the University timely cured its breach as permitted by the Grant Agreement, the University is entitled to summary judgment on its breach of contract claim regarding the timeliness of the faculty appointments. *See CadleRock Joint Venture II, L.P. v. ADCO Equities, L.P.*, 269 A.D.2d 251, 253 (N.Y. App. Div. 2000) (affirming dismissal of complaint where alleged breach was cured when the defendant restored the status quo before the end of the cure period).

Second, § 3.5(b) of the Grant Agreement provides that:

> The [Foundation] acknowledges and agrees that neither it, nor any member of the Pearson Family, nor the Advisory Council, nor any Donor Members, will have any role or authority with respect to making appointments (academic or professional)

---

[26] If Plaintiffs were to elect this option, they would still be obligated to make a "current funding payment," i.e., the maximum of the "expendable portion range" ($1,300,000 for 2018). (*See* Doc. 6 § 1.1, App'x 1.)

to the Pearson Institute or the Pearson Forum, setting the research agenda of the Pearson Institute, or the selection of topics or presenters for the Pearson Forum.

(Doc. 6 § 3.5(b)).  While this language establishes that Plaintiffs have no "role or authority with respect to making appointments," it does not mean that Plaintiffs are wholly barred from making any "after-the-fact faculty-qualification challenges" as the University claims.  (Doc. 189 at 17.) On the contrary, in construing the Grant Agreement as a whole, it is apparent that Plaintiffs have the right to bring a claim for breach of the Grant Agreement regarding the faculty's qualifications. Although the Grant Agreement is silent on what qualifications the faculty chairs must possess, the University is at all times obligated to use Plaintiffs' grant for purposes consistent with TPI's stated mission, i.e., "to promote ongoing discussion, understanding and resolution of global conflicts, and to contribute to the advancement of a global society at peace."  (Doc. 6 § 1.2.)  It is possible that an individual could be so unqualified that they fail to advance, or could even frustrate, TPI's stated mission.  *Cf. Glob. Fitness Holdings, LLC v. Fed. Recovery Acceptance, Inc.*, 127 F. Supp. 3d 1176, 1190 (D. Utah 2015) ("Although the Contracts are silent as [to] possession, the primary purpose of the Contracts would be wholly frustrated if they did not grant to Paramount the necessary right and obligation to possess this data.").  In such a situation, the University would be in violation of § 1.2, by using the grant for an improper purpose.  And under § 6.5, Plaintiffs are entitled to initiate "court proceeding[s]" regarding the University's misuse of funds.

Thus, § 3.5(b) does not operate to bar Plaintiffs' claim regarding the faculty chairs' qualifications.  Accordingly, the court denies the University's motion with respect to Plaintiffs' claim that the University breached the Grant Agreement by failing to hire qualified faculty.

### 2.      Plaintiffs' Institute Director and Executive Director Claims (Count I)

Plaintiffs bring a breach of contract claim challenging the appointment of Professor James Robinson as Institute Director.  (Doc. 110 ¶ 29.)  Plaintiffs pleaded this claim in the alternative,

alleging the University either failed to appoint an Institute Director as required by the Grant

Agreement, or failed to appoint an Executive Director pursuant to an oral amendment to the Grant

Agreement.  (*Id.* ¶ 30.)  The University moves for summary judgment on both alternatives.

The court begins with the terms of the Grant Agreement.  Section 3.2(a) provides:

> The University shall cause the Harris School to appoint a faculty director to direct the day-to-day operations of the Pearson Institute (the "Institute Director"), in accordance with the Initial Budget and subject to the timeframe included in the Operating Plan. The Institute Director shall be selected by the Dean of the Harris School to hold a named professorship in the Harris School to be designated as the "The Reverend Dr. Richard L. Pearson Professor of Global Conflict Studies and Faculty Director, The Pearson Institute for the Study and Resolution of Global Conflicts." The Institute Director shall be a prominent faculty member with an established record of published scholarship that demonstrates his or her commitment to issues pertinent to the Mission and to the work of the Pearson Institute.

(Doc. 6 § 3.2(a)).  This was one of the University's Founding Obligations, and the Grant

Agreement set a deadline of September 1, 2016 for the University to appoint an Institute Director.

(*Id.* § 3.1(a), Ex. A.)

It is uncontroverted that on June 1, 2016, the University appointed Professor James

Robinson as The Reverend Dr. Richard L. Pearson Professor of Global Conflict Studies and

Faculty Director, which is the named professorship given to the Institute Director under the plain

language of § 3.2(a).  (*See* Doc. 189-7.)  Professor Robinson is a prominent economist and political

scientist who held chaired professorships at Harvard University from 2009 to 2015 and had joined

the University of Chicago in 2015 as a University Professor, an honor reflecting internationally

recognized eminence.  He holds degrees from the London School of Economics, the University of

Warwick, and Yale University. (Doc. 189-15.)  These uncontroverted material facts establish that

the University complied with its obligation under Article 3 of the Grant Agreement to appoint a

qualified Institute Director prior to September 1, 2016.

However, Plaintiffs claim that in Fall 2015, the parties reached an oral agreement to amend the Grant agreement.  (Doc. 207 at 20 ("It is equally clear, however, that this aspect of the Grant Agreement was amended orally at the request of the University."))  Specifically, Plaintiffs contend the parties agreed to split the Institute Director's management responsibilities into two separate positions: "a Faculty Director, responsible for faculty, curricula and the awarding of scholarships and fellowships, and an Executive Director, responsible for management, operations, outward facing initiatives, and relationships."  (Doc. 110 at 7.)   Under the purported Amended Grant Agreement, the due date for the appointment of both the Faculty Director and the Executive Director would remain September 1, 2016.  (*Id*.)  Plaintiffs thus contend that Professor Robinson was actually appointed as the Faculty Director under the Amended Grant Agreement, and the University is in breach of the amended contract for its failure to appoint an Executive Director.

The court disagrees.  "Under New York law . . . where a contract requires any amendments to be evidenced by a writing signed by the parties, oral modifications to the contract are prohibited."  *Indus. Window Corp. v. Fed. Ins. Co.*, 609 F. Supp. 2d 329, 339 (S.D.N.Y. 2009); *see also* N.Y. Gen. Oblig. Law § 15–301(1) ("A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent.")  Here, Section 10.9 of the Grant Agreement states that it "contains all of the terms agreed upon by the parties hereto with respect to the subject matter of this Agreement."  (Doc. 6 § 10.9.)  And § 10.10 clearly provides that the Grant Agreement "may be amended *only by a writing signed* by the [Foundation], Thomas L. Pearson (solely with respect to Thomas L. Pearson's obligations under this Agreement) and the University."  (*Id*. § 10.10 (emphasis added.))

46

There is a limited exception to this rule if partial performance can be demonstrated.[27] However, "[i]n order to avoid the requirement of a written and signed modification, any alleged partial performance must be 'unequivocally referable' to the alleged modification." *Indus. Window Corp*, 609 F. Supp. 2d at 339. Here, the University's appointment of Professor Robinson was entirely consistent with its obligations under the plain language of the Grant Agreement, and any reliance on behalf of Plaintiffs amounted to nothing more than what the Grant Agreement already required the University to do. Plaintiffs cite Professor Robinson's employment letter, which identifies him as TPI's "Faculty Director." But this is not inconsistent with the language of § 3.2(a) of the Grant Agreement. Indeed, it defines the Institute Director as "*a faculty director* to direct the day-to-day operations of TPI," and confers upon the Institute Director the title: "The Reverend Dr. Richard L. Pearson Professor of Global Conflict Studies and *Faculty Director*." (Doc. 6 § 3.2(a) (emphasis added.)) And while there is some evidence showing the parties were negotiating the terms of a potential amendment to the Grant Agreement, and showing the University took steps in anticipation of a modified structure, it is apparent the parties never executed a written agreement.

Furthermore, even assuming (contrary to fact) that the alleged oral modifications were otherwise valid, there is no indication that such modifications (i.e., requiring the University to hire a Faculty Director as an additional Founding Obligation) were supported by adequate consideration. *See Tierney v. Capricorn Invest., L.P.*, 189 A.D.2d 629, 631 (N.Y. App. Div. 1993) ("Neither a promise to do that which the promisor is already bound to do, nor the performance of

---

[27] Plaintiffs claim that under New York law, "[a]n oral agreement is enforceable, even in instances where a contract specifically requires amendments to be in writing, when "the conduct of the parties demonstrates an indisputable mutual departure from the written agreement and the changes were clearly requested by [one party] and executed by [the other]." (Doc. 207 at 20.)

an existing legal obligation constitutes valid consideration").  Accordingly, the University is entitled to summary judgment on Plaintiffs' Institute Director and Executive Director claims.

### 3.   Curriculum (Count I)

Next, Plaintiffs claim that the University breached its obligation under the Grant Agreement to "create" and "develop" an academic curriculum for TPI that would constitute TPI's "own work product."  (Doc. 110 ¶¶ 40-41.)  Plaintiffs allege that TPI faculty "substantially relied on course materials already developed and taught" at the University or elsewhere, which fails to advance the reputation of TPI as "a leading academic and research center driven by the rigorous study of data and evidence, developing new original thinking and scholarship."  (*Id*. ¶¶ 41-42.)

The University moves for summary judgment on this claim, arguing that the Grant Agreement does not obligate the University to create entirely new courses for TPI.  (Doc. 189 at 26-27.)  Plaintiffs contend that the language used in the Grant Agreement's recitals evidences the parties' intent to have the University create new materials for a curriculum, and not simply recycle previously taught courses and materials.  Plaintiffs further contend that the evidence shows that the University failed in its curriculum obligation under any reasonable interpretation of the Grant Agreement.  (Doc. 207 at 25-26.)

Here, the court agrees with the University; the Grant Agreement does not obligate the University to create an entirely new curriculum for TPI.  The operative part of the Grant Agreement provides that the University was required to have "2-3 classes offered relating to the study of global conflict and its resolution" by September 1, 2016, "5-6 classes" by September 1, 2017, "9-10 classes" by September 2018, and "10-12 classes" by September 2019 through the end of the Initial Operating Plan (June 2024).  (Doc. 6 § 3.1(a), Ex. C-1–C-5.)  Additionally, § 1.2 provides that:

> The mission of the Pearson Institute and the Pearson Forum shall be to promote ongoing discussion, understanding and resolution of global conflicts, and to

contribute to the advancement of a global society at peace, including by: . . . (ii) engaging students, scholars and policy makers *through educational programs, including academic courses*, with respect to issues related to global conflict resolution . . . .

(*Id*. § 1.2 (emphasis added.))

This language does not require the University to create an entirely new work product for

TPI, nor does it prohibit TPI faculty from "recycling" previously taught courses or materials.

Plaintiffs thus rely on the Grant Agreement's recitals, which provide:

WHEREAS, University faculty and other academic appointees affiliated with [TPI] will *develop* educational programs, including academic courses, within the Harris School . . . and other schools and divisions within the University relating to the study of global conflict and its resolution, through which to engage students with respect to issues related to global conflict resolution; and
. . . .

WHEREAS, the Donor desires to make the Grant to the University for the sole purpose of creating and operating [TPI], creating and operating the Pearson Forum and allowing the University to *create* educational programs, including academic courses; and

WHEREAS, the University desires to accept the Grant to be used solely for purposes of creating and operating [TPI], creating and operating the Pearson Forum as described below, and allowing the University to *create* educational programs, including academic courses.

(*Id*. at 3-4 (emphasis added.))

Plaintiffs contend that this language creates a question of fact to be tried as to whether the

use of the word "create" repeatedly in the recitals evidences an intent to have the University create

new materials for a curriculum.  (Doc. 207 at 25.)  The court disagrees.  Although "a statement in

a 'whereas' clause may be useful in interpreting an ambiguous operative clause in a contract, it

cannot create any right beyond those arising from the operative terms of the document."[28]

---

[28] Plaintiffs cite *Indus. Dev. Found. of Auburn v. U.S. Hoffman Mach. Corp.*, for the proposition that recitals can create binding obligations on the parties.  11 Misc. 2d 625, 633 (N.Y. Sup. Ct. 1958).  In that case, the court stated: "[s]uch recitals, while not strictly forming a part of the contract, may be resorted to as indicating the intention of the parties

*Aramony v. United Way of Am.*, 254 F.3d 403, 413 (2d Cir. 2001) (quotations omitted); *see also Credit Lyonnais v. Getty Square Assocs.*, 876 F. Supp. 517, 521 (S.D.N.Y. 1995) ("Indeed, a whereas clause in a document such as this conveys no rights whatsoever."). But here, the Grant Agreement is not ambiguous. The operative terms of the contract merely require the University to offer a certain number of classes "relating to the study of global conflict and its resolution" by the dates set forth in the Initial Operating Plan. (Doc. 6 § 3.1(a), Ex. C–1–C–5.) There are no operative contract terms that obligate the University to create entirely new courses and materials for these classes, so long as the classes offered at TPI "relat[e] to the study of global conflict and its resolution."

Accordingly, Plaintiffs' claim for breach of contract relating to the University's failure to "create" and "develop" an entirely new academic curriculum for TPI fails as a matter of law. *See Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 103-04 (2d Cir. 1985) ("Since there is no operative clause of the 1971 Agreement that in any way indicates an agreement by [one of the defendants] to adopt the burdens imposed on the Sellers in the 1969 Agreement, we conclude that the first 'WHEREAS' clause of the 1971 Agreement did not have the effect claimed by the plaintiffs.").

### 4.    Fraudulent Inducement (Count III)

In Count III, Plaintiffs claim the University fraudulently induced them to make their grant by misrepresenting the true cost of operating TPI, and the sources of funds that were necessary to support those operations. The University contends that summary judgment is appropriate because New York law does not permit fraudulent inducement claims if they are not sufficiently distinct from a breach of contract claim. (Doc. 189 at 29-30.) Specifically, the University argues that

---

and the meaning and scope of the agreement." *Id.* This merely restates the general rule that recitals are not an operative part of a contract and may only be used to interpret ambiguous operative terms.

Plaintiffs' fraud claim turns on whether the University's Initial Budget failed to include information required by § 3.1(d) of the Grant Agreement. (*Id.* at 31.)

In response, Plaintiffs argue that New York law permits parallel fraud and breach of contract claims when the fraudulent misrepresentation is collateral or extraneous to the contract. (Doc. 207 at 24.) Plaintiffs also contend that the University has taken contradictory stances on this issue. (Doc. 226 at 8.) Plaintiffs note that, in the present motion, the University is arguing that Plaintiffs cannot bring a fraud claim based on § 3.1(d) because of its breach of contract claim based on § 3.1(d). But in response to Plaintiffs' motion for summary judgment, the University argued that Plaintiffs should be estopped from bringing a breach of contract claim based on § 3.1(d).

To prevail on a claim for fraudulent inducement under New York law, the plaintiff must establish: (1) a false representation of material fact; (2) known by the utterer to be untrue; (3) made with the intention of inducing reliance and forbearance from further inquiry; (4) that is justifiably relied upon; and (5) results in damages. *MBIA Ins. Corp. v. Credit Suisse Sec. (USA) LLC*, 927 N.Y.S.2d 517, 530 (N.Y. Sup. Ct. 2011). "A fraud claim should be dismissed as redundant when it merely restates a breach of contract claim, i.e., when the only fraud alleged is that the defendant was not sincere when it promised to perform under the contract." *First Bank of Am. v. Motor Car Funding, Inc.*, 690 N.Y.S.2d 17, 20-21 (N.Y. App. Div. 1999); *see also Cronos Grp. Ltd. v. XComIP, LLC*, 64 N.Y.S.3d 180, 190 (N.Y. App. Div. 2017) ("[W]here the promised performance is an obligation of the promisor under an enforceable contract between the parties, and the only damages sought are those recoverable for a breach of contract, allegations of such an insincere promise are redundant of a claim for breach of the parties' contract and, therefore, do not state a cause of action for fraud." (internal quotations omitted)).

51

"By contrast, a cause of action for fraud may be maintained where a plaintiff pleads a breach of duty separate from, or in addition to, a breach of the contract." *Id*. at 21. "For example, if a plaintiff alleges that it was induced to enter into a transaction because a defendant misrepresented material facts, the plaintiff has stated a claim for fraud even though the same circumstances also give rise to the plaintiff's breach of contract claim." *Id*. "Unlike a misrepresentation of future intent to perform, a misrepresentation of present facts is collateral to the contract (though it may have induced the plaintiff to sign the contract) and therefore involves a separate breach of duty." *Id*.

Here, the court finds that Plaintiffs' fraudulent inducement claim is not duplicative of the claim for breach of contract regarding the University's Initial Budget and § 3.1(d) of the Grant Agreement. Plaintiffs allege that the University drastically and knowingly understated the actual costs and expenditures necessary to operate TPI, the nature and extent of the Harris School's contributions, and the University's financial issues. Plaintiffs contend that these omissions and misrepresentations were material, and induced Plaintiffs to enter into the Grant Agreement as written, i.e., without adequate assurances that the Harris School's contributions would be sufficient and guaranteed. These are not misrepresentations of the University's future intent to perform, but rather misrepresentations of present facts that are collateral to the Grant Agreement. Moreover, these misrepresentations involve a separate breach of duty since these disclosures were not required under the terms of the Grant Agreement. Thus, Plaintiffs' fraudulent inducement claim is not duplicative of the breach of contract claim.

It is unclear whether Plaintiffs will be able to ultimately prevail under this theory. Particularly, Plaintiffs may have difficulty establishing that the University knowingly made any false representations. Plaintiffs rely upon statements the University made in 2014 suggesting that

it had not disclosed the Harris School's contributions to Plaintiffs at that point.  (*See* Doc. 207 ¶¶ 39-40.)  But the University cites a preliminary agreement from January 1, 2015, wherein the University stated that the Pearsons' endowment would only cover about 62.5% of the total cost of the Institute Director position, and 42% of faculty chairs, with the remainder being covered by the Harris School.  (*See* Doc. 189-30 at 5.)  In any event, the University does not develop this argument beyond this brief discussion and relies primarily upon the argument that Plaintiffs' fraudulent inducement claim is duplicative of the breach of contract claim.  Accordingly, the University has failed to establish that it is entitled to summary judgment on Plaintiffs' fraudulent inducement claim.

### 5.      Unilateral Mistake (Count IV)

In Count V of the amended complaint, Plaintiffs seek rescission of the Grant Agreement on the ground of unilateral mistake.  (Doc. 110 ¶¶ 100-106.)  Plaintiffs allege that they mistakenly "believed that all sources of funds for TPI and [the Pearson Forum] had been disclosed by the U of C in Exhibit D to the Grant Agreement," when TPI and the Pearson Forum "were relying on additional sources of revenue for their operations beyond what had been disclosed in Exhibit D to the Grant Agreement, a fact that was not disclosed to the Plaintiffs."  (*Id*. ¶¶ 101-02).  Plaintiffs allege that had they known the University was contributing to the costs of operating the Institute and the Forum, they would not have entered into the Grant Agreement.  (*Id*. ¶ 105.)

In order to establish entitlement to rescission of a contract on the basis of unilateral mistake, the plaintiff must establish: (1) he entered into the contract under a mistake of material fact; and (2) that the other contracting party either knew or should have known that such mistake was being made.  *Summit Health, Inc. v. APS Healthcare Bethesda, Inc*., 993 F. Supp. 2d 379, 404 (S.D.N.Y.

2014).  The party seeking rescission must also establish that it exercised ordinary care and that enforcement would be unconscionable.  *Id*. at 404-05.

The University moves for summary judgment on the second element, arguing that there is no evidence it knew or should have known of Plaintiffs' alleged mistake.  (Doc. 189 at 33.)  The University cites Provost Diemeier's deposition testimony, wherein he testified that what the University "explained to the Pearsons is that their—their—their gift to endow a chair would generate a payout every year, and that payout would cover a portion of the total compensation for the faculty member. The rest of the compensation would be carried by the—by the Harris School." (*See* Doc. 189-32 at 307:18-308:14.)

But Plaintiffs contend that summary judgment is not appropriate because there is a genuine dispute of material fact.  Plaintiffs cite an email the University's Budget Director David Murphy sent to University Vice President David Fithian on December 29, 2014.  Murphy attached a draft of the Initial Budget and noted that the exhibit "does not include funding from Non-Pearson sources," and "perhaps the donor would want to see that we do anticipate generating other outside sources of support."  (Doc. 207-4 at 6; *see also id*. at 4 (University President Robert Zimmer emailing University employees in January 2014 and stating that "[The Pearsons] were imagining paying for the faculty fully . . . . The real cost of a chair is more like 200K annually which is 6M. So we are subsidizing a good deal of the cost of the faculty compensation. We should make that clear to them . . ."))  Murphy also testified in his deposition that the University "was aware that there would need to be more money contributed in order to . . . operate" TPI.  (Doc. 207-3 at 51.) Plaintiffs contend that "at no point before the Grant Agreement was signed did the University explain to the Foundation that Exhibit D excluded millions of dollars in support from the

University, and it surely never explained that this additional support was necessary to cover more than 30% of TPI's operating costs."  (Doc. 207 at 30.)

Here, the court finds that Plaintiffs have failed to create a genuine dispute of material fact as to whether the University knew or should have known that Plaintiffs were entering into the Grant Agreement under the mistaken belief that the University would not be contributing to TPI's operation expenses.  Plaintiffs rely upon the University's emails sent internally on January 18, 2014, and December 29, 2014.  (Doc. 207-4 at 4, 6.)  These communications merely establish that the University had not disclosed the additional funding necessary to fully cover TPI's operations *as of December 29*, 2014.   However, it is uncontroverted that on *December 31*, 2014, the University provided Plaintiffs with a "Summary of Terms for Pearson Family Gift-Discussion Draft," which disclosed that the endowment would cover about 40% of the endowed chairs' expected salary and benefits.  (Doc. 289-33 at 15; *see also* Doc. 189-32 at 313:15-23.)  Plaintiffs reviewed this document and made redline edits.  (*See* Doc. 189-34 at 21.)  And in January 2015, the University provided a preliminary agreement draft, which stated that the Pearson's endowment would only cover about "62.5% of total cost of the" Institute Director position, and "42% of total cost" faculty chairs.  (Doc. 189-30 at 5.)  The draft clearly states that "[t]he remainder would be covered by the Harris School."  (*Id*.)  Again, Plaintiffs reviewed this document and made redline edits.  (*See id*.)

Nevertheless, Plaintiffs contend that these disclosures were mooted when the University submitted the Initial Budget, attached as Exhibit D to the Grant Agreement.  According to Plaintiffs, Thomas Pearson believed the University's disclosures to be "nominal . . . incomplete, [and] not thorough," so he disregarded them.  (*See* Doc. 207-1 at 20-21.)  Plaintiffs thus contend that Mr. Pearson specifically required the University to provide an operating plan and budget that

he could review and rely upon, and that he relied solely on the University's Initial Budget as the University's "final word on the expected expenditures and revenues for TPI's operations." (*Id.*; Doc. 207 at 31.)

However, this does not establish that the University knew or should have known that Mr. Pearson had completely disregarded the University's prior disclosures, or that his position was that the Initial Budget would be the University's "final word" on TPI's operating expenses/the Harris School's contributions. There is no evidence that Mr. Pearson communicated his newly-formed beliefs to the University at any point between January 1 and April 3, 2015.[29] And the Initial Budget that Mr. Pearson apparently relied upon was entirely consistent with the University's prior disclosures.[30] Consequently, there are no facts from which a reasonable jury could find that the University had notice that Plaintiffs were entering into the contract under the mistaken belief that the University would never pay for any expenses that benefit TPI.[31]

Accordingly, the University is entitled to summary judgment on Plaintiffs' claim for unilateral mistake.

### 6.    Rescission / Return of Payments (Count V)

Next, the University moves for summary judgment on Plaintiffs' claim for the equitable remedy of rescission and return of all payments made to the University. In Count V, Plaintiffs

---

[29] In Plaintiffs' redlines of these documents, Plaintiffs did not offer any revisions or comments to the University's quotes.

[30] For example, in January 2015, the University disclosed that the average total cost for a professor to lead TPI would be $400,000, and for the other named professorships would be $300,000. The University stated that the endowment would "cover about 62.5% of total cost" ($250,000) for the Institute Director, and "about 42% of total cost" ($126,000) for the faculty chairs. (See Doc. 189-30 at 5.) In the Initial Budget, the University budgeted exactly $250,000 for the Institute Director and $125,000 for the faculty chairs. (Doc. 6 at D-3.) Thus, the Initial Budget, which complied with § 3.1(d) of the Grant Agreement, was entirely consistent with the University's disclosures in the preliminary draft and did not misrepresent TPI's expenses or the Harris School's contributions.

[31] As noted above, the Grant Agreement specifically contemplates the University expending funds "in support of the Pearson Institute." (Doc. 6 § 6.4(b)(1); *see also id.* § 3.6(b)).

allege that the University's "materially false representations and/or omissions regarding the budget for TPI and [the Pearson Forum], whether intentionally deceptive or negligent, the fundamental financial assumptions upon which the Grant Agreement is based are invalid, thereby defeating the very purpose of the agreement."  (Doc. 110 ¶ 108.)  Plaintiffs additionally allege that "these representations and omissions created a mistake of fact on the part of the Foundation so significant that it goes to the very foundation of the Grant Agreement."  (*Id*. ¶ 109.)

The University moves for summary judgment on the ground that New York law requires a rescission demand be made immediately upon the discovery of fraud or mistake.  (Doc. 189 at 35.) Plaintiffs disagree, arguing that Plaintiffs' decision to not exercise permissive termination rights offered in the Grant Agreement does not forfeit Plaintiffs' remedies otherwise available under the law.  (Doc. 207 at 32.)

Here, the Grant Agreement provides that Plaintiffs "may terminate this Agreement" if:

(a) the University (i) has failed to meet any Founding Obligation by the "Due Date" specified for such Founding Obligation in Exhibit A, after the earlier of (x) receiving written notice from the Donor of such failure, such notice having been given within ninety (90) days following the "Due Date" specified in Exhibit A for the accomplishment of such Founding Obligation, and such notice specifying in reasonable detail the basis for claiming that such failure has occurred, and (y) the University providing the Donor with notice as provided under Section 3.l(b); and (ii) has failed to cure such failure in all material respects within the "Cure Period" specified for such Founding Obligation in Exhibit A;

(b) at any time before March 1, 2030, the University has breached any Maintenance Obligation and has failed to cure such breach in all material respects within the "Cure Period" specified for such Maintenance Obligation in Exhibit B, after the earlier of (x) receiving written notice from the Donor of such failure, such notice having been given within ninety (90) days of the date that the Donor possesses actual knowledge of the University's alleged breach, and such notice specifying in reasonable detail the basis for claiming that such breach has occurred, and (y) the University providing the Donor with notice as provided under Section 3.1(b); or

(c) the University has breached in any material respect any of its other material obligations contained in this Agreement, and has failed to cure in all material respects such breach within one (1) year after receiving written notice from the Donor of such failure, such notice having been given within ninety (90) days of the date that the Donor possesses actual knowledge of the University's alleged breach, and such notice specifying in reasonable detail the basis for claiming that such breach has occurred.

(Doc. 6 § 6.2(a)-(c)).

Section 6.4 provides that, "[u]pon termination of this Agreement pursuant to §§ 6.2(a) or 6.2(b), Plaintiffs will have certain "rights of reversion." Upon termination of the Grant Agreement pursuant to §§ 6.2(a), the University shall refund to Plaintiffs all amounts paid to the University as of the effective date of termination upon a mutual release of all claims arising from the termination. (*Id*. § 6.4(a)(1).) Upon termination of the Grant Agreement pursuant to § 6.2(b), the University shall refund to Plaintiffs all amounts paid as of the effective date of termination, "less the amount of such funds previously expended by the University in support of [TPI] or the Pearson Forum, such termination and refund being the Donor's sole and exclusive remedy for the University's failure . . . ." (*Id*. § 6.4(b)(1).)

Section 6.6 then provides that:

> [A]fter the expiration of the time periods specified in Sections 6.2(a) [and] 6.2(b) . . . for the exercise by the Donor of its reversion rights, the University will continue to use the Pearson Fund to support [TPI] and the Pearson Forum . . . and after the expiration of such time periods, the exclusive remedy provisions in Section 6.4 . . . shall cease to be effective *and the Donor will be entitled to any remedies available to it under applicable law* arising from the University's breach of its obligations.

(*Id*. § 6.6 (emphasis added.))

Plaintiffs contend that the highlighted language means that rescission was intended to be an optional remedy. And because Plaintiffs either opted not to exercise their reversion rights under the Grant Agreement or failed to meet the requirements specified to do so, then under § 6.6,

58

Plaintiffs would still have their ordinary remedies under the law.  (Doc. 207 at 33.)  And Plaintiffs contend that they timely sought rescission because they promptly moved to amend the complaint to include fraud and rescission claims after discovery revealed the University's misrepresentations about the budget.  (*Id*. at 38.)

 As an initial matter, the court agrees that Plaintiffs' right to terminate the Grant Agreement was an optional remedy.  *See Perma Research & Dev. Co. v. Singer Co*., 308 F. Supp. 743, 746 (S.D.N.Y. 1970) ("An option to terminate is not an exclusive remedy, and a party is not obligated to exercise such an option but may stand on his rights.").  Plaintiffs were not required to exercise this right within the time periods specified in §§ 6.2(a) and 6.2(b) because § 6.2 clearly begins by stating that Plaintiffs "*may* terminate this Agreement."  *See id.* at 746-47 (holding that option to terminate contract was not the plaintiff's sole, exclusive remedy because the contract stated that the plaintiff "may notify" the defendant of its exercise of its rights to reversion).  Thus, Plaintiffs are entitled to decline to exercise their contractual rights and instead stand on their ordinary remedies under the law.

 Second, the court finds that Plaintiffs may still be entitled to rescission of the Grant Agreement based upon fraudulent inducement.  Under New York law, a party may seek rescission on the basis of fraud or mistake.  *See Banque Arabe Et Internationale D'Investissement v. Md. Nat'l Bank*, 850 F. Supp. 1199, 1210 (S.D.N.Y. 1994), *aff'd*, 57 F.3d 146 (2d Cir. 1995).  "Where a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose, and adhere to it. He is not permitted to play fast and loose." *Id*. at 1210-11 (brackets and ellipses omitted).  "As a result, a plaintiff is required to assert his right to rescind without unreasonable delay."  *Id*. at 1211.  Rescission claims must be made promptly after discovery of the fraud or mistake.  *See id*.  While "[t]he principle of promptness is a fairly

stringent requirement," the plaintiff "need not raise the claim *immediately* upon notice of the fraud but is afforded a reasonable period after notice of the fraud within which to consider whether or not to rescind." *Id*. (emphasis in original). In measuring the reasonableness of a party's delay in seeking rescission, courts apply a "highly fact-intensive test." *Rekor Sys., Inc. v. Loughlin*, 2020 WL 6898271, at *6 (S.D.N.Y. 2020).

Here, Plaintiffs failed to promptly seek rescission after the discovery of Plaintiffs' *unilateral mistake*. Under the unilateral mistake theory, Plaintiffs discovered the mistake in mid-February 2017 at the latest when the University allegedly disclosed the Harris School's contributions for the first time. (*See* Doc. 110 ¶ 80; Doc. 189-2 at 269:13-15 (Thomas Pearson testifying that the Harris School's contributions were disclosed for the first time in mid-February 2017.)) But Plaintiffs did not seek to amend the complaint until October 21, 2019. Plaintiffs have thus waived their right to rescission on the basis of unilateral mistake. *See, e.g.*, *R & A Food Servs., Inc. v. Halmar Equities, Inc.*, 278 A.D.2d 398, 399 (N.Y. App. Div. 2000) (holding that plaintiff who sought rescission "more than one year" after learning of alleged fraud had waived right to rescission).

However, the court has previously found that Plaintiffs timely brought the fraud claim upon learning new information in discovery that demonstrated an *intent to defraud*. (*See* Doc. 109 at 4.) Plaintiffs represented that this information was learned sometime in August 2019, and Plaintiffs sought leave to amend on October 21, 2019. (*See* Doc. 93 at 3.) Because the University has not demonstrated that it is entitled to summary judgment on the fraud claim, and because promptness is ordinarily a question of fact, the court will allow Plaintiffs to pursue the equitable remedy of rescission based upon fraudulent inducement.

**7.   Punitive Damages.**

Finally, the University moves for summary judgment on Plaintiffs' request for punitive damages.  Under New York law, punitive damages arising from a contractual relationship are only recoverable if the plaintiff can show that the harm was "part of a pattern of similar conduct aimed at the public generally." *Rocanova v. Equitable Life Assur. Soc. of U.S.*, 634 N.E.2d 940, 944 (N.Y. 1994) ("[A] private party seeking to recover punitive damages must not only demonstrate egregious tortious conduct by which he or she was aggrieved, but also that such conduct was part of a pattern of similar conduct directed at the public generally.").  The University contends that Plaintiffs cannot show that any of the University's alleged conduct in this dispute was part of a pattern directed at the public generally.  (Doc. 189 at 39.)

In response, Plaintiffs concede that they do not have any evidence of a pattern of similar conduct directed at the public.  But Plaintiffs contend the University should be foreclosed from asserting its position because in July 2019, the University refused to produce any documents responsive to Plaintiffs' request for evidence relating to "any threats of litigation, claims, default assertions, disputes, and/or mediations" arising out of gifts in excess of $10 million.  (Doc. 207 at 36.)  The University's position was that such documents "were not relevant to any issue in dispute." (Doc. 209-3 at 69-70.)

However, as the University points out, Plaintiffs have not moved to compel the production of such documents.  Nor have Plaintiffs sought a continuance by submitting an affidavit showing why they cannot present evidence in opposition to a motion for summary judgment.  *See* Fed. R. Civ. P. 56(d), (f).  Consequently, Plaintiffs cannot claim that they did not have a sufficient opportunity to gather evidence.  Because Plaintiffs have failed to present any evidence by which a reasonable jury could find that the University's conduct was part of a pattern directed at the public generally, the University is entitled to summary judgment on Plaintiffs' request for punitive

damages.  *See Naifeh v. Ideal Homes of Norman, L.P.*, 260 F. App'x 122, 124 (10th Cir. 2008) (affirming summary judgment for the defendant when the plaintiff's "response brief did not allude to the motion to compel or otherwise invoke the protection of Rule 56(f), and she did not file a Rule 56(f) affidavit explaining her need for further evidence"); *see also Pasternak v. Lear Petroleum Exploration, Inc*., 790 F.2d 828, 832-33 (10th Cir. 1986) ("Where a party opposing summary judgment and seeking a continuance pending completion of discovery fails to take advantage of the shelter provided by Rule 56(f) by filing an affidavit, there is no abuse of discretion in granting summary judgment if it is otherwise appropriate.").

## IV.    CONCLUSION

IT IS THEREFORE ORDERED that Plaintiffs' motion for partial summary judgment (Doc. 187) is DENIED.

IT IS FURTHER ORDERED that Count I of the amended complaint, as it pertains to the University's failure to provide an Initial Budget that complied with § 3.1(d), is STRICKEN as exceeding the scope of the leave to amend.

IT IS FURTHER ORDERED that the University's motion for partial summary judgment (Doc. 189) is GRANTED in part and DENIED in part.  The motion is granted with respect to: (1) Plaintiffs' breach of contract claims regarding the quality of the March 2017 Definitive Operating Plan and Budget, the timeliness of the University's faculty appointments, the University's appointment of an Institute Director and Executive Director, and creating and developing a new academic curriculum; (2) Plaintiffs' claim for unilateral mistake; and (3) Plaintiffs' request for punitive damages.  The motion is denied as to the remaining issues.

IT IS FURTHER ORDERED that both parties' motions in limine and *Daubert* motions (Docs. 248, 250, 251, 252, 254, 255, 256, 257) are DENIED without prejudice.

IT IS SO ORDERED.  Dated this 31st day of July, 2023.

_s/John W. Broomes_
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE